# EXHIBIT 1

Samyangfood | COMPANY | SAMYANG FOOD                                          Page 1 of 2

---

Samyang Foods, Inc., full of love and happiness

B  ⌾  🐦  f      [삼양맛선] [ ENG ]

**SamYang**

BRAND          SAMYANG FAMILY          INFORMATION          CONTACT US          COMPANY
                                        CENTER                                   OVERVIEW

---

# Company Overview

We introduce Samyang Foods Company's business activities, which are based on a foundation spirit of honesty and integrity.

---

| H | COMPANY Overview | Samyangfood | |
|---|---|---|---|

## Samyang Food

| Introduction | CEO MESSAGE | VISION & MISSION | CI | HISTORY |
|---|---|---|---|---|

### Making a remarkable history in the domestic food industry with passion and a belief in ramen

Samyang Foods, Inc., established in 1961, has been walking a single path, pursuing honesty and trust for over 50 years. Its pioneering entrepreneurial spirit, with the aim of bringing an era where the average life expectancy becomes 100 years through food, has been the foundation for Samyang Foods to become a trustworthy company to customers.
With the passion and challenge to generate new growth engines, Samyang Foods will make every effort to allow everyone to enjoy a more delicious world.

### Produced Korea's First Ramen in September 1963

The 1960s was a time when most Koreans had to tighten their belts, because the only staples, rice and mixed grains, were scarce. Samyang Foods, Inc.'s efforts to overcome the food shortage led to the birth of Korea's first ramen, Samyang Ramen, in 1963. Ramen has become the second staple food in Korea.

### Improvement in Diet

After the nation was released from hunger through the continuous national economic growth and with brighter prospects for food self-sufficiency in Korea, Samyang Foods, Inc. took a leading role in improving the Korean people's diet.

By boosting the forest land livestock industry by making a pasture of about 60 million ㎡ in the Daegwallyeong plateau area, the company has improved the diet and played a key role in improving national health.

---

Samyangfood | COMPANY | SAMYANG FOOD                                              Page 2 of 2

### Establishment of Dagwallyeong Samyang Ranch and Belief in Good Ingredients

Daegwallyeong Samyang Ranch has played the role of providing a key ingredient source for Samyang Foods, Inc. to produce self-sufficient meat, including beef for making ramen soup base, and raise dairy cattle in clean air and a vast pasture, leading to the smooth supply of milk and dairy products.

### A Comprehensive Food Company

Samyang Foods, Inc. uses natural ingredients with high quality so as to provide food with high quality and differentiated taste along with excellent food with traditional Korean flavors.
Samyang Foods, Inc. has food-related subsidiary companies.
Natural Samyang Inc. stably supplies a variety of agro-fishery products including the ingredients for ramen soup base such as scallions, garlic, sesame, red pepper and seafood. Eco Green Campus Inc. provides fresh beef and milk from a vast ranch at an altitude of 850m to 1,400m around Daegwallyeong in Gangwon-do.

Samyang Foods, Inc. has established a thorough quality management system so that consumers can trust its products by being certified by qualified international offices (KOLAS, ISO22000, HALAL) as well as a domestic one, HACCP.

### Samyang Foods, Inc. leading K-Food

In particular, Hot Chicken stir-fried noodles has become very popular in China, Southeast Asia, etc., becoming the main brand leading K-Food. To make Hot Chicken stir-fried noodles continue to grow as a global brand, the company is reinforcing local promotion and marketing with Samyang Foods, Inc.'s representative character, "Hochi."

※ Main Export Nations

* Noodles/Snacks
- the Americas : United States, Canada, Argentina, Paraguay, and Chile
- Asia : China, Japan, Singapore, Malaysia, Vietnam, Malaysia, and Hong Kong
- Europe : the U.K., Germany, Spain, Sweden, and the Netherlands.
- Oceania : Australia, New Zealand, Samoa, and Micronesia
- Middle East: Saudi Arabia, Bahrain, and United Arab Emirates

* Dairy Products - Asia : China

---



Company    Contact Us    Directions

104, Opaesan-ro 3-gil, Seongbuk-gu, Seoul, Korea | Samyang Foods, Inc.
Copyright © 2016 Samyang Foods. All rights reserved.

B    instagram    twitter    facebook    

Family Site

,

Samyangfood | COMPANY | SAMYANG FOOD                                                    Page 1 of 2



# Company Overview

We introduce Samyang Foods Company's business activities, which are based on a foundation spirit of honesty and integrity.

| H | COMPANY Overview | Samyangfood | |
|---|---|---|---|

## Samyang Food

| Introduction | CEO MESSAGE | VISION & MISSION | CI | HISTORY |
|---|---|---|---|---|

## History

From the 2000's to Today        From the 1980's to the 1990's        From the 1960's to the 1970's

### History Samyangfood

| 1978 | Oct. | Opened Daehwa Hospital, a Medical Corporation |
|---|---|---|
| 1978 | Oct. | The late Honorary President Chun Joong-yoon was awarded the Silver Tower Industrial Medal. |
| 1778 | Jan. | Established Samyang Oil & Feed Corporation Inc. |
| 1976 | Feb. | Samyang Baker Tank Terminal Supplied 7,000 –Ton Capacity Tank |
| 1975 | Oct. | Launched Samyang Australian Cheese |
| 1975 | Sep. | Established Samyang Food Chain Inc. |

| 1970 | Oct. | Started the Construction of Honam Plant Launched Beef Ramen |
|---|---|---|
| 1970 | Sep. | Launched Curry Ramen |
| 1970 | May. | Launched Naengmyeon, (Korean) Cold noodles |
| 1970 | Mar. | Launched jajangmyeon, black-bean-sauce noodles |
| 1970 | Jul. | Established Igeon Education Foundation |
| 1969 | Oct. | Started the construction of a branch in Yeongnam, Gyeongsang-do |

Samyangfood | COMPANY | SAMYANG FOOD                                              Page 2 of 2

| 1973 | Nov. | Started construction of Daegwallyeong Samyang Ranch |
|---|---|---|
| 1973 | Oct. | Started the Production of Soy and Sesame Oil |
| 1973 | Mar. | The late Honorary President Chun Joong-yoon was awarded the Order of Industrial Service Merit on the 17th Tax Day. |
| 1972 | Feb. | Launched Korea's first cup ramen, Samyang Cup Ramen accomplished over $2.5m in ramen exports to Southeast Asia, Europe and America. Established Samyang Livestock Inc. |
| 1971 | Nov. | Founded Samyang Dairy Sesame Oil Extraction Plant in Samyang Dairy Inc. |
| 1971 | Aug. | Launched Korea's First Ramen Snack, Popeye |

| 1969 | Jul. | Started the production of kalguksu, (handmade) chopped noodles |
|---|---|---|
| 1969 | Jul. | The late Honorary President Chun Joong-yoon was awarded the Bronze Tower Industrial Medal |
| 1969 | | Korea's first ramen exports (to Vietnam) |
| 1963 | Sep. | Launched Korea's first ramen brand, Samyang Ramen |
| 1961 | Oct. | Changed company name to Samyang Food Industry Inc. |
| 1961 | Aug. | Established Samyang Oil Inc. |

SAMYANG

Company     Contact Us     Directions

104, Opaesan-ro 3-gil, Seongbuk-gu, Seoul, Korea | Samyang Foods, Inc.
Copyright © 2016 Samyang Foods. All rights reserved.

B  🅸  🆃  f          Family Site

.

Samyangfood | COMPANY | SAMYANG FOOD                                        Page 1 of 2



Samyang Foods, Inc., full of love and happiness

BRAND          SAMYANG FAMILY          INFORMATION CENTER          CONTACT US          COMPANY OVERVIEW

# Company Overview

We introduce Samyang Foods Company's business activities, which are based on a foundation spirit of honesty and integrity.

| H | COMPANY Overview | Samyangfood | |
|---|---|---|---|

## Samyang Food

| Introduction | CEO MESSAGE | VISION & MISSION | CI | HISTORY |
|---|---|---|---|---|

## History

From the 2000's to Today        **From the 1980's to the 1990's**        From the 1960's to the 1970's

### History Samyangfood

| 1998 | Sep. | Authorization of Reconciliation |
|---|---|---|
| 1997 | Aug. | The Korean Supreme Court acquitted Samyang for ramen beef tallow accident. |
| 1997 | Feb. | Moved Company Building from Jongno to Wolgok |
| 1990 | Jun. | Changed Company Name from Samyang Food Industry Inc. to Samyang Foods, Inc. |
| 1990 | May. | Samyang Drinking Type Yogurt and Samyang Spoon Type Yogurt obtained Korea's first KS in fermented milk industry. |

| 1989 | Feb. | Started the Construction of Samyang Foods, Inc. Wonju Plant |
|---|---|---|
| 1987 | Dec. | "Samyang Carnation" Ice Cream Obtained Korea's First KS |
| 1987 | Mar. | "Samyang Brewed Soy Sauce" Obtained Korea's First KS in Soy Sauce Industry |
| 1986 | Sep. | Launched Sattobab, a Corn Snack |
| 1985 | May. | The late honorary president, Chun Joong-yoon, was awarded the Gold Tower Order of Industrial Service Merit. |
| 1982 | May. | |

Samyangfood | COMPANY | SAMYANG FOOD                                                    Page 2 of 2

| 1990 | Mar. | Started Work of Munmak Printing Plant |
|------|------|---------------------------------------|
| 1989 | Dec. | Launched Korea's First Rice Ramen |
| 1989 | Nov. | Outbreak of Samyang Ramen Beef Tallow Accident |
| 1989 | May. | Established Qingdao Samyang Food Limited in Qingdao, Eastern China |

|      |      | Samyang Oil & Feed Corporation and Samyang Gold Cooking Oil Obtained KS |
|------|------|---------------------------------------|
| 1981 | Jan. | Launched Korea's First Spoon Type Yogurt, "Yoghurt" |
| 1980 | Dec. | Started the Construction of Samyang Dairy Processing Plant Expanded into Dairy Processing Business |
| 1980 | Jul. | Established Company Incorporated abroad, Samyang USA |

SAMYANG

Company    Contact Us    Directions

104, Opaesan-ro 3-gil, Seongbuk-gu, Seoul, Korea | Samyang Foods, Inc.
Copyright © 2016 Samyang Foods. All rights reserved.

b    ⊙    ✗    f         Family Site

,



Samyang Foods, Inc., full of love and happiness

BRAND          SAMYANG FAMILY          INFORMATION CENTER          CONTACT US          COMPANY OVERVIEW

# Company Overview

We introduce Samyang Foods Company's business activities, which are based on a foundation spirit of honesty and integrity.

| H | COMPANY Overview | Samyangfood | |
|---|---|---|---|

## Samyang Food

| Introduction | CEO MESSAGE | VISION & MISSION | CI | HISTORY |
|---|---|---|---|---|

## History

From the 2000's to Today          From the 1980's to the 1990's          From the 1960's to the 1970's

History Samyangfood

| 2017 | Sep. | Signing an MOU of triangular strategic partnership with Jiangsu Seif Green Food Developmentand JD group, China. |
| | Sep. | Obtaining Halal certificate from MUI for the first time in Korea instant noodle industry (6 Products) Hot Chicken Flavor Ramen, Hot Chicken Flavor Ramen Big Bowl, Hot Chicken Flavor Ramen Cup, Hot Chicken Flavor Ramen Cheese Flavor, Hot Chicken Flavor Ramen Cheese Flavor Big Bowl, Hot Chicken Flavor Ramen Ice |
| 2016 | Sep. | 55th Anniversary of Samyang Foods, Inc. Founding |
| 2015 | Sep. | Took over Natural Samyang Inc. and Saeahchim, a Company Specialized in Frozen Food |
| 2014 | Mar. | Obtained & Received HALAL (Korea Muslim Federation) |

| 2012 | Apr. | Launched Hot Chicken Flavor Ramen |
| 2012 | Mar. | Samyang Ranch Certified as Organic Livestock |
| 2011 | Nov. | Samyang Ranch Certified as Organic Pasture |
| 2011 | Sep. | 50th Anniversary of Samyang Foods, Inc. Founding |
| 2011 | Aug. | Took over Jeju Milk Inc. |
| 2011 | Apr. | Established Samyang THS Inc. (Standard Business as a Subsidiary for the Handicapped) |

Samyangfood | COMPANY | SAMYANG FOOD                                      Page 2 of 2

|      |      | Certification and HALAL Certification Items (Seven kinds) Samyang Ramen, Kimchi Ramen, Yukgaejang, Sutah Ramen, Hot Chicken Stir-Fried Ramen, Big Cup Hot Chicken Stir-Fried Ramen, Cup Hot Chicken Stir-Fried Ramen |
|------|------|------|
| 2014 | Jan. | Daegwallyeong Samyang Ranch Designated as 2018 Pyeongchang Winter Olympics Special Tourist Zone |
| 2013 | Sep. | Launched Korea's First Baked Instant Noodles |

| | | |
|------|------|------|
| 2010 | Aug. | Took over Homyeondang Restaurant Company |
| 2010 | May. | The late Honorary President Chun Joong-yoon was awarded the Order of Civil Merit, Camellia Medal. |
| 2010 | Mar. | The late Chun Joong-yoon was selected as honorary president and Chun In-jang took office. |
| 2009 | Oct. | Gangwon-do Wonju Factory Certified by HACCP |
| 2008 | Feb. | Food Research Institute Certified by International Testing Institute KOLAS |
| 2005 | Mar. | Completion of Reconciliation |
| 2001 | Jul. | Completed the Construction of Daegwallyeong Organic Fertilizer Plant<br>Produced Daegwallyeong Organic Fertilizer |
| 2000 | Nov. | The late honorary president Chun Joong-yoon was awarded Walnamjang. |



Company    Contact Us    Directions

104, Opaesan-ro 3-gil, Seongbuk-gu, Seoul, Korea | Samyang Foods, Inc.
Copyright © 2016 Samyang Foods. All rights reserved.

 

Family Site

.

# EXHIBIT 2

ARTICLES OF INCORPORATION

SAM YANG (U.S.A.), INC.

A California Corporation



FILED
In the office of the Secretary of State
of the State of California

JUL 1 1980

_____ FEB BY, Secretary of State

By B⋅ll H⋅⋅⋅

Deputy

I.   The Name of this corporation is:

SAM YANG (U.S.A.), INC.

II.  The purpose of this corporation is to engage in any lawful
     act of activities for which a corporation may be organized
     under the General Law of California, other than the banking
     business, trust company business or the practice of a pro-
     fession permitted to be incorporated by the California
     Corporation Code.

III. The name of the corporation's initial agent for service of
     process is:

Dong Sup Huh

who may be served at:

1600 West Walnut Parkway
Compton, California 90220

IV.  The corporation is authorized to issue only one class of
     shares and the total number of shares which the corporation
     is authorized to issue is ONE THOUSAND (1,000) SHARES.


     IN WITNESS WHEREOF, the undersigned incorporator executed these
Articles of Incorporation on June_23_, 1980, Compton, California.


DONG SUP HUH


     The undersigned declares that he is the Incorporator who has
executed the above Articles of Incorporation and hereby declares that
this instrument is the act and deed of the undersigned.


DONG SUP HUH

SAMYANG0003303

# EXHIBIT 3

SUH LAW GROUP, APC
Michael K. Suh (SBN 213855)
E-mail: Micahel@suhlawgroup.com
Edward W. Suh (SBN 265356)
E-mail: Edward@suhlawgroup.com
3810 Wilshire Blvd., Suite 1212
Los Angeles, California  90010
Telephone:  (213) 385-7347
Facsimile:  (213) 383-3323

SEYFARTH SHAW LLP
Eric R. McDonough (SBN 193956)
E-mail: emcdonough@seyfarth.com
Aaron Belzer (SBN 238901)
E-mail: abelzer@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California  90067-3021
Telephone:  (310) 277-7200
Facsimile:  (310) 201-5219

Attorneys for Plaintiffs and Counter-Defendants
SAM YANG (U.S.A.), INC.; ROYPAC, INC. dba
S.C. CONTINENT CORPORATION; and MUN-KYUNG CHUN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM YANG (U.S.A), INC.; ROYPAC, INC. dba S.C. CONTINENT CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> SAMYANG FOODS CO., LTD.; and Does 1 through 20, inclusive, <br><br> Defendants. <br><br> AND RELATED COUNTER-CLAIMS | Case No. CV11-04592 RSWL <br><br> **PLAINTIFF AND COUNTER-DEFENDANT SAM YANG (U.S.A), INC.'S OBJECTIONS TO PLAINTIFF SAMYANG FOOD CO., LTD'S NOTICE OF DEPOSITION UNDER FED. R. CIV. P. 30(B)(6)** |

Plaintiff and Cross-Defendant Sam Yang (U.S.A.), Inc. ("SYUSA") hereby objects to the Amended Notice of Deposition of Plaintiff Sam Yang (U.S.A.), Inc. Pursuant to Federal Rule of Civil Procedure 30(b)(6) (the "Notice"), served by Defendant and Cross-Claimant Samyang Food Co., Ltd. ("Samyang Korea"), on November 30, 2016, and to each of the proposed subject matters of examination ("Deposition Topics"), as follows:

## GENERAL OBJECTIONS

1.     SYUSA objects to the Notice generally on the ground and to the extent that it fails to comply with Rule 30(b)(3) of Federal Rule of Civil Procedure.

2.     SYUSA objects to the Notice generally on the ground and to the extent that it seeks to impose upon SYUSA discovery obligations beyond those contained in the Federal Rules of Civil Procedure or the Local Rules of this Court.

3.     SYUSA objects to the Notice generally, and to the description of each of the matters described therein, on the ground and to the extent that Samyang Korea fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).

4.     SYUSA objects to the Notice generally, and to the Deposition Topics described therein, on the ground and to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor reasonably calculated to lead to the discovery of admissible evidence.

5.     SYUSA objects to the Notice generally, and to the Deposition Topics described therein, on the ground and to the extent that they seek information, documents, or things protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege.

6.     SYUSA objects to the Notice generally, and to the Deposition Topics described therein, on the ground and to the extent that they seek confidential or proprietary information.

7.      SYUSA objects to the Notice generally, and to the Deposition Topics described therein, on the ground and to the extent that they seek information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, any confidentiality rights possessed by third parties.

8.      SYUSA objects to each definition applicable to the Deposition Topics to the extent that it purports to define a word in a way that is inconsistent with its generally understood meaning.  SYUSA further objects to each definition applicable to the Definition Topics to the extent that it can be construed to impose obligations upon SYUSA that are greater than those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or any other applicable statute, rule or case law governing the discovery or disclosure of information.

9.      SYUSA generally objects to each Deposition Topic in which the terms "YOU," "YOUR," or "SYUSA" appear on the ground that Samyang Korea's definition of this term is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing, to the extent that it purports to include "any and all of [SYUSA'S] employees, agents, representatives, assignees, delegees, and/or any other person acting on its behalf or for its benefit."

10.     DDS generally objects to each Deposition Topic in which the term(s) "RELATE TO," "RELATING TO," "RELATED TO," and "CONCERNING" appear.  These terms, as defined by Samyang Korea, are overly broad, vague and ambiguous, and designating and producing an officer, director and/or managing agent to testify as to a Deposition Topic in which these terms appear would require SYUSA and its attorneys either to guess or engage in unreasonably difficult, complex, and time consuming logical thought processes to identify relevant or responsive information, as well as potentially to disclose the conclusions, opinions or thought processes of counsel in violation of the attorney work product doctrine.

11.     SYUSA generally objects to each Deposition Topic in which the terms "COMMUNICATION," or "DOCUMENT" appear on the grounds, and to the extent, that these terms—as defined by Samyang Korea—are broader than and deviate from their commonly understood definitions.  SYUSA further generally objects to each Deposition Topic in which the terms "COMMUNICATION," or "DOCUMENT" appear on the grounds and to the extent that their inclusion in any Deposition Topic would render such Deposition Topic overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects generally objects to each Deposition Topic in which these terms appear to the extent that they can be construed to impose obligations upon SYUSA that are greater than those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court, or any other applicable statute, rule or case law governing the discovery or disclosure of information.  SYUSA further objects generally to each Deposition Topic in which the terms "DOCUMENT," or "COMMUNICATION" appear to the extent they purport to seek information not reasonably available to SYUSA.

SYUSA's general and specific objections are based upon information currently available to it.  SYUSA's investigation and discovery in this action are ongoing, and SYUSA reserves the right to supplement its objections in the event that additional information is obtained through such investigation or discovery.  Nothing contained in these objections is intended to be or should be construed as an admission by SYUSA of the relevance or admissibility at trial or on any motion of any information contained in these objections.  By making these objections, SYUSA does not waive its right to assert additional objections at the time of deposition.

## OBJECTIONS TO DEPOSITION TOPICS

SYUSA incorporates by reference each General Objection set forth above into each specific response set forth below.  The assertion of same, similar, or

-4-

1   additional objections to the individual requests does not waive any of SYUSA's

2   General Objections.

3   **Deposition Topic No. 1:**

4        The business operations of SCCC from 1997 to the present.

5   **Objection to Topic No. 1:**

6        SYUSA objects to this Deposition Topic on the ground that it fails to

7   describe with reasonable particularity the matters for examination, as required by

8   Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

9   Deposition Topic to the extent that it seeks information that is neither relevant to

10  the subject matter involved in this litigation, nor proportional to the needs of this

11  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

12  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

13  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

14  grounds and to the extent that it information that is not within the possession,

15  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

16  the grounds and to the extent that it seeks confidential or proprietary business data

17  or information.  SYUSA further objects to this Deposition Topic on the grounds

18  that it is vague, ambiguous and uncertain in its use of the term "business

19  operations."  SYUSA objects to this Deposition Topic to the extent that it requests

20  information that is protected or prohibited from disclosure under Federal,

21  California or other applicable law, including but not limited to, confidentiality

22  rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

23  extent that it seeks information protected by the attorney-client privilege, the work

24  product doctrine or any other privilege.

25        Subject to and without waiving the foregoing objections, SYUSA designates

26  See Young Lee to testify on its behalf as to this Deposition Matter.

27

28

-5-

Objections to Notice of Taking Deposition
Case No. CV11-04592 RSWL (AGRx)

**Deposition Topic No. 2:**

The business operations of SYUSA from 1997 to the present.

**Objection to Topic No. 2:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the term "business operations." SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 3:**

The details and circumstances of YOUR performance under the DISTRIBUTION AGREEMENT from 1997 to August 1, 2016.

**Objection to Topic No. 3:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6). SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case. SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing. SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information. SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the phrase "details and circumstances," and the term "performance." SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties. SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 4:**

Facts and circumstances RELATING TO negotiations to terminate the DISTRIBUTION AGREEMENT in 2012 and 2013, including any and all DOCUMENTS and COMMUNICATIONS RELATING TO such termination.

**Objection to Topic No. 4:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by

-7-

1    Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

2    Deposition Topic to the extent that it seeks information that is neither relevant to

3    the subject matter involved in this litigation, nor proportional to the needs of this

4    case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

5    burdensome and oppressive, overly broad, not reasonably limited by time or scope,

6    annoying or harassing.  SYUSA further objects to this Deposition Topic on the

7    grounds and to the extent that it information that is not within the possession,

8    custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

9    the grounds and to the extent that it seeks confidential or proprietary business data

10   or information.  SYUSA further objects to this Deposition Topic on the grounds

11   that it is vague, ambiguous and uncertain in its use of the phrase "facts and

12   circumstances."  SYUSA objects to this Deposition Topic to the extent that it

13   requests information that is protected or prohibited from disclosure under Federal,

14   California or other applicable law, including but not limited to, confidentiality

15   rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

16   extent that it seeks information protected by the attorney-client privilege, the work

17   product doctrine or any other privilege.

18        Subject to and without waiving the foregoing objections, SYUSA designates

19   See Young Lee to testify on its behalf as to this Deposition Matter.

20   **Deposition Topic No. 5:**

21        Facts and circumstances RELATING TO the August 1, 2016 termination of

22   the DISTRIBUTION AGREEMENT, including any and all DOCUMENTS and

23   COMMUNICATIONS RELATING TO such termination.

24   **Objection to Topic No. 5:**

25        SYUSA objects to this Deposition Topic on the ground that it fails to

26   describe with reasonable particularity the matters for examination, as required by

27   Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

28

-8-

1   Deposition Topic to the extent that it seeks information that is neither relevant to

2   the subject matter involved in this litigation, nor proportional to the needs of this

3   case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

4   burdensome and oppressive, overly broad, not reasonably limited by time or scope,

5   annoying or harassing.  SYUSA further objects to this Deposition Topic on the

6   grounds and to the extent that it information that is not within the possession,

7   custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

8   the grounds and to the extent that it seeks confidential or proprietary business data

9   or information.  SYUSA further objects to this Deposition Topic on the grounds

10  that it is vague, ambiguous and uncertain in its use of the term "facts and

11  circumstances," and "termination."  SYUSA further objects to this Deposition

12  Topic to the extent it assumes facts not supported by any evidence; to the extent

13  SYUSA designates any officer, director or managing agent to testify on this

14  Deposition Topic, SYUSA does not admit the facts assumed and/or the existence

15  of facts supporting the assumption.  SYUSA objects to this Deposition Topic to the

16  extent that it requests information that is protected or prohibited from disclosure

17  under Federal, California or other applicable law, including but not limited to,

18  confidentiality rights possessed by third parties.  SYUSA objects to this Deposition

19  Topic to the extent that it seeks information protected by the attorney-client

20  privilege, the work product doctrine or any other privilege.

21          Subject to and without waiving the foregoing objections, SYUSA designates

22  Mun-Kyung Chung to testify on its behalf as to this Deposition Matter.  However,

23  Ms. Chung is unavailable for deposition on the noticed date.  SYUSA will make

24  her available at a date mutually convenient to the parties and their counsel.

25  **Deposition Topic No. 6:**

26          Facts and circumstances RELATING TO the execution of the

27  DISTRIBUTION AGREEMENT on November 29, 1997.

28

-9-

**Objection to Topic No. 6:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the phrase "facts and circumstances," and the term "execution."  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates Mun-Kyung Chung to testify on its behalf as to this Deposition Matter.  However, Ms. Chung is unavailable for deposition on the noticed date.  SYUSA will make her available at a date mutually convenient to the parties and their counsel.

**Deposition Topic No. 7:**

All facts supporting YOUR contentions in the FAC.

**Objection to Topic No. 7:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this

-10-

case.  SYUSA objects to this Deposition Topic on the grounds that its request for "all facts supporting" the FAC renders this Deposition Topic overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information. SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the term "contentions."  SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties. SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

**Deposition Topic No. 8:**

YOUR incorporation and corporate structure, including YOUR corporate relationship to ROYPAC and SCCC.

**Objection to Topic No. 8:**

SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the terms "corporate structure" and "corporate relationship."  SYUSA

1   objects to this Deposition Topic to the extent that it seeks information protected by

2   the attorney-client privilege, the work product doctrine or any other privilege.

3          Subject to and without waiving the foregoing objections, SYUSA designates

4   See Young Lee to testify on its behalf as to this Deposition Matter.

5   **Deposition Topic No. 9:**

6          The title and responsibilities of each of YOUR current and former

7   employees, contractors, agents, and representatives.

8   **Objection to Topic No. 9:**

9          SYUSA objects to this Deposition Topic on the ground that it fails to

10  describe with reasonable particularity the matters for examination, as required by

11  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

12  Deposition Topic to the extent that it seeks information that is neither relevant to

13  the subject matter involved in this litigation, nor proportional to the needs of this

14  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

15  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

16  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

17  grounds and to the extent that it seeks confidential or proprietary business data or

18  information.  SYUSA further objects to this Deposition Topic on the grounds that

19  it is vague, ambiguous and uncertain in its use of the term "responsibilities."

20  SYUSA objects to this Deposition Topic to the extent that it requests information

21  that is protected or prohibited from disclosure under Federal, California or other

22  applicable law, including but not limited to, confidentiality rights possessed by

23  third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks

24  information protected by the attorney-client privilege, the work product doctrine or

25  any other privilege.

26

27

28

Objections to Notice of Taking Deposition
Case No. CV11-04592 RSWL (AGRx)

**Deposition Topic No. 10:**

YOUR assignment to SCCC and/or ROYPAC of any of YOUR rights or obligations under the DISTRIBUTION AGREEMENT.

**Objection to Topic No. 10:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent it assumes facts not supported by any evidence; to the extent SYUSA designates any officer, director or managing agent to testify on this Deposition Topic, SYUSA does not admit the facts assumed and/or the existence of facts supporting the assumption.  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the term "assignment," and "rights and obligations."  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 11:**

YOUR financial performance since YOUR inception.

**Objection to Topic No. 11:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by

-13-

1   Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

2   Deposition Topic to the extent that it seeks information that is neither relevant to

3   the subject matter involved in this litigation, nor proportional to the needs of this

4   case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

5   burdensome and oppressive, overly broad, not reasonably limited by time or scope,

6   annoying or harassing.  SYUSA further objects to this Deposition Topic on the

7   grounds and to the extent that it seeks confidential or proprietary business data or

8   information.  SYUSA further objects to this Deposition Topic on the grounds that

9   it is vague, ambiguous and uncertain in its use of the term "financial performance."

10  SYUSA further objects to this Deposition Topic to the extent that it requests

11  information that is protected or prohibited from disclosure under Federal,

12  California or other applicable law, including but not limited to, confidentiality

13  rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

14  extent that it seeks information protected by the attorney-client privilege, the work

15  product doctrine or any other privilege.

16          Subject to and without waiving the foregoing objections, SYUSA designates

17  See Young Lee to testify on its behalf as to this Deposition Matter.

18  **Deposition Topic No. 12:**

19          YOUR financial statements from 1997 to the present.

20  **Objection to Topic No. 12:**

21          SYUSA objects to this Deposition Topic on the ground that it fails to

22  describe with reasonable particularity the matters for examination, as required by

23  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

24  Deposition Topic to the extent that it seeks information that is neither relevant to

25  the subject matter involved in this litigation, nor proportional to the needs of this

26  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

27  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

28

-14-

annoying or harassing.  SYUSA further objects to this Deposition Topic on the

grounds and to the extent that it information that is not within the possession,

custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

the grounds and to the extent that it seeks confidential or proprietary business data

or information.  SYUSA further objects to this Deposition Topic on the grounds

that it is vague, ambiguous and uncertain in its use of the term "financial

statements."  SYUSA further objects to this Deposition Topic to the extent that it

appears to be a request for documents.  SYUSA further objects to this Deposition

Topic to the extent that it requests information that is protected or prohibited from

disclosure under Federal, California or other applicable law, including but not

limited to, confidentiality rights possessed by third parties.  SYUSA objects to this

Deposition Topic to the extent that it seeks information protected by the attorney-

client privilege, the work product doctrine or any other privilege.

        Subject to and without waiving the foregoing objections, SYUSA designates

See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 13:**

        YOUR advertising and marketing efforts from 1996 to the present.

**Objection to Topic No. 13:**

        SYUSA objects to this Deposition Topic on the ground that it fails to

describe with reasonable particularity the matters for examination, as required by

Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

Deposition Topic to the extent that it seeks information that is neither relevant to

the subject matter involved in this litigation, nor proportional to the needs of this

case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

burdensome and oppressive, overly broad, not reasonably limited by time or scope,

annoying or harassing.  SYUSA further objects to this Deposition Topic on the

grounds and to the extent that it information that is not within the possession,

-15-

1  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on
2  the grounds and to the extent that it seeks confidential or proprietary business data
3  or information.  SYUSA further objects to this Deposition Topic on the grounds
4  that it is vague, ambiguous and uncertain in its use of the term "advertising and
5  marketing efforts."  SYUSA further objects to this Deposition Topic to the extent
6  that it requests information that is protected or prohibited from disclosure under
7  Federal, California or other applicable law, including but not limited to,
8  confidentiality rights possessed by third parties.  SYUSA objects to this Deposition
9  Topic to the extent that it seeks information protected by the attorney-client
10  privilege, the work product doctrine or any other privilege.

11        Subject to and without waiving the foregoing objections, SYUSA designates
12  See Young Lee to testify on its behalf as to this Deposition Matter.

13  **Deposition Topic No. 14:**

14        The dollar amount of YOUR purchase and sales of Samyang food products
15  from 1997 to present.

16  **Objection to Topic No. 14:**

17        SYUSA further objects to this Deposition Topic to the extent that it seeks
18  information that is neither relevant to the subject matter involved in this litigation,
19  nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic
20  on the grounds that it is overly burdensome and oppressive, overly broad, not
21  reasonably limited by time or scope, annoying or harassing.  SYUSA further
22  objects to this Deposition Topic on the grounds and to the extent that it information
23  that is not within the possession, custody or control of SYUSA.  SYUSA further
24  objects to this Deposition Topic on the grounds and to the extent that it seeks
25  confidential or proprietary business data or information.  SYUSA further objects to
26  this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in
27  its use of the phrase "dollar amounts of YOUR purchase and sales."  SYUSA

28

-16-

1 objects to this Deposition Topic to the extent that it requests information that is
2 protected or prohibited from disclosure under Federal, California or other
3 applicable law, including but not limited to, confidentiality rights possessed by
4 third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks
5 information protected by the attorney-client privilege, the work product doctrine or
6 any other privilege.

7 **Deposition Topic No. 15:**

8     YOUR efforts to sell, distribute, market, and promote Samyang's food
9 products and brand in Canada from 1997 to August 1, 2016, including any and all
10 distribution channels that YOU identified and developed in that region.

11 **Objection to Topic No. 15:**

12     SYUSA objects to this Deposition Topic on the ground that it fails to
13 describe with reasonable particularity the matters for examination, as required by
14 Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this
15 Deposition Topic to the extent that it seeks information that is neither relevant to
16 the subject matter involved in this litigation, nor proportional to the needs of this
17 case.  SYUSA objects to this Deposition Topic on the grounds that it is overly
18 burdensome and oppressive, overly broad, not reasonably limited by time or scope,
19 annoying or harassing.  SYUSA further objects to this Deposition Topic on the
20 grounds and to the extent that it information that is not within the possession,
21 custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on
22 the grounds and to the extent that it seeks confidential or proprietary business data
23 or information.  SYUSA further objects to this Deposition Topic on the grounds
24 that it is vague, ambiguous and uncertain in its use of the phrase "efforts to sell,
25 distribute, market and promote," and the terms "distribution channels,"
26 "identified," and "developed."  SYUSA objects to this Deposition Topic to the
27 extent that it requests information that is protected or prohibited from disclosure

28

1    under Federal, California or other applicable law, including but not limited to,

2    confidentiality rights possessed by third parties.  SYUSA objects to this Deposition

3    Topic to the extent that it seeks information protected by the attorney-client

4    privilege, the work product doctrine or any other privilege.

5          Subject to and without waiving the foregoing objections, SYUSA designates

6    See Young Lee to testify on its behalf as to this Deposition Matter.

7    **Deposition Topic No. 16:**

8          YOUR efforts to sell, distribute, market, and promote Samyang's food

9    products and brand in Mexico from 1997 to August 1, 2016, including any and all

10   distribution channels that YOU identified and developed in that region.

11   **Objection to Topic No. 16:**

12         SYUSA objects to this Deposition Topic on the ground that it fails to

13   describe with reasonable particularity the matters for examination, as required by

14   Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

15   Deposition Topic to the extent that it seeks information that is neither relevant to

16   the subject matter involved in this litigation, nor proportional to the needs of this

17   case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

18   burdensome and oppressive, overly broad, not reasonably limited by time or scope,

19   annoying or harassing.  SYUSA further objects to this Deposition Topic on the

20   grounds and to the extent that it information that is not within the possession,

21   custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

22   the grounds and to the extent that it seeks confidential or proprietary business data

23   or information.  SYUSA further objects to this Deposition Topic on the grounds

24   that it is vague, ambiguous and uncertain in its use of the phrase "efforts to sell,

25   distribute, market and promote," and the terms "distribution channels,"

26   "identified," and "developed."  SYUSA objects to this Deposition Topic to the

27   extent that it requests information that is protected or prohibited from disclosure

28

-18-

1   under Federal, California or other applicable law, including but not limited to,

2   confidentiality rights possessed by third parties.  SYUSA objects to this Deposition

3   Topic to the extent that it seeks information protected by the attorney-client

4   privilege, the work product doctrine or any other privilege.

5       Subject to and without waiving the foregoing objections, SYUSA designates

6   See Young Lee to testify on its behalf as to this Deposition Matter.

7   **Deposition Topic No. 17:**

8       YOUR efforts to sell, distribute, market, and promote Samyang's food

9   products and brand in the West Coast region of the United States, from 1997 to

10  August 1, 2016, including any and all distribution channels that YOU identified

11  and developed in that region.

12  **Objection to Topic No. 17:**

13      SYUSA objects to this Deposition Topic on the ground that it fails to

14  describe with reasonable particularity the matters for examination, as required by

15  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

16  Deposition Topic to the extent that it seeks information that is neither relevant to

17  the subject matter involved in this litigation, nor proportional to the needs of this

18  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

19  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

20  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

21  grounds and to the extent that it information that is not within the possession,

22  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

23  the grounds and to the extent that it seeks confidential or proprietary business data

24  or information.  SYUSA further objects to this Deposition Topic on the grounds

25  that it is vague, ambiguous and uncertain in its use of the phrase "efforts to sell,

26  distribute, market and promote," and the terms "West Coast region," "distribution

27  channels," "identified," and "developed."  SYUSA objects to this Deposition Topic

28

-19-

1   to the extent that it requests information that is protected or prohibited from

2   disclosure under Federal, California or other applicable law, including but not

3   limited to, confidentiality rights possessed by third parties.  SYUSA objects to this

4   Deposition Topic to the extent that it seeks information protected by the attorney-

5   client privilege, the work product doctrine or any other privilege.

6          Subject to and without waiving the foregoing objections, SYUSA designates

7   See Young Lee to testify on its behalf as to this Deposition Matter.

8   **Deposition Topic No. 18:**

9          YOUR efforts to sell, distribute, market, and promote Samyang's food

10  products and brand in the East Coast region of the United States from 1997 to

11  August 1, 2016, including any and all distribution channels that YOU identified

12  and developed in that region.

13  **Objection to Topic No. 18:**

14         SYUSA objects to this Deposition Topic on the ground that it fails to

15  describe with reasonable particularity the matters for examination, as required by

16  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

17  Deposition Topic to the extent that it seeks information that is neither relevant to

18  the subject matter involved in this litigation, nor proportional to the needs of this

19  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

20  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

21  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

22  grounds and to the extent that it information that is not within the possession,

23  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

24  the grounds and to the extent that it seeks confidential or proprietary business data

25  or information.  SYUSA further objects to this Deposition Topic on the grounds

26  that it is vague, ambiguous and uncertain in its use of the phrase "efforts to sell,

27  distribute, market and promote," and the terms "East Coast region," "distribution

28

-20-

channels," "identified," and "developed."  SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 19:**

Any and all trademarks or copyrights YOU have registered or attempted to register in the United States, Canada, or Mexico RELATING TO Samyang or Samyang's food products.

**Objection to Topic No. 19:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  Samyang further objects to this Deposition Topic to the extent that it seeks information equally available to Samyang Korea or information readily available from public records.   SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the phrase "RELATING TO Samyang or Samyang's food products." SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Objections to Notice of Taking Deposition
Case No. CV11-04592 RSWL (AGRx)

1       Subject to and without waiving the foregoing objections, SYUSA designates

2  See Young Lee to testify on its behalf as to this Deposition Matter.

3  **Deposition Topic No. 20:**

4       Any analysis or study of the ramen market in North America (or any part

5  thereof) that YOU conducted from 1997 to the present.

6  **Objection to Topic No. 20:**

7       SYUSA objects to this Deposition Topic on the ground that it fails to

8  describe with reasonable particularity the matters for examination, as required by

9  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

10 Deposition Topic to the extent that it seeks information that is neither relevant to

11 the subject matter involved in this litigation, nor proportional to the needs of this

12 case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

13 burdensome and oppressive, overly broad, not reasonably limited by time or scope,

14 annoying or harassing.  SYUSA further objects to this Deposition Topic on the

15 grounds and to the extent that it information that is not within the possession,

16 custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

17 the grounds and to the extent that it seeks confidential or proprietary business data

18 or information.  SYUSA further objects to this Deposition Topic on the grounds

19 that it is vague, ambiguous and uncertain in its use of the terms "analysis," "study,"

20 "ramen market," and "conducted."  SYUSA objects to this Deposition Topic to the

21 extent that it requests information that is protected or prohibited from disclosure

22 under Federal, California or other applicable law, including but not limited to,

23 confidentiality rights possessed by third parties.  SYUSA objects to this Deposition

24 Topic to the extent that it seeks information protected by the attorney-client

25 privilege, the work product doctrine or any other privilege.

26      Subject to and without waiving the foregoing objections, SYUSA designates

27 See Young Lee to testify on its behalf as to this Deposition Matter.

28

Objections to Notice of Taking Deposition
Case No. CV11-04592 RSWL (AGRx)

**Deposition Topic No. 21:**

Any analysis or study of YOUR competitors in North America (or any part thereof) that YOU conducted from 1997 to the present.

**Objection to Topic No. 21:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the terms "analysis," "study," "competitors," and "conducted." SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 22:**

Identities of all individuals or entities to which YOU sold ramen from 1997 to the present.

**Objection to Topic No. 22:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the term "identities."  SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

**Deposition Topic No. 23:**

Any COMMUNICATIONS between YOU and Samyang (or any of its predecessors or affiliates) from 1997 to the present.

**Objection to Topic No. 23:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe
with reasonable particularity the matters for examination, as required by Federal
Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic
to the extent that it seeks information that is neither relevant to the subject matter
involved in this litigation, nor proportional to the needs of this case.  SYUSA objects
to this Deposition Topic on the grounds that it is overly burdensome and oppressive,
overly broad, not reasonably limited by time or scope, annoying or harassing,
including in its use of the overly-broad defined term "COMMUNICATIONS," and
its failure to identify the relevant content or information of such
"COMMUNICATIONS."  SYUSA further objects to this Deposition Topic on the
grounds and to the extent that it information that is not within the possession,
custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on
the grounds and to the extent that it seeks confidential or proprietary business data or
information.  SYUSA further objects to this Deposition Topic on the grounds that it
is vague, ambiguous and uncertain in its use of the terms "predecessors," and
"affiliates."  SYUSA objects to this Deposition Topic to the extent that it requests
information that is protected or prohibited from disclosure under Federal, California
or other applicable law, including but not limited to, confidentiality rights possessed
by third parties.  SYUSA objects to this Deposition Topic to the extent that it seeks
information protected by the attorney-client privilege, the work product doctrine or
any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates
See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 24:**

Any business plans YOU prepared from 1997 to the present.

-25-

**Objection to Topic No. 24:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on the grounds and to the extent that it seeks confidential or proprietary business data or information.  SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the term "business plans." SYUSA objects to this Deposition Topic to the extent that it requests information that is protected or prohibited from disclosure under Federal, California or other applicable law, including but not limited to, confidentiality rights possessed by third parties.  SYUSA further objects to this Deposition Topic on the ground that it appears to be a request for documents.  SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 25:**

The assertions made in YOUR September 12, 2016 letter to Grand Supercenter and any other similar COMMUNICATIONS YOU sent to distributors

1  or retailers RELATING TO the DISTRIBUTION AGREEMENT and/or YOUR

2  alleged rights thereunder.

3  **Objection to Topic No. 25:**

4      SYUSA objects to this Deposition Topic on the ground that it fails to

5  describe with reasonable particularity the matters for examination, as required by

6  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

7  Deposition Topic to the extent that it seeks information that is neither relevant to

8  the subject matter involved in this litigation, nor proportional to the needs of this

9  case.  SYUSA further objects to this Deposition Topic on the grounds and to the

10  extent that it seeks confidential or proprietary business data or information.

11  SYUSA further objects to this Deposition Topic on the grounds that it is vague,

12  ambiguous and uncertain in its use of the pharses "assertions made," and "other

13  similar COMMUNICATIONS."   SYUSA objects to this Deposition Topic to the

14  extent that it requests information that is protected or prohibited from disclosure

15  under Federal, California or other applicable law, including but not limited to,

16  confidentiality rights possessed by third parties.  SYUSA objects to this Deposition

17  Topic to the extent that it seeks information protected by the attorney-client

18  privilege, the work product doctrine or any other privilege.

19      Subject to and without waiving the foregoing objections, SYUSA designates

20  See Young Lee to testify on its behalf as to this Deposition Matter.

21  **Deposition Topic No. 26:**

22      The assertions made in YOUR July 12, 2012 letter to Samyang, and any

23  other similar COMMUNICATIONS YOU sent to Samyang or its affiliates,

24  RELATING TO the alleged importation of Samyang's products in North America

25  through companies other than SYUSA.

26

27

28

-27-

**Objection to Topic No. 26:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA objects to this Deposition Topic on the grounds that it is overly burdensome and oppressive, overly broad, not reasonably limited by time or scope, annoying or harassing. SYUSA further objects to this Deposition Topic on the grounds and to the extent that it information that is not within the possession, custody or control of SYUSA. SYUSA further objects to this Deposition Topic on the grounds that it is vague, ambiguous and uncertain in its use of the phrase "assertions made," "other similar COMMUNICATIONS," and "affiliates."   SYUSA objects to this Deposition Topic to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine or any other privilege.

Subject to and without waiving the foregoing objections, SYUSA designates See Young Lee to testify on its behalf as to this Deposition Matter.

**Deposition Topic No. 27:**

Any and all damages or injury YOU contend YOU have suffered as a result of Samyang's alleged breach of the DISTRIBUTION AGREEMENT.

**Objection to Topic No. 27:**

SYUSA objects to this Deposition Topic on the ground that it fails to describe with reasonable particularity the matters for examination, as required by Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this Deposition Topic to the extent that it seeks information that is neither relevant to the subject matter involved in this litigation, nor proportional to the needs of this case.  SYUSA further objects to this Deposition Topic on the grounds that it its

-28-

1    properly the subject of expert testimony.  SYUSA object to this Deposition Topic

2    to the extent that it calls for speculation and/or a legal opinion and conclusion.

3    SYUSA objects to this Deposition Topic to the extent that it seeks information

4    protected by the attorney-client privilege, the work product doctrine or any other

5    privilege.  SYUSA object to this Deposition Topic on the grounds that it is overly

6    burdensome and oppressive, overly broad, not reasonably limited by time or scope,

7    annoying or harassing.

8         Subject to and without waiving the foregoing objections, SYUSA designates

9    See Young Lee to testify on its behalf as to this Deposition Matter.

10    **Deposition Topic No. 28:**

11         Any and all damages or injury YOU contend YOU have suffered as a result

12    of Samyang's termination of the DISTRIBUTION AGREEMENT.

13    **Objection to Topic No. 28:**

14         SYUSA objects to this Deposition Topic on the ground that it fails to

15    describe with reasonable particularity the matters for examination, as required by

16    Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

17    Deposition Topic to the extent that it seeks information that is neither relevant to

18    the subject matter involved in this litigation, nor proportional to the needs of this

19    case.  SYUSA further objects to this Deposition Topic on the grounds that it is

20    properly the subject of expert testimony.  SYUSA object to this Deposition Topic

21    to the extent that it calls for speculation and/or a legal opinion and conclusion.

22    SYUSA objects to this Deposition Topic to the extent that it seeks information

23    protected by the attorney-client privilege, the work product doctrine or any other

24    privilege.  SYUSA object to this Deposition Topic on the grounds that it is overly

25    burdensome and oppressive, overly broad, not reasonably limited by time or scope,

26    annoying or harassing.  SYUSA further objects to this Deposition Topic to the

27    extent it assumes facts not supported by any evidence; to the extent SYUSA

28

-29-

1    designates any officer, director or managing agent to testify on this Deposition

2    Topic, SYUSA does not admit the facts assumed and/or the existence of facts

3    supporting the assumption.

4          Subject to and without waiving the foregoing objections, SYUSA designates

5    See Young Lee to testify on its behalf as to this Deposition Matter.

6    **Deposition Topic No. 29:**

7          Any and all actions YOU took from April 21, 2016 to August 1, 2016 to

8    avoid or mitigate any alleged business losses or damages from resulting from

9    termination of the DISTRIBUTION AGREEMENT.

10   **Objection to Topic No. 29:**

11         SYUSA objects to this Deposition Topic on the ground that it fails to

12   describe with reasonable particularity the matters for examination, as required by

13   Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

14   Deposition Topic to the extent that it seeks information that is neither relevant to

15   the subject matter involved in this litigation, nor proportional to the needs of this

16   case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

17   burdensome and oppressive, overly broad, not reasonably limited by time or scope,

18   annoying or harassing.  SYUSA further objects to this Deposition Topic on the

19   grounds and to the extent that it seeks confidential or proprietary business data or

20   information.  SYUSA objects to this Deposition Topic to the extent that it requests

21   information that is protected or prohibited from disclosure under Federal,

22   California or other applicable law, including but not limited to, confidentiality

23   rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

24   extent that it seeks information protected by the attorney-client privilege, the work

25   product doctrine or any other privilege.  SYUSA further objects to this Deposition

26   Topic to the extent it assumes facts not supported by any evidence; to the extent

27   SYUSA designates any officer, director or managing agent to testify on this

28

-30-

1  Deposition Topic, SYUSA does not admit the facts assumed and/or the existence

2  of facts supporting the assumption.

3     Subject to and without waiving the foregoing objections, SYUSA designates

4  See Young Lee to testify on its behalf as to this Deposition Matter.

5  **Deposition Topic No. 30:**

6     YOUR INTERROGATORY RESPONSES.

7  **Objection to Topic No. 30:**

8     SYUSA objects to this Deposition Topic on the ground that it fails to

9  describe with reasonable particularity the matters for examination, as required by

10  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

11  Deposition Topic to the extent that it seeks information that is neither relevant to

12  the subject matter involved in this litigation, nor proportional to the needs of this

13  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

14  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

15  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

16  grounds and to the extent that it information that is not within the possession,

17  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

18  the grounds and to the extent that it seeks confidential or proprietary business data

19  or information.  SYUSA further objects to this Deposition Topic on the grounds

20  that it is vague, ambiguous and uncertain in its use of the term "business

21  operations."  SYUSA objects to this Deposition Topic to the extent that it requests

22  information that is protected or prohibited from disclosure under Federal,

23  California or other applicable law, including but not limited to, confidentiality

24  rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

25  extent that it seeks information protected by the attorney-client privilege, the work

26  product doctrine or any other privilege.

27

28

Objections to Notice of Taking Deposition
Case No. CV11-04592 RSWL (AGRx)

1      Subject to and without waiving the foregoing objections, SYUSA designates

2  See Young Lee to testify on its behalf as to this Deposition Matter.

3  **Deposition Topic No. 31:**

4      YOUR RFP RESPONSES.

5  **Objection to Topic No. 31:**

6      SYUSA objects to this Deposition Topic on the ground that it fails to

7  describe with reasonable particularity the matters for examination, as required by

8  Federal Rule of Civil Procedure 30(b)(6).  SYUSA further objects to this

9  Deposition Topic to the extent that it seeks information that is neither relevant to

10  the subject matter involved in this litigation, nor proportional to the needs of this

11  case.  SYUSA objects to this Deposition Topic on the grounds that it is overly

12  burdensome and oppressive, overly broad, not reasonably limited by time or scope,

13  annoying or harassing.  SYUSA further objects to this Deposition Topic on the

14  grounds and to the extent that it information that is not within the possession,

15  custody or control of SYUSA.  SYUSA further objects to this Deposition Topic on

16  the grounds and to the extent that it seeks confidential or proprietary business data

17  or information.  SYUSA further objects to this Deposition Topic on the grounds

18  that it is vague, ambiguous and uncertain in its use of the term "business

19  operations."  SYUSA objects to this Deposition Topic to the extent that it requests

20  information that is protected or prohibited from disclosure under Federal,

21  California or other applicable law, including but not limited to, confidentiality

22  rights possessed by third parties.  SYUSA objects to this Deposition Topic to the

23  extent that it seeks information protected by the attorney-client privilege, the work

24  product doctrine or any other privilege.

25      Subject to and without waiving the foregoing objections, SYUSA designates

26  See Young Lee to testify on its behalf as to this Deposition Matter.

27

28

-32-

1    DATED: December 20, 2016          SEYFARTH SHAW LLP

2

3                                      By

4                                         Eric R. McDonough
                                          Aaron Belzer
5

6                                      Attorneys for Plaintiffs and Counter-Defendants
                                       SAM YANG (U.S.A.), INC.; ROYPAC, INC.
7                                      dba S.C. CONTINENT CORPORATION; and
                                       MUN-KYUNG CHUN
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              -33-
14212236v.1

**PROOF OF SERVICE**

STATE OF CALIFORNIA      )
                         )  SS
COUNTY OF LOS ANGELES    )

    I am employed by Nationwide Legal, Inc. in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1609 W. James M. Wood Blvd., Los Angeles, CA 90015.  On December 20, 2016, I served the within documents:

    PLAINTIFF AND COUNTER-DEFENDANT SAM YANG (U.S.A.) INC.'S OBJECTIONS TO PLAINTIFF SAMYANG FOOD CO., LTD'S NOTICE OF DEPOSITION UNDER FED.R.CIV.P.30(B)(6)

☐   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☒   by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐   by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed envelope or package provided by an overnight delivery carrier with postage paid on account and deposited for collection with the overnight carrier at Los Angeles, California, addressed as set forth below.

☐   by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

☐   electronically by using the Court's ECF/CM System.

    Ekwan E. Rhow
    erhow@birdmarella.com
    Ashley D. Bowman
    abowman@birdmarella.com
    Kate S. Shin
    kshin@birdmarell.com
    BIRD,MARELLA, BOXER, WOLPER, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.
    1875 Century Park East, 23rd Floor
    Los Angeles, CA  90067-2561
    T:  (310) 201-2100     F:  (310) 201-2110

    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course

36338444v 1

of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 20, 2016, at Los Angeles, California.

_____
Signature

_____
Print Name

2

36338444v.1

# EXHIBIT 4

```
 1                   UNITED STATES DISTRICT COURT
 2          CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
 4      --------------------------
        SAM YANG (U.S.A.) INC.,     )
 5      ROYPAC, INC., dba S.C.      )
        CONTINENT CORPORATION,      )
 6                                  )
                     Plaintiffs,    )
 7                                  )
           vs.                      ) No. 2:15-cv-07697 AB (KSx)
 8                                  )
        SAMYANG FOODS CO., LTD.;    )
 9      and Does 1 through 20,      )
        inclusive,                  )
10                                  )
                     Defendants.    )
11      --------------------------
        SAMYANG FOODS CO., LTD.,    )
12                                  )
              Counter-Claimant,     )
13                                  )
           vs.                      )
14                                  )
        SAM YANG (U.S.A.) INC.,     )
15      ROYPAC, INC. Dba S.C.       )
        CONTINENT CORPORATION;      )
16      MUN-KYUNG CHUN, and Does 1  )
        through 20, inclusive,      )
17                                  )
              Counter-Defendants.   )
18      --------------------------
19
                     DEPOSITION OF MUN-KYUNG CHUN
20                      LOS ANGELES, CALIFORNIA
                       WEDNESDAY, MAY 10, 2017
21
22
23      Job No. 2604288
        Reported by:
24      RICKI Q. MELTON, RPR
        CSR No. 9400
25      PAGES 1 - 159


                                                   Page 1
```

| | | |
|---|---|---|
| 1 | you started as controller in 1985? | 10:04:49 |
| 2 | A    Yes. | 10:04:56 |
| 3 | Q    What was the salary? | 10:04:58 |
| 4 | A    I started at $3,000. | 10:05:02 |
| 5 | Q    A year or a month? | 10:05:08 |
| 6 | A    A month. | 10:05:14 |
| 7 | Q    Okay.  I was going to say you should have | 10:05:14 |
| 8 | asked your dad for more. | 10:05:20 |
| 9 | You owned shares -- as of 1997, you owned | 10:05:25 |
| 10 | shares of Samyang Korea; correct? | 10:05:33 |
| 11 | A    Yes. | 10:05:43 |
| 12 | Q    How much? | 10:05:44 |
| 13 | A    Must I say? | 10:05:51 |
| 14 | Q    Yes. | 10:05:52 |
| 15 | A    I recall that it's 20,600 shares. | 10:05:53 |
| 16 | Q    Do you know what percentage of the total | 10:06:08 |
| 17 | shares that was at the time? | 10:06:10 |
| 18 | A    No. | 10:06:19 |
| 19 | Q    Do you know how you -- who gave you those | 10:06:20 |
| 20 | shares? | 10:06:22 |
| 21 | A    My father. | 10:06:26 |
| 22 | Q    When did he give you those shares? | 10:06:27 |
| 23 | A    I don't recall. | 10:06:33 |
| 24 | Q    Okay.  After 1997 -- and, again, let's put | 10:06:34 |
| 25 | a time frame on here.  I don't want to bring this | 10:06:56 |

Page 25

```
 1    up unnecessarily, but your father passed away in      10:06:58

 2    what year?                                            10:07:01

 3        A    I recall that it was in 2015.                10:07:15

 4        Q    So between 1998 and before your father       10:07:18

 5    passed away in 2015, did you obtain any additional    10:07:23

 6    shares of Samyang Korea?                              10:07:26

 7        A    No.                                          10:07:42

 8        Q    And the shares that you owned, the 20,600    10:07:44

 9    shares, do you still own those today?                 10:07:49

10        A    Yes.                                         10:07:56

11        Q    In or around 1997, do you recall an event   10:08:07

12    that happened in Korea called the IMF Crisis?         10:08:13

13        A    Yes.                                         10:08:21

14        Q    And tell me what -- generally speaking,      10:08:22

15    what was the IMF Crisis?                              10:08:25

16             MR. McDONOUGH:  Vague, ambiguous,            10:08:31

17    overbroad.                                            10:08:32

18             You may answer.                              10:08:33

19             THE WITNESS:  So IMF is referring to the     10:08:40

20    foreign currency crisis.                              10:08:45

21             At that time, not only the Korea as a        10:08:55

22    nation but Samyang Korea was in crisis as well.       10:08:58

23    Samyang Korea did not have money and also didn't      10:09:08

24    have a place to borrow money from.  So that's what    10:09:11

25    the situation was there.                              10:09:17
```

                                                        Page 26

| | | |
|---|---|---|
| 1 | BY MR. RHOW: | 10:09:22 |
| 2 | Q    How did you know this? | 10:09:22 |
| 3 | A    It's because I read it on the newspaper | 10:09:32 |
| 4 | and I also heard it from my father during our | 10:09:34 |
| 5 | conversations. | 10:09:38 |
| 6 | MR. McDONOUGH:  I belatedly object to | 10:09:39 |
| 7 | "this" being vague and ambiguous. | 10:09:42 |
| 8 | Her answer contained a number of different | 10:09:43 |
| 9 | things.  I don't know what you were referring to | 10:09:46 |
| 10 | when you asked her what she knew or how she knew it. | 10:09:48 |
| 11 | BY MR. RHOW: | 10:10:00 |
| 12 | Q    Okay.  You discussed the IMF crisis with | 10:10:00 |
| 13 | your father at the time; correct? | 10:10:04 |
| 14 | A    Yes. | 10:10:10 |
| 15 | Q    And you understood that Samyang Korea was | 10:10:11 |
| 16 | in crisis? | 10:10:14 |
| 17 | A    Yes. | 10:10:22 |
| 18 | Q    These were the most difficult times that | 10:10:23 |
| 19 | Samyang Korea had ever faced; correct? | 10:10:25 |
| 20 | MR. McDONOUGH:  Object insofar as it lacks | 10:10:32 |
| 21 | foundation, calls for speculation. | 10:10:35 |
| 22 | You may answer. | 10:10:37 |
| 23 | THE WITNESS:  Yes. | 10:10:42 |
| 24 | BY MR. RHOW: | 10:10:43 |
| 25 | Q    And not only was Samyang USA -- strike | 10:10:45 |

Page 27

| | | |
|---|---|---|
| 1 | that. | 10:10:47 |
| 2 | Not only was Samyang Korea having | 10:10:47 |
| 3 | difficulties borrowing money, it also was having | 10:10:49 |
| 4 | difficulties obtaining foreign currency; true? | 10:10:54 |
| 5 | MR. McDONOUGH:  Objection.  Vague as to | 10:11:11 |
| 6 | time. | 10:11:12 |
| 7 | THE WITNESS:  Yes. | 10:11:13 |
| 8 | BY MR. RHOW: | 10:11:13 |
| 9 | Q    Okay.  In fact, in 1997, there was a | 10:11:14 |
| 10 | potential that Samyang Korea would have to go into | 10:11:18 |
| 11 | bankruptcy. | 10:11:20 |
| 12 | MR. McDONOUGH:  Lacks foundation, calls | 10:11:27 |
| 13 | for speculation. | 10:11:30 |
| 14 | You may answer. | 10:11:30 |
| 15 | THE WITNESS:  Yes. | 10:11:32 |
| 16 | BY MR. RHOW: | 10:11:34 |
| 17 | Q    In fact, in 1997, there was a potential | 10:11:36 |
| 18 | that creditors would take over Samyang Korea. | 10:11:39 |
| 19 | MR. McDONOUGH:  Same objections.  Lacks | 10:11:52 |
| 20 | foundation, calls for speculation. | 10:11:54 |
| 21 | You may answer. | 10:11:55 |
| 22 | THE WITNESS:  Yes. | 10:11:56 |
| 23 | BY MR. RHOW: | 10:12:02 |
| 24 | Q    Samyang USA was a source of foreign | 10:12:05 |
| 25 | capital in 1997; right? | 10:12:07 |

Page 28

| | | |
|---|---|---|
| 1 | A    Can you repeat that for me again? | 10:12:19 |
| 2 | Q    Sure. | 10:12:21 |
| 3 | In 1997, Samyang USA was a source of | 10:12:21 |
| 4 | foreign capital because it was selling products | 10:12:26 |
| 5 | outside of Korea. | 10:12:29 |
| 6 | MR. McDONOUGH:  Objection.  Vague and | 10:12:48 |
| 7 | ambiguous. | 10:12:50 |
| 8 | You may answer. | 10:12:51 |
| 9 | THE WITNESS:  Can you make it more easier | 10:12:55 |
| 10 | for me to understand? | 10:12:58 |
| 11 | BY MR. RHOW: | 10:12:59 |
| 12 | Q    I'll try, and if you don't understand the | 10:12:59 |
| 13 | question, absolutely what you are doing is | 10:13:03 |
| 14 | appropriate. | 10:13:05 |
| 15 | Samyang USA sold goods outside of Korea; | 10:13:11 |
| 16 | right? | 10:13:14 |
| 17 | A    When you say -- when you say "outside of | 10:13:25 |
| 18 | Korea," are you referring to third country besides | 10:13:29 |
| 19 | U.S.? | 10:13:32 |
| 20 | Q    Let's use the U.S. | 10:13:33 |
| 21 | Okay.  Samyang USA in 1997 sold products | 10:13:36 |
| 22 | in the United States. | 10:13:40 |
| 23 | A    Yes. | 10:13:45 |
| 24 | Q    And it collected U.S. dollars. | 10:13:46 |
| 25 | A    Yes. | 10:13:52 |

Page 29

```
 1      Q    And my question was directed at who you        10:15:39
 2   talked to at Samyang Korea.  So let me rephrase it.     10:15:42
 3          Generally speaking, between 1985 and 1997,       10:15:44
 4   you did speak with your father at Samyang Korea         10:15:51
 5   about Samyang USA operations; right?                    10:15:54
 6      A    Yes.                                            10:15:54
 7      Q    Okay.  And your father was the primary          10:16:16
 8   person at Samyang Korea you would talk to about         10:16:18
 9   Samyang USA operations?                                 10:16:21
10      A    Yes.                                            10:16:25
11      Q    Going back to the topic we were on, I           10:16:34
12   think you had said that you had talked with your        10:16:40
13   father in 1997 about how the IMF crisis was             10:16:42
14   affecting Samyang USA.  Tell me about those             10:16:49
15   conversations.                                          10:16:51
16          MR. McDONOUGH:  Vague, ambiguous,                10:17:03
17   overbroad, compound, potentially calls for multiple     10:17:05
18   narratives.                                             10:17:10
19          You may answer.                                  10:17:11
20          THE WITNESS:  My father told me that the         10:17:21
21   Samyang Korea was in a very hard situation.             10:17:27
22   BY MR. RHOW:                                            10:17:34
23      Q    And how did he say that the IMF crisis was      10:17:35
24   affecting or could affect Samyang USA?                  10:17:39
25      A    Rather than talking about the effects on        10:18:04
```

Page 31

| | | |
|---|---|---|
| 1 | Samyang USA, he mostly talked about the effects on | 10:18:06 |
| 2 | Samyang Korea. | 10:18:09 |
| 3 | Q    Do you recall discussing with your father | 10:18:13 |
| 4 | the concept of separating Samyang USA from Samyang | 10:18:16 |
| 5 | Korea in order to avoid creditors? | 10:18:22 |
| 6 | A    We discussed about something like that a | 10:18:45 |
| 7 | little. | 10:18:47 |
| 8 | Q    Okay.  And do you recall discussing with | 10:18:49 |
| 9 | your father that by separating Samyang USA from | 10:18:51 |
| 10 | Samyang Korea, he could protect Samyang USA from a | 10:18:56 |
| 11 | potential bankruptcy? | 10:19:01 |
| 12 | MR. McDONOUGH:  The question is ambiguous. | 10:19:16 |
| 13 | You may answer. | 10:19:18 |
| 14 | THE WITNESS:  I think we talked about | 10:19:20 |
| 15 | something like that as well. | 10:19:24 |
| 16 | BY MR. RHOW: | 10:19:26 |
| 17 | Q    And do you recall discussing with your | 10:19:26 |
| 18 | father that, by changing ownership of Samyang USA, | 10:19:28 |
| 19 | it would be more difficult for Samyang Korea's | 10:19:36 |
| 20 | creditors to attack Samyang USA? | 10:19:39 |
| 21 | A    We didn't talk about anything as such | 10:20:13 |
| 22 | right after IMF happened. | 10:20:16 |
| 23 | Q    Did you ever talk about that? | 10:20:18 |
| 24 | A    I recall it was after the happening. | 10:20:23 |
| 25 | Q    Sometime in 1997? | 10:20:26 |

Page 32

| | | |
|---|---|---|
| 1 | A    Yes, it was sometime after. | 10:20:36 |
| 2 | Q    What else do you recall about the | 10:20:38 |
| 3 | conversations you had with your father about | 10:20:40 |
| 4 | separating Samyang Korea and Samyang USA? | 10:20:43 |
| 5 | MR. McDONOUGH:  Vague, ambiguous, | 10:20:53 |
| 6 | overbroad, potentially calls for multiple | 10:20:57 |
| 7 | narratives. | 10:20:59 |
| 8 | You may answer. | 10:21:00 |
| 9 | THE WITNESS:  Rather than we discuss about | 10:21:02 |
| 10 | something like that, because he was in urgent need | 10:21:15 |
| 11 | for cash, he -- or capital, rather, he asked me for | 10:21:20 |
| 12 | money.  He asked me to loan him the money. | 10:21:24 |
| 13 | BY MR. RHOW: | 10:21:27 |
| 14 | Q    Asked you personally? | 10:21:28 |
| 15 | A    Yes. | 10:21:30 |
| 16 | Q    And did you loan him money? | 10:21:32 |
| 17 | A    Yes. | 10:21:35 |
| 18 | Q    How much? | 10:21:36 |
| 19 | A    At that time in U.S. currency, I loaned | 10:21:48 |
| 20 | him $500,000. | 10:21:52 |
| 21 | Q    Okay.  We will get to that in a second, | 10:21:55 |
| 22 | but when was that loan made?  Do you recall? | 10:21:58 |
| 23 | A    I recall it was sometime in November or | 10:22:15 |
| 24 | December. | 10:22:18 |
| 25 | Q    What year? | 10:22:18 |

Page 33

| | | |
|---|---|---|
| 1 | THE WITNESS:  So at that time -- the | 10:43:20 |
| 2 | Korean money, the 1 billion, 2 billion, 3 billion, | 10:43:28 |
| 3 | it had the value -- more value -- Korean money, | 10:43:31 |
| 4 | 1 billion, 2 billion, or even 3 billion had the | 10:43:36 |
| 5 | equal value in the U.S. of $300 million or more. | 10:43:40 |
| 6 | MR. JIN:  30 million. | 10:44:04 |
| 7 | THE INTERPRETER:  So interpreter would | 10:44:05 |
| 8 | like to stand corrected.  May the interpreter just | 10:44:06 |
| 9 | clarify with the witness? | 10:44:09 |
| 10 | MR. RHOW:  Please. | 10:44:10 |
| 11 | THE WITNESS:  So -- so at that time, the | 10:44:20 |
| 12 | Korean Won going from billion, 2 billion, even up | 10:44:25 |
| 13 | to 3 billion won was equal to the $30 million U.S. | 10:44:29 |
| 14 | That's how bad the currency was, and that's how bad | 10:44:36 |
| 15 | the Korean crisis was. | 10:44:39 |
| 16 | Prior to this, there was a discussion | 10:44:53 |
| 17 | regarding entering into agreement as such with my | 10:44:56 |
| 18 | father, but people around me all opposed to that | 10:44:59 |
| 19 | idea.  So I was told that it's -- if it's about | 10:45:03 |
| 20 | 3 billion won, then I could invest in anything in | 10:45:18 |
| 21 | Korea and I could make so much money later.  So I | 10:45:22 |
| 22 | was told not to invest in this. | 10:45:24 |
| 23 | And the Samyang USA, even though the | 10:45:41 |
| 24 | company existed for some time, but since Russia | 10:45:44 |
| 25 | already entered into moratorium so it was in a bad | 10:45:49 |

Page 45

| | | |
|---|---|---|
| 1 | condition as well. | 10:45:53 |
| 2 | So that means, even though it was | 10:45:54 |
| 3 | currently running business, it didn't have any | 10:45:56 |
| 4 | bright vision.  So I told my father that I didn't | 10:46:03 |
| 5 | want do it and I wanted my money back.  I told him | 10:46:07 |
| 6 | that I rather use that money to invest in something | 10:46:17 |
| 7 | in the U.S. or invest in something in Korea because | 10:46:20 |
| 8 | it's my hard-earned money. | 10:46:26 |
| 9 | So I came back to the U.S. and father kept | 10:46:29 |
| 10 | calling me.  So no matter how much tens of millions | 10:46:33 |
| 11 | of dollars the Samyang Korea might have in its | 10:46:49 |
| 12 | assets, at the time in that circumstance, it was | 10:46:54 |
| 13 | just the same as a piece of paper without cash. | 10:47:01 |
| 14 | It's nothing.  Because my dad begged so much, I had | 10:47:06 |
| 15 | no choice but to do this as this. | 10:47:23 |
| 16 | Q    "Do this," meaning sign Exhibit 1009? | 10:47:27 |
| 17 | A    Yes, correct. | 10:47:46 |
| 18 | And the reason is Samyang Korea already | 10:47:47 |
| 19 | set a bankruptcy date.  It was set for -- set on | 10:47:50 |
| 20 | January 26th, 1998. | 10:47:59 |
| 21 | Q    So by signing Exhibit 1009, you believed | 10:48:02 |
| 22 | that you were helping your father deal with the | 10:48:06 |
| 23 | bankruptcy? | 10:48:08 |
| 24 | A    Yes.  There was some meaning to that as | 10:48:23 |
| 25 | well because my father was the founder. | 10:48:25 |

Page 46

| | | |
|---|---|---|
| 1 | BY MR. RHOW: | 11:13:56 |
| 2 |    Q   I'll repeat it. | 11:13:57 |
| 3 |      Who else was there when you said what you | 11:13:58 |
| 4 | just said you said? | 11:14:00 |
| 5 |    A   It was just my father. | 11:14:06 |
| 6 |    Q   Clearly your father.  Who else, if anyone? | 11:14:07 |
| 7 |      MR. McDONOUGH:  Asked and answered. | 11:14:12 |
| 8 |      THE WITNESS:  No one else. | 11:14:20 |
| 9 | BY MR. RHOW: | 11:14:21 |
| 10 |    Q   Okay.  Go to Exhibit 1009.  That's the | 11:14:21 |
| 11 | other document.  Yeah, right there. | 11:14:27 |
| 12 |      So you see that Exhibit 1009 is dated | 11:14:30 |
| 13 | November 29th, 1997? | 11:14:35 |
| 14 |    A   Yes. | 11:14:44 |
| 15 |    Q   And if you look at Exhibit 1011, you see | 11:14:45 |
| 16 | your wire transfer is December 22nd, 23rd, 1997. | 11:14:51 |
| 17 |    A   Yes. | 11:15:08 |
| 18 |    Q   Was Exhibit 1009 signed before or after | 11:15:08 |
| 19 | December 22nd, 1997? | 11:15:15 |
| 20 |    A   You are referring to this document? | 11:15:30 |
| 21 |    Q   Correct. | 11:15:32 |
| 22 |    A   When I signed the Samyang USA document, I | 11:15:34 |
| 23 | signed it together. | 11:15:42 |
| 24 |    Q   I don't understand that answer.  Together | 11:15:45 |
| 25 | with what? | 11:15:46 |

Page 52

| | | |
|---|---|---|
| 1 | A    So when I signed the stock purchase | 11:16:00 |
| 2 | agreement, that was on January 26th, and that was | 11:16:02 |
| 3 | the date that was set for the bankruptcy. | 11:16:08 |
| 4 | Q    Okay.  So to be clear, then, what your | 11:16:10 |
| 5 | testimony is -- is that, although Exhibit 1009 is | 11:16:15 |
| 6 | dated November 29th, 1997, it was signed in | 11:16:19 |
| 7 | January 1998; correct? | 11:16:23 |
| 8 | A    Yes, that's correct. | 11:16:47 |
| 9 | Q    Okay.  The stock purchase agreement, I | 11:16:48 |
| 10 | want to make sure we have all of these documents | 11:16:52 |
| 11 | down. | 11:16:56 |
| 12 | I think it's Exhibit 1016. | 11:16:57 |
| 13 | (Exhibit 1016 was marked for | 11:17:00 |
| 14 | identification by the reporter | 11:17:00 |
| 15 | and is attached hereto.) | 11:17:15 |
| 16 | MR. RHOW:  1016. | 11:17:15 |
| 17 | Q    Take a look at that.  Take as much time as | 11:17:27 |
| 18 | you need, but the question I'm going to have is: | 11:17:35 |
| 19 | Is Exhibit 1016 the stock purchase agreement that | 11:17:39 |
| 20 | you just mentioned in your testimony? | 11:17:41 |
| 21 | A    That's correct. | 11:17:57 |
| 22 | Q    You didn't sign 1016, did you? | 11:17:58 |
| 23 | A    I didn't. | 11:18:08 |
| 24 | Q    Someone who we'll presumably get into | 11:18:09 |
| 25 | later, Choon Taik Lim signed 1016; correct? | 11:18:13 |

Page 53

| | | | |
|---|---|---|---|
| 1 | A | Correct. | 11:18:27 |
| 2 | Q | Did you witness him signing it? | 11:18:27 |
| 3 | A | I did not, but someone else did. | 11:18:35 |
| 4 | Q | I'm asking about you. | 11:18:38 |
| 5 | | Did you witness him -- you did not witness | 11:18:39 |
| 6 | | Mr. Lim signing the stock purchase agreement, which | 11:18:41 |
| 7 | | is 1016? | 11:18:44 |
| 8 | A | Whether I did? | 11:18:59 |
| 9 | Q | Yeah.  You didn't; right? | 11:19:01 |
| 10 | A | No.  If it wasn't me, then my attorney | 11:19:06 |
| 11 | | did. | 11:19:09 |
| 12 | Q | By the way, who was your attorney? | 11:19:09 |
| 13 | A | Must I say the name? | 11:19:14 |
| 14 | Q | Yes. | 11:19:16 |
| 15 | A | Chi Young Kim. | 11:19:17 |
| 16 | Q | An attorney in L.A.? | 11:19:20 |
| 17 | A | Yes. | 11:19:22 |
| 18 | Q | Okay.  Now -- by the way, who is Mr. Lim? | 11:19:27 |
| 19 | A | He is my CPA, as well as my agent. | 11:19:37 |
| 20 | Q | Okay.  Now, put out 1009, please.  All I'm | 11:19:39 |
| 21 | | trying to do is clarify your testimony. | 11:19:54 |
| 22 | | Were those signed at the same time, 1009 | 11:19:56 |
| 23 | | and 1016? | 11:19:58 |
| 24 | A | Yes. | 11:20:12 |
| 25 | Q | You weren't there to see the execution of | 11:20:12 |

Page 54

| | | |
|---|---|---|
| 1 | 1016. | 11:20:15 |
| 2 | A    Which person was signing? | 11:20:25 |
| 3 | Q    Yeah. | 11:20:30 |
| 4 | A    At which point -- who was signing? | 11:20:32 |
| 5 | Q    How do you know 1016 and 1009 were signed | 11:20:38 |
| 6 | on the same date? | 11:20:41 |
| 7 | A    So -- because, you know, there's a | 11:21:03 |
| 8 | distance between Korea and the U.S., so the person | 11:21:05 |
| 9 | in the U.S. signed this document first and took the | 11:21:10 |
| 10 | document to Korea and had my father sign it there. | 11:21:13 |
| 11 | Q    Okay.  When did you sign Exhibit 1009? | 11:21:17 |
| 12 | A    So it was either a day before January 26th | 11:21:35 |
| 13 | or two days before January 26th. | 11:21:38 |
| 14 | Q    Okay.  And you signed in L.A. or in Korea? | 11:21:41 |
| 15 | A    I signed it in L.A. | 11:21:47 |
| 16 | Q    Okay.  Now, the attorney -- sorry.  What | 11:21:49 |
| 17 | was the attorney's name again? | 11:21:54 |
| 18 | A    Chi Young Kim. | 11:22:00 |
| 19 | Q    Mr. or Mrs.? | 11:22:01 |
| 20 | A    Mr. | 11:22:03 |
| 21 | Q    Mr. Kim.  Let's call him "Mr. Kim, the | 11:22:03 |
| 22 | attorney." | 11:22:07 |
| 23 |     Did Mr. Kim, the attorney, assist you in | 11:22:08 |
| 24 | drafting 1016? | 11:22:11 |
| 25 | A    Yes. | 11:22:22 |

Page 55

| | | |
|---|---|---|
| 1 | Q    Did Mr. Kim, the attorney, assist you in | 11:22:23 |
| 2 | drafting 1009? | 11:22:25 |
| 3 |      THE INTERPRETER:  Interpreter's | 11:22:27 |
| 4 | correction. | 11:22:29 |
| 5 |      THE WITNESS:  Yes.  Yes. | 11:22:31 |
| 6 | BY MR. RHOW: | 11:22:37 |
| 7 | Q    And do you know where or why a date of | 11:22:37 |
| 8 | November 29th, 1997, is listed in Exhibit 1009? | 11:22:41 |
| 9 |      MR. McDONOUGH:  Lacks foundation, calls | 11:22:57 |
| 10 | for speculation. | 11:22:59 |
| 11 |      You may answer. | 11:22:59 |
| 12 |      THE WITNESS:  I don't recall for sure. | 11:23:00 |
| 13 | BY MR. RHOW: | 11:23:11 |
| 14 | Q    Do you know if that was done on purpose? | 11:23:11 |
| 15 |      MR. McDONOUGH:  Same objections. | 11:23:15 |
| 16 |      THE WITNESS:  You know, after the IMF, I | 11:23:17 |
| 17 | spoke to my father a lot.  So I don't really recall | 11:23:36 |
| 18 | much, but if it was done on purpose, then it should | 11:23:39 |
| 19 | have been fixed before taking it to him. | 11:23:45 |
| 20 | BY MR. RHOW: | 11:23:45 |
| 21 | Q    So you believe that this November 29th, | 11:23:48 |
| 22 | 1997, date was requested by your father? | 11:23:50 |
| 23 | A    I don't recall even as to that, but I know | 11:24:09 |
| 24 | those were signed on the same day. | 11:24:10 |
| 25 |      My father and I, we did not think that | 11:24:16 |

Page 56

```
 1    those dates were important.  Signing the document    11:24:19

 2    was more important.                                  11:24:23

 3         Q    Very clear.  Very clear.                    11:24:24

 4         A    Yes.                                        11:24:27

 5         Q    Thank you.                                  11:24:28

 6              Exhibit 1009 and Exhibit 1016, were those  11:24:29

 7    documents related in some way?                       11:24:39

 8              MR. McDONOUGH:  Vague and ambiguous as to   11:24:51

 9    "related."                                           11:24:52

10              You may answer.                             11:24:53

11              THE WITNESS:  What do you mean by           11:24:55

12    "related"?                                           11:25:03

13    BY MR. RHOW:                                         11:25:03

14         Q    Was there a reason why those two documents 11:25:04

15    were being signed on or about the same day?          11:25:07

16         A    When I enter into an agreement, these two  11:25:24

17    were regarded as the same package.                   11:25:26

18         Q    It was part of the same overall deal.      11:25:29

19         A    Because only having the stocks does not    11:25:35

20    allow you to sell the ramen.  That's why these two   11:25:42

21    were entered into together.                          11:25:44

22         Q    Okay.  So whoever would own the company    11:25:46

23    under 1016 needed to be able to sell the ramen       11:25:50

24    under 1009; right?                                   11:25:53

25         A    That's correct.                            11:26:06
```

Page 57

```
 1        Q     Okay.  Perfect.                        11:26:06

 2              The effect of 1016 was to move ownership   11:26:08

 3   of Samyang USA from Samyang Korea to a third party;   11:26:14

 4   right?                                              11:26:14

 5        A     Yes.                                    11:26:14

 6        Q     Okay.  And the timing of 1016 and 1009 was  11:26:33

 7   specifically designed to come before the bankruptcy  11:26:40

 8   of Samyang Korea that you were told about in Korea?  11:26:47

 9        A     That's what my father desired.          11:27:04

10        Q     Okay.  What was the bankruptcy in Korea,  11:27:07

11   that your father explained to you, going to entail?  11:27:12

12        A     I don't think my father actually knew much  11:27:32

13   either.  He really didn't feel it much in the       11:27:34

14   beginning.  You know, founders, they are very       11:27:41

15   stubborn, as you know.                              11:27:47

16              So after I came back to the U.S., and as I  11:28:01

17   was talking on the phone with him, I told him that  11:28:04

18   I don't need this.  I just want my money back, but  11:28:07

19   he said that he didn't have the money to pay me     11:28:11

20   back and he offered me.                             11:28:12

21              So we were just going -- you know, doing  11:28:21

22   the talk work, going back and forth and back and    11:28:24

23   forth, and then the three days -- three days before  11:28:29

24   the bankruptcy, we agreed to drop this.             11:28:35

25              MR. McDONOUGH:  Wait.  This might help us.  11:28:39
```

Page 58

| | | |
|---|---|---|
| 1 | MR. RHOW:  This is going to end up being a | 11:34:39 |
| 2 | comedy routine.  Let me go back and reask it. | 11:34:41 |
| 3 | Q    Using the January 25th, 1998, date on | 11:34:49 |
| 4 | Exhibit 1016, do you know if the 3 billion won was | 11:34:56 |
| 5 | wired before or after that date? | 11:35:08 |
| 6 | A    So after it arrived, the document was | 11:35:24 |
| 7 | signed. | 11:35:28 |
| 8 | Q    After the wire arrived, the document was | 11:35:29 |
| 9 | signed? | 11:35:32 |
| 10 | A    That's correct. | 11:35:38 |
| 11 | Q    Okay.  So the 3 billion won must have been | 11:35:38 |
| 12 | wired at some point in January 1998; correct? | 11:35:41 |
| 13 | A    So it was the 1 billion won that I already | 11:36:06 |
| 14 | loaned to my father prior to that.  So that 30 -- | 11:36:12 |
| 15 | 3 billion was including that 1 billion won I | 11:36:18 |
| 16 | already loaned to him. | 11:36:22 |
| 17 | Q    So the 2 billion won was wired to Samyang | 11:36:24 |
| 18 | Korea at some point in January 1998. | 11:36:26 |
| 19 | A    Right, the rest of the money. | 11:36:40 |
| 20 | Q    Okay.  And that was wired from one of your | 11:36:42 |
| 21 | personal accounts? | 11:36:45 |
| 22 | A    Yes. | 11:36:49 |
| 23 | Q    And do you have a copy of the wire transfer | 11:36:50 |
| 24 | for that 2 billion won? | 11:36:54 |
| 25 | A    Yes. | 11:37:02 |

Page 62

```
 1    January 25th, 1998?                              11:39:29

 2         A    It was Mr. Choon Taik Lim, the signer.  11:39:43

 3         Q    So he was the 100 percent owner?        11:39:48

 4         A    Yes.                                    11:39:51

 5         Q    Given that Mr. Calypco -- strike that.  11:39:52

 6              Given that Mr. -- this is going to be   11:39:58

 7    funny -- given that Mr. Lim was the owner of      11:40:00

 8    Calypco, why did you, instead of Calypco, wire the 11:40:04

 9    $2 billion in January 1998?                       11:40:11

10         A    That's because that's what my father    11:40:30

11    wanted me to do.                                  11:40:32

12         Q    Did he explain why he wanted Calypco to be 11:40:34

13    the buyer instead of you?                         11:40:39

14         A    He told me not to do it under my name.  11:40:50

15         Q    Did he explain why?                     11:40:53

16         A    I don't know whether it was related to the 11:41:14

17    bankruptcy or maybe it was because, you know, we  11:41:16

18    are the same family, the father and the daughter. 11:41:20

19    I don't know as to that, but he just told me to   11:41:22

20    have someone else do it.                          11:41:24

21         Q    Okay.  Anything else he say in connection 11:41:27

22    with that subject?                                11:41:31

23         A    So at that time, he told me to hurry and 11:41:43

24    bring the document before the company goes        11:41:47

25    bankrupt.  He was quite rushing.                  11:41:49
```

Page 64

| | | |
|---|---|---|
| 1 | know, everything was done by my attorney. | 11:50:17 |
| 2 | So to be honest with you, I don't recall | 11:50:20 |
| 3 | much. | 11:50:23 |
| 4 | Q    And that's fair. | 11:50:23 |
| 5 | Do you recall discussing with your father | 11:50:24 |
| 6 | in January 1998 that after the purchase of Samyang | 11:50:26 |
| 7 | USA by Calypco, that at a date later, you would | 11:50:33 |
| 8 | then purchase the shares of Calypco? | 11:50:38 |
| 9 | A    Yes. | 11:50:59 |
| 10 | Q    Okay.  And so is Exhibit 1021 the document | 11:51:00 |
| 11 | that was part of the original discussion you had | 11:51:10 |
| 12 | with your father in January 1998? | 11:51:12 |
| 13 | A    Yes. | 11:51:35 |
| 14 | MR. McDONOUGH:  Vague and ambiguous. | 11:51:35 |
| 15 | Remember to allow me to object. | 11:51:37 |
| 16 | THE WITNESS:  Yes. | 11:51:40 |
| 17 | BY MR. RHOW: | 11:51:41 |
| 18 | Q    And you understood that, by delaying your | 11:51:42 |
| 19 | purchase of Calypco shares, your father could | 11:51:50 |
| 20 | conceal your involvement in the purchase of Samyang | 11:51:54 |
| 21 | USA; correct? | 11:52:01 |
| 22 | MR. McDONOUGH:  Argumentative as to | 11:52:23 |
| 23 | "conceal," lacks foundation, calls for speculation. | 11:52:26 |
| 24 | You may answer. | 11:52:27 |
| 25 | THE WITNESS:  I don't know as to that. | 11:52:38 |

Page 68

| | | |
|---|---|---|
| 1 | BY MR. RHOW: | 11:52:39 |
| 2 | Q    If you look at Exhibit 1021, under | 11:53:34 |
| 3 | Article 1 -- and let me just -- I'll read it and | 11:53:38 |
| 4 | then you can translate it -- what it says is the | 11:53:43 |
| 5 | corporation, which is Calypco, owns all the | 11:53:46 |
| 6 | outstanding shares of itself, I guess, and that | 11:53:50 |
| 7 | you, Chun, Ms. Chun, loaned 1.875 -- I assume | 11:53:56 |
| 8 | that's a typo -- $1.875 million to the corporation | 11:54:05 |
| 9 | under a promissory note dated December 31st, 1997. | 11:54:10 |
| 10 | Is that sentence true? | 11:54:13 |
| 11 | A    This, as the other ones, it was created by | 11:55:12 |
| 12 | my attorney. | 11:55:16 |
| 13 | Q    Not my question. | 11:55:17 |
| 14 | My question is:  Is it true that you, in | 11:55:18 |
| 15 | fact, loaned $1.875 million to Calypco sometime | 11:55:23 |
| 16 | before December 31st, 1997? | 11:55:31 |
| 17 | A    I don't recall as far as this goes. | 11:56:02 |
| 18 | Q    Okay.  Leave the document to the side. | 11:56:05 |
| 19 | I'm going to ask you:  Do you recall | 11:56:07 |
| 20 | providing to Calypco at any time $1.875 million? | 11:56:11 |
| 21 | A    When the wire transfer was done, that's | 11:56:33 |
| 22 | when I loaned the money. | 11:56:37 |
| 23 | Q    So you recall loaning -- my question is | 11:56:39 |
| 24 | pretty precise, Ms. Chun.  This is a "yes" or "no." | 11:56:42 |
| 25 | Do you recall loaning $1.875 million to | 11:56:47 |

Page 69

| | | |
|---|---|---|
| 1 | Calypco at any time? | 11:56:52 |
| 2 | A    I don't quite recall. | 11:57:14 |

3      Q    Okay.  Exhibit 1021, do you know why it      11:57:29

4  was prepared?                                        11:57:32

5      A    Since everything was done by my attorney,   11:57:47

6  I don't really know.                                 11:57:49

7      Q    Do you know -- and that attorney is         11:57:50

8  Mr. Kim, the attorney?                               11:57:53

9      A    Yes.                                        11:57:58

10      Q    Is he still around?                        11:57:59

11           MR. McDONOUGH:  Vague as to "around."      11:58:03

12           MR. RHOW:  Yeah, it is vague.              11:58:06

13           THE WITNESS:  You know, I haven't -- I     11:58:09

14  haven't really reached out to him recently and he's 11:58:17

15  at an old age so I don't know whether he's still    11:58:21

16  practicing or not.                                  11:58:23

17  BY MR. RHOW:                                        11:58:24

18      Q    Is there a way for you to reach him?       11:58:25

19      A    If you like me to, I'll try.               11:58:38

20      Q    Not that.  Do you have his phone number?   11:58:39

21      A    I don't have it with me.                   11:58:45

22      Q    Okay.  Do you know if Exhibit 1021 was     11:58:46

23  signed on December 16th, 1998, or a different date? 11:58:53

24      A    I do not recall.                           11:59:17

25           MR. RHOW:  Let's look at 1014-E.  Sorry.   11:59:20

Page 70

| | | |
|---|---|---|
| 1 | You view Exhibits 1009 and 1016 as part of | 12:04:49 |
| 2 | the overall agreement you had with your father back | 12:04:53 |
| 3 | in January 1998; right? | 12:04:56 |
| 4 | A    Yes. | 12:05:10 |
| 5 | Q    Okay.  The loan you made to Calypco, was | 12:05:11 |
| 6 | that part of the overall agreement you had with | 12:05:14 |
| 7 | your father? | 12:05:15 |
| 8 | A    What do you mean by that? | 12:05:28 |
| 9 | Q    Look, the -- you indicated just now that | 12:05:31 |
| 10 | you wired 1-million-some-odd dollars to Calypco a | 12:05:33 |
| 11 | couple of days before Exhibits 1009 and 1016 were | 12:05:39 |
| 12 | signed. | 12:05:44 |
| 13 | Translate that. | 12:05:46 |
| 14 | Was your wire -- no question. | 12:06:11 |
| 15 | Was your wire to Calypco related to your | 12:06:12 |
| 16 | overall agreement with your father? | 12:06:15 |
| 17 | MR. McDONOUGH:  Vague as to "related to." | 12:06:27 |
| 18 | You may answer. | 12:06:30 |
| 19 | THE WITNESS:  So it wasn't sent from | 12:06:31 |
| 20 | Calypco, but from Calypco, it was sent to Samyang | 12:06:42 |
| 21 | Korea. | 12:06:47 |
| 22 | BY MR. RHOW: | 12:06:48 |
| 23 | Q    That's not my question. | 12:06:48 |
| 24 | A    I do not understand your question. | 12:06:51 |
| 25 | Q    Okay.  Let me ask it a different way. | 12:06:56 |

Page 73

| | | |
|---|---|---|
| 1 | Did your father request that you provide a | 12:06:57 |
| 2 | loan to Calypco? | 12:06:59 |
| 3 | A    No.  He just straight out said that we | 12:07:17 |
| 4 | should enter into an agreement with another person | 12:07:23 |
| 5 | and then later change the name on that agreement. | 12:07:26 |
| 6 | Q    Change the name to you? | 12:07:30 |
| 7 | A    Later, yes.  Yes. | 12:07:33 |
| 8 | Q    Later -- he said that the name would later | 12:07:37 |
| 9 | be changed to you; right? | 12:07:40 |
| 10 | A    He told me not to do that then. | 12:07:50 |
| 11 | Q    But later to do that? | 12:07:53 |
| 12 | A    Yes. | 12:07:57 |
| 13 | Q    And you agreed? | 12:07:58 |
| 14 | A    Yes. | 12:08:01 |
| 15 | Q    Okay.  And that's the deal that we see in | 12:08:01 |
| 16 | Exhibits 1009 and 1016; right? | 12:08:06 |
| 17 | A    Yes. | 12:08:15 |
| 18 | Q    Okay.  And so we still have not got an | 12:08:26 |
| 19 | answer on my Calypco question. | 12:08:30 |
| 20 | Who requested that you make the loan to | 12:08:32 |
| 21 | Calypco? | 12:08:34 |
| 22 | A    That was done because Calypco had to send | 12:08:45 |
| 23 | the money to Samyang Korea. | 12:08:54 |
| 24 | Q    Not my question. | 12:08:56 |
| 25 | Who?  Who?  Who requested that you make | 12:08:57 |

Page 74

| | | |
|---|---|---|
| 1 | A    -- more specific? | 12:37:03 |
| 2 | Q    It's fair. | 12:37:05 |
| 3 | In 1998, after January of that year, did | 12:37:05 |
| 4 | the operations of Samyang USA change in terms of | 12:37:09 |
| 5 | how it was manufacturing its products and how it | 12:37:15 |
| 6 | was reporting back to Samyang Korea? | 12:37:20 |
| 7 | MR. McDONOUGH:  Objection.  Compound. | 12:37:50 |
| 8 | It's asking two different questions. | 12:37:52 |
| 9 | You may answer. | 12:37:54 |
| 10 | THE WITNESS:  I don't think there was much | 12:37:57 |
| 11 | at that time. | 12:38:02 |
| 12 | BY MR. RHOW: | 12:38:02 |
| 13 | Q    Okay.  After January 1998, Samyang USA | 12:38:03 |
| 14 | continued to report on its operations to Samyang | 12:38:06 |
| 15 | Korea; correct? | 12:38:10 |
| 16 | A    We sent fax. | 12:38:25 |
| 17 | Q    That's what you had done before January | 12:38:26 |
| 18 | 1998, and you continued that practice after January | 12:38:29 |
| 19 | 1998? | 12:38:32 |
| 20 | A    On -- on the -- in terms of the duty, yes. | 12:38:41 |
| 21 | Q    And after January 1998, did your father | 12:38:47 |
| 22 | continue to have ultimate authority over Samyang | 12:38:50 |
| 23 | USA? | 12:38:53 |
| 24 | MR. McDONOUGH:  Overbroad as to time.  16 | 12:39:01 |
| 25 | years. | 12:39:03 |

Page 81

```
 1            You may answer.                     12:39:03

 2            THE WITNESS:  Can you repeat that again?   12:39:10

 3    BY MR. RHOW:                                 12:39:13

 4      Q    Sure.                                 12:39:13

 5            After January 1998, did your father  12:39:13

 6    continue to have ultimate authority over Samyang  12:39:17

 7    USA?                                         12:39:21

 8            MR. McDONOUGH:  Same objection.      12:39:31

 9            THE WITNESS:  Things were similar whether  12:39:33

10    before or after.                            12:39:38

11    BY MR. RHOW:                                 12:39:39

12      Q    So in terms of your father's authority,  12:39:39

13    that didn't change?                          12:39:42

14      A    Correct.                             12:39:48

15      Q    Do you know who the owners were of Calypco  12:39:49

16    prior to you becoming the owner of Calypco --  12:40:09

17    strike that.                                12:40:17

18            Do you know who the owners were of Calypco  12:40:18

19    at any time?                                 12:40:23

20      A    I do not know for sure.              12:40:31

21      Q    Did you ever own Calypco or any part of it?  12:40:34

22      A    I do not recall.                     12:40:47

23      Q    Do you know who Angela Lim is as it   12:40:48

24    relates to Calypco?                          12:40:53

25      A    I do not know.                       12:41:01
```

Page 82

| | | |
|---|---|---|
| 1 | through 1832. | 12:54:21 |
| 2 | (Exhibit 1031 was marked for | 12:54:22 |
| 3 | identification by the reporter | 12:54:22 |
| 4 | and is attached hereto.) | 12:55:20 |
| 5 | BY MR. RHOW: | 12:55:20 |
| 6 | Q    And you received Exhibit 1031 from your | 12:55:20 |
| 7 | father; correct? | 12:55:22 |
| 8 | A    Yes. | 12:55:25 |
| 9 | Q    And then let's go to 1032. | 12:55:28 |
| 10 | 1032 is a document Bates numbered Samyang | 12:55:47 |
| 11 | 3304 through 3306. | 12:55:59 |
| 12 | (Exhibit 1032 was marked for | 12:56:02 |
| 13 | identification by the reporter | 12:56:02 |
| 14 | and is attached hereto.) | 12:56:12 |
| 15 | BY MR. RHOW: | 12:56:12 |
| 16 | Q    And is Exhibit 1032 the response that you | 12:56:23 |
| 17 | sent to your father to Exhibit 1031? | 12:56:28 |
| 18 | A    Yes. | 12:56:39 |
| 19 | Q    Other than Exhibit 1032, did you also talk | 12:56:40 |
| 20 | to your father about what he had written in 1031? | 12:56:44 |
| 21 | A    Yes. | 12:56:59 |
| 22 | Q    And what was discussed? | 12:56:59 |
| 23 | A    We discussed about his signature. | 12:57:11 |
| 24 | Q    What about his signature? | 12:57:15 |
| 25 | A    We discussed about the signature because | 12:57:29 |

Page 89

Veritext Legal Solutions
866 299-5127

```
 1    only, or are you referring to the fax?          01:10:08

 2        Q    I actually don't know what you mean by  01:10:12

 3    that.  My only question -- forget the documents. 01:10:14

 4            I'm just asking:  Did Samyang USA ever sue 01:10:17

 5    Samyang Korea to stop sales by Samyang Korea in   01:10:23

 6    Canada after April 20th, 2001?  "Yes" or "no"?   01:10:27

 7    It's just a "yes" or "no."                        01:10:57

 8        A    I do not know for sure.  I do not        01:11:00

 9    understand that question.                         01:11:04

10        Q    That's fine.                             01:11:05

11            After April 20th, 2001, were you aware    01:11:08

12    that Samyang Korea was distributing products in   01:11:11

13    Canada?                                           01:11:15

14        A    I was contacted regarding that.          01:11:26

15        Q    Okay.  And so after you became aware that 01:11:27

16    Samyang Korea was selling in Canada, Samyang USA  01:11:31

17    did not then file a lawsuit to stop that; correct? 01:11:38

18        A    My father asked me.                      01:11:54

19        Q    Not to do that?                          01:11:57

20        A    That just to let go of the -- that for   01:12:02

21    that time.                                        01:12:05

22        Q    And you did.                             01:12:05

23        A    Because he's my father.                  01:12:07

24        Q    So the answer is "yes, because he's my   01:12:12

25    father"?                                          01:12:17
```

Page 97

```
 1              LOS ANGELES, CALIFORNIA, MAY 10, 2017

 2                        2:18 P.M.

 3                         -o0o-

 4

 5                   MUN-KYUNG CHUN,

 6     the witness, having been previously administered

 7     an oath in accordance with CCP Section 2094,

 8     testified as follows:

 9                                               02:18:33

10         VIDEO OPERATOR:  The time is 2:18.  We are  02:18:33

11   back on the record.                         02:18:35

12                                               02:18:35

13                    EXAMINATION                02:18:35

14                                               02:18:38

15   BY MR. RHOW:                                02:18:38

16       Q    Ms. Chun, good afternoon.          02:18:38

17       A    Yes, good afternoon.               02:18:39

18       Q    We were on Exhibit 1032, and why don't we  02:18:42

19   take a quick look at that.                  02:18:54

20            Now, this was a letter that your attorney  02:18:57

21   prepared for you?                           02:18:59

22       A    Yes.                               02:19:05

23       Q    And this was Mr. Kim, the attorney?  02:19:05

24       A    No.                                02:19:11

25       Q    Who prepared the letter for you?   02:19:11

                                          Page 100
```

| | | | |
|---|---|---|---|
| 1 | A | An attorney. | 02:19:17 |
| 2 | Q | What was the name of the attorney? | 02:19:18 |
| 3 | A | Michael Suh. | 02:19:23 |
| 4 | Q | The second page of the document, if you | 02:19:26 |
| 5 | | see the second paragraph, it requests that Samyang | 02:19:36 |
| 6 | | Korea stop shipping products to Canada. | 02:19:43 |
| 7 | | Do you see that? | 02:19:45 |
| 8 | A | Yes. | 02:19:54 |
| 9 | Q | After April 20th, 2001, when did you | 02:19:55 |
| 10 | | become aware that Samyang Korea was still shipping | 02:19:59 |
| 11 | | goods to Canada? | 02:20:02 |
| 12 | A | It was after I received the fax. | 02:20:17 |
| 13 | Q | Do you recall in what year that was? | 02:20:20 |
| 14 | A | I think it was the beginning part of 2000. | 02:20:35 |
| 15 | Q | Okay.  So my question is:  After April | 02:20:41 |
| 16 | | 2001 -- so I'm later.  Okay -- were you aware that | 02:20:47 |
| 17 | | Samyang Korea was still selling products in Canada? | 02:20:53 |
| 18 | A | Yes. | 02:21:10 |
| 19 | Q | And were you aware that Samyang Korea was | 02:21:11 |
| 20 | | selling products in Canada from 2001 up until the | 02:21:14 |
| 21 | | present? | 02:21:18 |
| 22 | A | Yes. | 02:21:27 |
| 23 | Q | Okay.  You mentioned a couple of seconds | 02:21:28 |
| 24 | | ago that you did first learn in 2000 that Samyang | 02:21:31 |
| 25 | | Korea was shipping goods to Canada; correct? | 02:21:38 |

Page 101

| | | |
|---|---|---|
| 1 | Q    Oh, okay. | 02:23:41 |
| 2 | But at some point prior to April 20th, | 02:23:42 |
| 3 | 2001? | 02:23:45 |
| 4 | A    It could have been prior to this or after | 02:23:53 |
| 5 | that. | 02:23:55 |
| 6 | Q    Okay. | 02:23:56 |
| 7 | A    Anyway, I saw it. | 02:23:57 |
| 8 | Q    Around that time frame? | 02:23:59 |
| 9 | A    Yes. | 02:24:05 |
| 10 | Q    Now, I'm going to state the obvious, but | 02:24:17 |
| 11 | you know that Samyang USA filed a lawsuit against | 02:24:19 |
| 12 | Samyang Korea.  That's why we're here. | 02:24:22 |
| 13 | A    Yes. | 02:24:30 |
| 14 | Q    Okay.  And that lawsuit was filed around | 02:24:31 |
| 15 | September 2015; correct? | 02:24:33 |
| 16 | A    Yes. | 02:24:43 |
| 17 | Q    And so prior to the September 2015 | 02:24:43 |
| 18 | lawsuit, has Samyang USA ever filed any other | 02:24:46 |
| 19 | lawsuits against Samyang Korea? | 02:24:49 |
| 20 | A    No. | 02:25:04 |
| 21 | Q    Okay.  All right.  Do you know a company | 02:25:05 |
| 22 | called Roypac? | 02:25:21 |
| 23 | A    Yes. | 02:25:24 |
| 24 | Q    And what is Roypac? | 02:25:26 |
| 25 | A    Roypac is a company that sells imported | 02:25:32 |

Page 103

| | | |
|---|---|---|
| 1 | goods. | 02:25:42 |
| 2 | Q    Okay.  Do you own Roypac? | 02:25:43 |
| 3 | A    No. | 02:25:49 |
| 4 | Q    Who owns Roypac? | 02:25:49 |
| 5 | A    It's owned by Samyang USA. | 02:25:56 |
| 6 | Q    100 percent of Roypac is owned by Samyang | 02:25:58 |
| 7 | USA? | 02:26:01 |
| 8 | A    Yes. | 02:26:04 |
| 9 | Q    How long has Samyang USA owned Roypac? | 02:26:05 |
| 10 | A    It's been more than 20 years. | 02:26:24 |
| 11 | Q    Who formed Roypac? | 02:26:26 |
| 12 | MR. McDONOUGH:  Vague and ambiguous. | 02:26:35 |
| 13 | You may answer. | 02:26:40 |
| 14 | THE WITNESS:  A person who formed it? | 02:26:46 |
| 15 | BY MR. RHOW: | 02:26:49 |
| 16 | Q    Yeah. | 02:26:49 |
| 17 | Who made the decision to form Roypac? | 02:26:49 |
| 18 | A    In the very beginning? | 02:26:57 |
| 19 | Q    Correct. | 02:26:59 |
| 20 | A    Myself. | 02:26:59 |
| 21 | Q    Oh, you did.  Okay. | 02:27:00 |
| 22 | Let's look at Exhibit 1005. | 02:27:02 |
| 23 | (Exhibit 1005 was marked for | 02:27:04 |
| 24 | identification by the reporter | 02:27:04 |
| 25 | and is attached hereto.) | 02:27:17 |

Page 104

| | | |
|---|---|---|
| 1 | ownership in Roypac?  Do you know the year? | 02:33:21 |
| 2 | A    I recall that it was in 1991. | 02:33:30 |
| 3 | Q    Not 2001? | 02:33:42 |
| 4 | A    So that was for the d/b/a SC, which sold | 02:33:52 |
| 5 | ramen. | 02:33:59 |
| 6 | Q    The reason I think 1991 could be wrong -- | 02:34:00 |
| 7 | I'm not saying it is wrong, but the DSA is | 02:34:04 |
| 8 | Exhibit 2 -- 1009, is dated 1997. | 02:34:10 |
| 9 | Did Samyang USA become the owner of Roypac | 02:34:23 |
| 10 | before or after Exhibit 1009? | 02:34:25 |
| 11 | THE INTERPRETER:  1009? | 02:34:29 |
| 12 | MR. RHOW:  Yeah. | 02:34:31 |
| 13 | THE WITNESS:  Does he mention Roypac? | 02:34:56 |
| 14 | BY MR. RHOW: | 02:34:56 |
| 15 | Q    No, no, no.  I'm trying to trigger your | 02:34:57 |
| 16 | memory. | 02:34:59 |
| 17 | So Roypac is formed in 1988; right? | 02:35:01 |
| 18 | A    Yes. | 02:35:08 |
| 19 | Q    At the beginning, you own it? | 02:35:09 |
| 20 | A    Yes. | 02:35:12 |
| 21 | Q    Okay.  At some point, Samyang USA becomes | 02:35:12 |
| 22 | the owner of Roypac? | 02:35:15 |
| 23 | A    Yes. | 02:35:21 |
| 24 | Q    Okay.  And is that in 1991 or later? | 02:35:22 |
| 25 | A    It was in 1991. | 02:35:29 |

Page 108

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | Q      Okay.  So in 1991, then, Samyang USA was | 02:35:32 |
| 2 | still owned by Samyang Korea; correct? | 02:35:36 |
| 3 | A      Yes. | 02:35:46 |
| 4 | Q      Okay.  So at some point, Roypac is | 02:35:47 |
| 5 | designated as the agent for Samyang USA under the | 02:35:59 |
| 6 | distribution and sales agreement, which is 1009; | 02:36:06 |
| 7 | correct? | 02:36:06 |
| 8 | A      In what year was that? | 02:36:31 |
| 9 | Q      In 2001; is that right?  Does that sound | 02:36:33 |
| 10 | right? | 02:36:38 |
| 11 | A      Yes, 2001 is correct. | 02:36:39 |
| 12 | Q      Okay.  Why was Roypac designated as | 02:36:40 |
| 13 | Samyang USA's agent under the distribution and | 02:36:44 |
| 14 | sales agreement? | 02:36:48 |
| 15 | A      So the Roypac's d/b/a SC began in 2001. | 02:37:08 |
| 16 | Q      Yeah. | 02:37:16 |
| 17 | So my question is:  What was the business | 02:37:16 |
| 18 | reason for appointing Roypac through its d/b/a SCCC | 02:37:18 |
| 19 | as the agent under the distribution and sales | 02:37:25 |
| 20 | agreement? | 02:37:30 |
| 21 | A      Samyang USA has imported goods as well as | 02:37:59 |
| 22 | domestic goods.  So to separate them and to | 02:38:03 |
| 23 | distinguish them, that's what I did. | 02:38:07 |
| 24 | Q      Okay.  So let me try to break that down. | 02:38:10 |
| 25 | Samyang USA was selling, you said, | 02:38:14 |

Page 109

```
 1    imported and domestic goods.  What are the imported    02:38:17

 2    goods?  What are the domestic goods?                   02:38:22

 3         A    So domestic goods were the locally           02:38:46

 4    manufactured goods, and the imported goods were the    02:38:48

 5    goods imported from Samyang Korea.                     02:38:51

 6         Q    Okay.  Why was it important to assign to     02:38:59

 7    Roypac responsibilities for the imported goods as      02:39:17

 8    opposed to keeping it at Samyang USA?                  02:39:23

 9         A    Some years ago, we were audited by IRS.      02:39:51

10    They audited us on domestic and imported goods.        02:40:03

11    They spent almost a year on imported goods, and we     02:40:08

12    received an audit almost four times.                   02:40:15

13            Since that causes them to look at the          02:40:29

14    domestic products at the same time and it gets         02:40:33

15    exposed too many times, so we decided to separate      02:40:39

16    it.                                                    02:40:42

17         Q    Was this a recommendation that was made by   02:40:43

18    Michael Suh?                                           02:40:50

19         A    Yes.                                         02:40:51

20         Q    Okay.  When you say "we got audited," you    02:40:58

21    meant Samyang USA had got audited; correct?            02:41:01

22         A    At that time, it was Samyang USA.            02:41:09

23         Q    Did Roypac also get audited later?           02:41:09

24         A    No, it was never audited.                    02:41:23

25         Q    Okay.  All right.  Going back in time a      02:41:24
```

                                                    Page 110

```
 1              (Exhibit 1112 was marked for          03:00:46

 2              identification by the reporter        03:00:46

 3              and is attached hereto.)              03:01:12

 4         MR. McDONOUGH:  Do you intend to have this 03:01:12

 5    declaration attached?                           03:01:14

 6         MR. RHOW:  It's the --                     03:01:16

 7         MR. McDONOUGH:  The 1029?                   03:01:17

 8         MR. RHOW:  Isn't it the translated --      03:01:17

 9         MR. McDONOUGH:  It is.  Okay.              03:01:20

10         MR. RHOW:  So let's do 1112.               03:01:27

11    Q    My only question is:  Do you recall        03:02:00

12    receiving Exhibit 1112 in October 2012?         03:02:02

13    A    Yes.                                       03:02:34

14    Q    Okay.  And prior to October 2012, had you  03:02:35

15    given notice to Samyang Korea of Roypac's       03:02:46

16    involvement in the distribution?                03:02:50

17    A    Regarding what?                            03:03:22

18    Q    Regarding anything.                        03:03:23

19         Did you give any sort of written notice to 03:03:25

20    Samyang Korea about Roypac's involvement with the 03:03:28

21    distribution?                                   03:03:31

22    A    I do not recall too well.                  03:03:45

23    Q    Okay.  As of January 1998, Samyang USA     03:03:47

24    owned a factory in Los Angeles; correct?        03:04:16

25    A    Yes.                                        03:04:28

                                         Page 119
```

| | | |
|---|---|---|
| 1 | Q     The period of time I want actually is -- | 04:22:19 |
| 2 | yeah -- 2004 until 2015. | 04:22:22 |
| 3 | Okay.  So during that time frame, just | 04:22:27 |
| 4 | tell me the folks who were involved or responsible | 04:22:32 |
| 5 | for distribution of Samyang products in the North | 04:22:36 |
| 6 | American market. | 04:22:42 |
| 7 | A     So from Samyang USA, the one who was in | 04:23:00 |
| 8 | charge of North American market was David. | 04:23:19 |
| 9 | Q     Okay. | 04:23:23 |
| 10 | A     And from Roypac, the one who was in charge | 04:23:24 |
| 11 | of North American market was Woon Bae Yeo and | 04:23:26 |
| 12 | SY Lee.  They're about it. | 04:23:30 |
| 13 | Q     When was David employed by Samyang USA? | 04:23:34 |
| 14 | A     I recall that it was the early 2000. | 04:23:49 |
| 15 | Early 2000. | 04:23:55 |
| 16 | Q     From 2000 to approximately when? | 04:23:56 |
| 17 | A     Until 2008. | 04:24:11 |
| 18 | Q     And SY Lee and WB, they are still your | 04:24:16 |
| 19 | employees? | 04:24:20 |
| 20 | A     They are working at Roypac. | 04:24:25 |
| 21 | Q     Okay.  And so they have been -- for the | 04:24:27 |
| 22 | entire period from 2004 to 2015, they were | 04:24:31 |
| 23 | responsible for the North American market for | 04:24:34 |
| 24 | Roypac? | 04:24:37 |
| 25 | A     Yes. | 04:24:47 |

Page 148

```
 1   STATE OF CALIFORNIA     )
 2   COUNTY OF LOS ANGELES   )
 3
 4       I, RICKI Q. MELTON, CSR No. 9400, RPR No. 45429,
     do hereby certify:
 5
         That the foregoing deposition testimony of
 6   MUN-KYUNG CHUN was taken before me at the time and
     place therein set forth, at which time the witness
 7   was placed under oath and was sworn by me to tell
     the truth, the whole truth, and nothing but the
 8   truth;
 9       That the testimony of the witness and all objections
     made by counsel at the time of the examination were
10   recorded stenographically by me and were thereafter
     transcribed under my direction and supervision, and
11   that the foregoing pages contain a full, true, and
     accurate record of all proceedings and testimony to
12   the best of my skill and ability.
13       I further certify that I am neither counsel for
     any party to said action nor am I related to any
14   party to said action, nor am I in any way
     interested in the outcome thereof.
15
16
17       IN WITNESS WHEREOF, I have subscribed my name
     this 20th day of May, 2017.
18
19
20
21
22
23
24           RICKI Q. MELTON, C.S.R. No. 9400
25
```

                                        Page 159

# EXHIBIT 5

## DISTRIBUTION AND SALES AGREEMENT

THIS AGREEMENT is made and entered into as of November 29, 1997, by and between SAMYANG FOODS CO., LTD., a Korean corporation which has its principal place of business at 82-9 Hawolgok 1-dong, Sungbuk-ku, Seoul, Korea ("SAMYANG KOREA") and SAMYANG U.S.A., INC., a California corporation, which has its principal place of business at 1935 Via Arado, Rancho Dominguez, CA 90220 ("SAMYANG U.S.A").

## RECITALS

A. SAMYANG KOREA manufactures and sells food items including instant noodles under various brand names. SAMYANG U.S.A. has marketed SAMYANG KOREA'S products and has manufactured its own instant noodles. SAMYANG KOREA has provided technology, equipment and raw materials to SAMYANG U.S.A for the latter's manufacturing in the United States.

B. The two companies desire to memorialize their relationship and their way of conducting business to ensure continuity of their mutually beneficial business relationship.

## AGREEMENTS

NOW, THEREFORE, in consideration of the agreements, provisions, promises and covenants herein set forth, SAMYANG KOREA and SAMYANG U.S.A agree as follow:

1. DISTRIBUTORSHIP.

SAMYANG KOREA hereby appoints SAMYANG U.S.A its exclusive distributor of all of SAMYANG KOREA'S products currently marketed or to be marketed in the future (the "Products") in North America including the United States, Canada and Mexico (the "Territories") and SAMYANG U.S.A hereby accepts such appointment from SAMYANG KOREA. The "Products" shall include all finished goods, raw materials, accessories and condiments that may go with such products. SAMYANG KOREA shall make all of its technology, equipment and process related to the Products currently in use or to be used in the future to SAMYANG U.S.A. SAMYANG KOREA shall provide technical and personal assistance relating to the Products if SAMYANG U.S.A requests. SAMYANG KOREA shall not appoint any other exclusive distributorship or grant any of the rights granted to SAMYANG U.S.A hereunder in the Territories. SAMYANG KOREA shall not directly or indirectly manufacture or sell any of the Products into the Territories except through SAMYANG U.S.A.

1



SY001398

2.  PURCHASE.

      SAMYANG KOREA  shall sell to SAMYANG U.S.A. the Products at the price and on terms and conditions most favorable to the largest distributor. It is the intention of the parties that the prices to be charged to SAMYANG U.S.A. and the terms for the payments shall be maintained at the current levels except that SAMYANG KOREA  may adjust the price to reflect the fluctuations of the costs of manufacturing or purchasing by SAMYANG KOREA. SAMYANG KOREA shall not arbitrarily increase the prices of the Products it charges to SAMYANG U.S.A. or change the payment terms. SAMYANG KOREA shall use its best efforts to fill the orders from SAMYANG U.S.A. and ship the Products in accordance with the schedule specified in the purchase orders.

3.  INTELLECTUAL PROPERTY

      SAMYANG KOREA hereby grants an irrevocable license to SAMYANG U.S.A the rights to use all of SAMYANG KOREA'S trademarks, trade names, brand names, trade dresses, logos, designs, packaging and copyrights pertaining to the Products currently in use or to be used in the future (the "Intellectual Property Rights") without charges. SAMYANG KOREA shall assign SAMYANG U.S.A any and all Intellectual Property Rights registered in the United States or any states authorities in the U.S. including, but not limited to, trademark registration for the name and logo of "Samyang."

4.  TERM

      The initial term of the distributorship hereunder shall be 50 years.  The term shall be automatically renewed for another 50 years thereafter.

5. Miscellaneous Provisions.

(a) Notices.

      No notice, document or communication to be given hereunder to any party shall be effective for any purpose unless personally delivered to the person at the appropriate address set forth in the beginning or when delivered by mail, sent by registered or certified mail, postage prepaid, addressed to the recipient's address set forth above.

(b) Construction.

      This Agreement shall be construed as a whole in accordance with its fair meaning, the captions being for the convenience of the parties only and not intended to describe or define the provisions in the portions of the Agreement to which they pertain.

SY001399

(c) Attorneys' Fees.

In the event of any controversy, claim or dispute between the parties arising out of or relating to this Agreement, or the enforcement of the provisions hereof, the prevailing party shall be entitled to recover its costs and expenses, including, but not limited to, reasonable attorneys' fees incurred in connection therewith.

(d) Severability.

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

(e) Governing Law.

This Agreement is to be governed by, interpreted under, and construed in accordance with the laws of the State of California.

(f) Counterparts.

This Agreement may be executed in counterparts.

3

SY001400

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above set forth, at Los Angeles, California.

SAMYANG KOREA :

SAMYANG FOODS CO., LTD.
A Korean corporation

By

Name :

Title :

SAMYANG U.S.A :

SAMYANG U.S.A., INC.
A California corporation

By

Mun Kyung Chun
President

4

SY001401

# EXHIBIT 6

Confidential

## STOCK SALE AND PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into as of January 25, 1998, by and between SAMYANG FOODS CO., LTD., a Korean corporation which has its principal place of business at 82-9 Hawolgok 1-dong, Sungbuk-ku, Seoul, Korea ("Seller") and CALYPCO, INC., a California corporation having its principal place of business at 1017 Stratford Avenue, South Pasadena, CA 91030 ("Buyer").

## RECITALS

A. Seller owns 550 shares of SAMYANG U.S.A., INC., a California corporation, which has its principal place of business at 1935 Via Arado, Rancho Dominguez, CA 90220 (the "Company"). The total issued and outstanding shares of the Company is 550 as of the date hereof.

B. Seller desires to divest itself from the Company in line with the overall business reorganization in Korea.

C. Buyer desires to purchase the entire issued and outstanding shares of the Company.

## AGREEMENTS

NOW, THEREFORE, in consideration of the agreements, provisions, promises and covenants herein set forth, Seller and Buyer agree as follow:

1. Sale and Purchase; Seller's Representations and Warranties.

Seller hereby sells to Buyer, and Buyer hereby purchases from Seller, 550 common shares of the Company upon the following conditions and terms. Further, Seller (1) shall enter into a long-term exclusive distributorship contract with the Company to ensure the supply of Seller's products to the Company and (2) shall assign the trademarks, service marks or any other intellectual property rights to the name "Samyang" in the United States. Seller represents and warrants that (a) the Company has issued 550 shares (the "Shares") and no more are outstanding; all of the Shares have been legally and validly issued and are fully paid and nonassessable; and (b) the Company has no outstanding obligations, understandings, or commitments regarding the issuance of any additional shares, or any options, rights, or warrants concerning the issuance of any additional shares or securities convertible

1



EXHIBIT 1016
Chun
5-10-17

SAMYANG0003316

Confidential

into shares. Seller further represents and warrants that Seller has good, marketable and indefeasible title to and full power of disposition over and has full right to sell and transfer to Buyer all the Shares to be sold by that Seller; and those Shares are free of all liens, claims, debts, or other encumbrances, and shall be free of all liens, claims, debts, or other encumbrances upon their transfer to Buyer under this agreement.

2. Purchase Price.

The total purchase price of the Shares is 3,000,000,000 won, which shall be paid as follows:

Wire transfer to an account designated by Seller within two business day from the date on which all the conditions precedent set forth in Section 3 below are satisfied or waived.

3. Conditions Precedent to Buyer's Obligations

(1) Seller shall have delivered the certificates representing the Shares to Buyer or its representative;
(2) Seller shall have executed and delivered the long-term exclusive distributorship agreement between Seller and the Company to Buyer or its representative;
(3) Seller shall have executed and delivered necessary assignment documents for the trademark, service mark and intellectual property right to the name "Samyang" in the United States to Buyer or its representative;
(4) The representations and warranties of Seller stated in paragraph 1 shall be true as of the Closing Date (as defined in Section 4 below).

4. Closing.

The sale and purchase of the Shares shall be consummated by Seller's delivery to Buyer of certificates for the Shares duly endorsed for assignment and transfer, or accompanied by other documents as set forth in Section 3 above and Buyer's transfer of funds to the account designated by Seller. The time of delivery and payment is the "Closing Date."

5. Filings and Approvals.

Each party will cooperate with the other in the preparation and filing, as soon as practicable, of (i) all necessary applications for regulatory approval of the purchase and sale of the Shares and related transactions, and (ii) all other documents necessary to obtain all other required approval and consents.

2

SAMYANG0003317

Confidential

6. Miscellaneous Provisions.

(a) Notices.

No notice, document or communication to be given hereunder to any party shall be effective for any purpose unless personally delivered to the person at the appropriate address set forth below (in which event such notice shall be deemed effective only upon such delivery) or when delivered by mail, sent by registered or certified mail, postage prepaid, addressed to the recipient's address set forth above.

(b) Entire Agreement, Modifications.

This Agreement contains the entire agreement among the parties hereto and supersedes any and all prior agreements, arrangements or understandings between the parties relating to the subject matter hereof except as set forth in the Shareholder Agreement. No oral understandings, statements, promises or inducements contrary to the terms of this Agreement exist. No variation or modification of this Agreement and no waiver of any of the provisions and conditions hereof, or granting of any consent contemplated hereby, shall be valid unless in writing and signed by the party against whom enforcement of any such variation, modification, waiver or consent is sought.

(c) Construction.

This Agreement shall be construed as a whole in accordance with its fair meaning, the captions being for the convenience of the parties only and not intended to describe or define the provisions in the portions of the Agreement to which they pertain.

(d) Attorneys' Fees.

In the event of any controversy, claim or dispute between the parties arising out of or relating to this Agreement, or the enforcement of the provisions hereof, the prevailing party shall be entitled to recover its costs and expenses, including, but not limited to, reasonable attorneys' fees incurred in connection therewith.

(e) Severability.

If any term, provision, covenant or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

3

SAMYANG0003318

Confidential

(f) Governing Law.

This Agreement is to be governed by, interpreted under, and construed in accordance with the laws of the State of California

(g) Counterparts.

This Agreement may be executed in counterparts.

IN WITNESS WHEREOF, the parties have executed this Agreement by and through their respective representative duly authorized and approved as of the day and year first above set forth, at Seoul, Korea by Seller and at Los Angeles, California, by Buyer.

Seller :

SAMYANG FOODS CO., LTD.
A Korean corporation

By
Name :
Title :

Buyer :

CALYPCO, INC.
A California corporation

By
Name : Choon Taik Lim
Title : President

SAMYANG0003319

# EXHIBIT 7

Confidential

# SAMYANG U.S.A., INC.
## 1935 S. VIA ARADO,
## RANCHO DOMINGUEZ, CA 90220

Telephone: 323) 636-8899  Fax: 323) 639-1334   E-Mail: SamyangUSA@earthlink.net

# VIA TELEFAX (02) 919-6180

Chairperson/President
Samyang Foods Co., Ltd.
82-9 Hawolgok 1-dong, Songbuk-gu,
Seoul, 136-131, Republic of Korea

Date of this Letter: April 20, 2001
Total Pages (including the cover page): 3

Re: Distribution and Sales Agreement

We hereby acknowledge the receipt of your company's letter dated on April 20, 2001 signed by the Chairperson of the company.

That letter alleges that the contract for the Distribution and the Sales Agreement was unconscionable to a party of the contract since the contract lacks some basic obligations and that the signer of your company was not fully aware of the contents of the contract. Therefore your company will not going to perform the contractual obligation in the future and will directly distribute your products to the territory over which this company has the exclusive right.

Further, your company want to transform the current payment method to LC basis for the subsequent shipments.

Please read this letter carefully to understand the contract between the two companies and our intent to protect the contractual right this company acquired in the exchange with the legal consideration.

## Contracts
### Distribution and Sales Agreement
This agreement was made and entered into as of November 29, 1997 by and between the two companies as a part of the total and entire sales contract of any interest of your company in Samyang U.S.A., Inc. The contract was fully supported by legal consideration which satisfied the legal detriments and benefits. At the time of the contract your company scrutinized the contract before the singing of the agreement. The agreement is the legally binding contract over the contracting parties of two signing

EXHIBIT
1038
Chun
5-10-17
tabbies

Confidential

PAGE TWO OF THREE
RE:DISTRIBUTION AND SALES AGREEMENT

companies. Thus, your allegation that the contact may be illusory is a complete false claim.

### Exclusive Right of Distribution

Pursuant to the clause of 1 of the contract, this company has the full and exclusive distribution right of all of Samyang Korea's products currently marketed or to be marketed in the future for the term of fifty years which is renewable for another same term after the termination of the original term.

Your sales to the Canadian company of your products while we have been unaware of it, seriously violated our contractual rights. We are going to exercise our right by employing all legal reliance to stop that illegal transactions to protect our right. Please understand that we are bringing this case against the Canadian company to the court of law to make the company's profits to be disgorged and to hold the company for our lost profits for this company. Please understand that your company is primarily liable for this infringement and all subsequent consequences. Your company has to **stop the shipment of products to S.K CANADA LTD in Canada** over which we have exclusive right to sell those products.

Samyang Korea is seriously violating the contract by not shipping the purchase order for that territory while Samyang Korea has to ship the products in accordance with the schedule specified in the purchase orders.

### Trade Names and Trade Marks

Pursuant to the clause of 3 of the contract, this company is the rightful owner that holds the intellectual property including Samyang Korea's trademarks, trade names, brand names, trade dresses, logos, designs, packaging and copyrights pertaining to the products currently in use or to be used in the future. **No other company or anyone else may ever use such names or marks without prior approval of this company in the geographical areas of U.S., Canada, and Mexico.**

If you violate our rights, you may be held liable for the serious penalties. Please note that U.S. governments enforces its power to protect these rights.

### Payment Method

Pursuant to the clause of 2 of the contract, the terms of the payment would be maintained the same and Samyang Korea shall not arbitrarily change the payment terms.

This means that this company cannot be compelled to accept the arbitrarily changed terms. However, we are willing to discuss this matter with you for the feasibility.

SAMYANG0003305

Confidential

PAGE THREE OF THREE
RE: DISTRIBUTION AND SALES AGREEMENT

Consequently, Samyang Korea shall not directly or indirectly manufacture or sell any of the products into the territories except through Samyang U.S.A. and Samyang Korea must ship the products in accordance with the schedule specified in our purchase orders.

We are going to seek all remedies against you for the losses by your infringement in violation of the contract. Please remember that any sales to the specified territories not through this company constitute the breach for which Samyang Korea is absolutely liable. Thus stop any illegal practice immediately before the losses may be magnified and it is hard for your company to bear the damages.

We are looking forward to hearing you soon with positive response to this official letter.

Thank you.

Sincerely,

President, M.K. Chun

SAMYANG0003306

# EXHIBIT 8

Confidential

# *Samyang Foods Co., Ltd.*

Address 82-9, Hawolgok 1-dong, Songbuk-gu, Seoul, 136-131, Republic of Korea
Home Page : http://www.samyangfood.co.kr
E-mail : gongwook@hotmail.com
Telephone : +82-2-940-3340-4, 940-3292
Facsimile : +82-2-919-6180

| | |
|---|---|
| To : S. C. CONTINENT CORPORATION | Date: OCT 04, 2012. |
| Attn. : President Mun Kyung Chun, Managing Director Si Young Lee | Total page(s) :1 |
| From : Overseas Sales Team | including this covering |

Subject: Business Communication

We wish your company prosperity day by day.

In the process preparing an agreement with your company to terminate the selling rights in the U.S., we have confirmed that S.C. CONTINENT CORP. was established on January 7, 2000 and dissolved on August 22, 2003.

Therefore, it is our judgment that it would be impossible for our company to continue to have transaction with S.C. CONTINENT CORP. after becoming aware of this fact. And it is our judgment that it would be also difficult to be the subject of exclusive distribution agreement in the LA region as well after entering into the termination agreement.

We urge your company to present the plans on how your company will resolve the above.

On the other hand, we plan to separately send you the termination agreement and the draft of exclusive distribution agreement with your company. Please review them.

Thank you.

Sincerely,
Won-tae Chung/Gong-wook Kim

Samyang Food Co., Ltd. RC/Overseas Sales Team leader (Acting)

CC.

*SAMYANG FOODS, a Ramen Manufacturer with a proud history of 40 years' tradition based on Honesty and Credit.*

SAMYANG0001065

Confidential

# *Samyang Foods Co., Ltd.*



Address : 82-9, Hawolgok dong, Seongbuk-gu, Seoul, 136-754, Republic of Korea

Home Page : [ HYPERLINK http://www.samyangfood.co.kr ]

E-mail : gongwook@hotmail.com

Telephone : +82-2-940-3340~4, 940-3292

Facsimile : +82-2-919-6180

---

To: S. C. CONTINENT CORPORATION

Attn.: 전문경 사장님, 이시영 상무님

From: 해외영업팀

Date: OCT. 04. 2012.

Total Page(s): 1

including this covering

Subject: 업무연락

귀사의 일익 번창하심을 기원합니다.

당사에서는 귀사와의 미국 판권 해지계약을 만드는 과정에서 S.C. CONTINETNT CORP.가 2000년 1월 7일 설립되어 2003년 8월 22일 해산된 것으로 확인하였습니다.

이에 당사에서는 이 내용을 인지한 이후에 S.C. CONTINENT CORP. 와 거래를 지속하는 것은 불가능한 것으로 판단됩니다. 또한 해지계약 체결 이후 LA 지역의 비독점 유통계약의 주체로도 어려울 것으로 판단됩니다.

이에 대한 귀사의 조속한 해결책 제시를 촉구하는 바입니다.

한편 귀사와의 해지계약 및 비독점 유통계약 초안은 별도로 송부할 예정입니다. 검토 바랍니다.

감사합니다.

정원태 / 김공욱 배상

삼양식품 RC 총괄 / 해외영업팀장 (대)

CC.

*SAMYANG FOODS, a Ramen Manufacturer with a proud history of 40 years' tradition based on Honesty and Credit.*

# CERTIFICATION OF TRANSLATION

# and

# DECLARATION

State of California        )
                           )   S. S.
Los Angeles County         )

I, Soomi Ko, the undersigned, declare under penalty of perjury that I am a duly certified Korean Court Interpreter approved by the United States District Courts, certified by the State of California and the Los Angeles County Superior Courts, with competent knowledge of Korean and English, and that I have truthfully and correctly translated **35 Exhibits listed below re: Sam Yang (USA), Inc. v. Samyang Foods Co., Ltd., et al., Case no. 2:15-cv-07697 AB (KSx)** from Korean to English in accordance with Fed. R. Evid. 901 and that the said translation is, to the best of my knowledge and belief, a true and correct translation. I further declare under penalty of perjury that I am neither counsel for, related to, nor employed by any of the parties, and that I have no financial or other interest in the outcome of any action related to this translation. I declare under penalty of perjury that the foregoing is true and correct.

List of Exhibits Translated

| | |
|---|---|
| Ex. 1006_TRANS.pdf | Ex. 1071_TRANS.pdf |
| Ex. 1007_TRANS.pdf | Ex. 1072_TRANS.pdf |
| Ex. 1010_TRANS.pdf | Ex. 1073_TRANS.pdf |
| Ex. 1012_TRANS.pdf | Ex. 1074_TRANS.pdf |
| Ex. 1023_TRANS.pdf | Ex. 1075_TRANS.pdf |
| Ex. 1024_TRANS.pdf | Ex. 1076_TRANS.pdf |
| Ex. 1027_TRANS.pdf | Ex. 1077_TRANS.pdf |
| Ex. 1029_TRANS.pdf | Ex. 1084_TRANS.pdf |
| Ex. 1036_TRANS.pdf | Ex. 1093_TRANS.pdf |
| Ex. 1038_TRANS.pdf | Ex. 1104_TRANS.pdf |
| Ex. 1044_TRANS.pdf | Ex. 1109_TRANS.pdf |
| Ex. 1045_TRANS.pdf | Ex. 1112_TRANS.pdf |
| Ex. 1048_TRANS.pdf | Ex. 1113_TRANS.pdf |
| Ex. 1051_TRANS.pdf | Ex. 1114_TRANS.pdf |
| Ex. 1052_TRANS.pdf | Ex. 1115_TRANS.pdf |

KO & MARTIN Certified Interpreters and Translators www.komartin.com  (213) 999-7848

| Ex. 1053_TRANS.pdf | Ex. 1119_TRANS.pdf |
| Ex. 1068_TRANS.pdf | Ex. 1120_TRANS.pdf |
| Ex. 1069_TRANS.pdf | |

Executed on 19th of December,

Soomi Ko
California State Certified Court Interpreter
#300732
Direct: (213) 999-7848
soomi@komartin.com
www.komartin.com

Ko & Martin Certified Interpreters and Translators
Specializing in Korean and Chinese Languages

# EXHIBIT 9

1                 UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

3

   _____

4    SAM YANG (U.S.A.), INC.;        )

5    ROYPAC, INC., dba S.C.          )

6    CONTINENT CORPORATION,          )

7              Plaintiffs,           )

8        vs.                         ) Case No.

9    SAMYANG FOODS, CO., LTD.; and) 2:15-cv-07697 AB (KSx)

10   Does 1 through 20, inclusive,)

11             Defendants.           )

12   _____)

13   AND RELATED ACTION.             )

     _____)

14

15     CONTINUED VIDEOTAPED DEPOSITION OF MUN-KYUNG CHUN

16                Los Angeles, California

17                Friday, October 20, 2017

18                      Volume II

19

20   Reported by:

21   NADIA NEWHART

22   CSR No. 8714

23   Job No. 2726320

24

25   PAGES 160 - 273

                                          Page 160

```
 1        A    I think that's probably true.

 2        Q    And do you recall when Sam Yang (U.S.A.) was

 3    founded?

 4        A    I was not there at the time, but I presume in

 5    the '80s.                                           10:19:20

 6        Q    And at that time, did you work for Sam Yang

 7    (U.S.A.) at all?

 8        A    No, I did not.

 9        Q    When did you begin working for Sam Yang

10    (U.S.A.), roughly?                                  10:19:37

11        A    That would have been mid-1980s.

12        Q    And at that time, Sam Yang (U.S.A.) was still

13    owned by Samyang Korea, correct?

14        A    Correct.

15        Q    And at that time, did your father, former      10:20:10

16    chairman, have ultimate authority over Sam Yang

17    (U.S.A.)'s business?

18        A    Yes.

19             MS. BOWMAN:   Okay.  I'd like to look at

20    Exhibit 1009, please.                               10:20:32

21             (Exhibit 1009 was marked for identification

22          by the court reporter and is attached hereto.)

23    BY MS. BOWMAN:

24        Q    Ms. Chun, do you recognize this -- this

25    document, Exhibit 1009?                             10:21:10
```

Page 168

1    Mexico, as the exclusive territories?

2         MR. McDONOUGH:  Vague and ambiguous as to

3    "made the decision" in particular.

4         You may answer.

5         THE WITNESS:  As I previously stated, the          10:39:16

6    agreement was to reflect the operation of Sam Yang

7    (U.S.A.) at the time as is.  And at that time, we

8    were in charge of North America where we were

9    exporting to Canada and Mexico.

10   BY MS. BOWMAN:                                          10:39:41

11     Q   At that time, in November 1997, was Sam Yang

12   (U.S.A.) distributing to any countries other than

13   the United States, Canada and Mexico?

14     A   Are you asking about 1997?

15     Q   Yes.                                              10:40:14

16     A   Other than Mexico and Canada, I think we were

17   selling -- we sold in Russia, as well as Guatemala.

18     Q   But you didn't want to include Russia and

19   Guatemala in the distribution and sales agreement?

20     A   At the time, Samyang Korea was not exporting     10:41:08

21   to Russia or Guatemala, and I had obtained

22   permission for those countries by calling Samyang

23   Korea before.

24         And so that I agree -- enter agreement with

25   my father that for -- continue, at least for some      10:41:37

                                                    Page 173

Veritext Legal Solutions
866 299-5127

```
 1    time, I would sell to those countries.
 2       Q    But you didn't think it was necessary to
 3    include those countries, Russia and Guatemala, in
 4    the written agreement, correct?
 5       A    Since my relationship was that of father and      10:42:09
 6    a daughter, so I trusted my father.
 7       Q    So you and your father had an informal,
 8    unwritten agreement that Sam Yang (U.S.A.) could
 9    distribute to Nicaragua and Russia?
10          THE INTERPRETER:  "Nicaragua," did you say?         10:42:43
11          MR. McDONOUGH:  It misstates -- it misstates
12    testimony.  It also -- you misspoke -- separately,
13    you misspoke, and said "Nicaragua."  You meant to
14    say "Guatemala."  I think we understood that.
15          MS. BOWMAN:  You're absolutely right.  I            10:43:00
16    apologize.  And I did say "Nicaragua" by accident.
17          MR. McDONOUGH:  We all knew what you meant.
18          MS. BOWMAN:  They're really close
19    geographically.
20          THE INTERPRETER:  So I will re-render?              10:43:09
21          MS. BOWMAN:  Please.
22          THE INTERPRETER:  So should I re-render
23    taking "Nicaragua" out to "Guatemala"?
24          MS. BOWMAN:  Yes.
25          MR. McDONOUGH:  And the objection is still          10:43:19
```

Page 174

```
  1    going to stand.

  2         THE INTERPRETER:  Okay.  I got it.

  3         THE WITNESS:  Yes, that's true.  And besides

  4    my father, the management who were right below my

  5    father were also aware of this.            10:44:00

  6    BY MS. BOWMAN:

  7    Q    But it was your father who ultimately had to

  8    approve of Sam Yang (U.S.A.) distributing to Russia

  9    and Guatemala, correct?

 10    A    That's correct.                        10:44:28

 11    Q    At this time, in November of 1997, did you

 12    want Sam Yang (U.S.A.) to obtain an exclusive

 13    distributorship for North America?

 14    A    I thought that goes without saying, because

 15    at the time, we were already conducting business the  10:45:08

 16    same way.

 17    Q    Why did you think it was necessary at that

 18    time to execute a written agreement reflecting the

 19    business that you were conducting with Samyang Korea

 20    as of November 1997?                        10:45:23

 21    A    When Sam Yang (U.S.A.) -- when we purchased

 22    Sam Yang (U.S.A.) from Samyang Korea, isn't it --

 23    doesn't that go without saying that when you

 24    purchase the company, the exclusivity comes with it?

 25    Q    I don't know.  I guess you would have to tell  10:46:21
```

Page 175

```
 1    was that gentle- -- person's name?  Byung Tae?

 2          MS. BOWMAN:  Yeah.

 3          THE WITNESS:  Oh, Byung Tae Kim.  He went to

 4    Korea to get the signature on the agreement.

 5    BY MS. BOWMAN:                                    11:25:15

 6       Q    And did you give him other documents to take

 7    along with this agreement, Exhibit 1009?

 8       A    Yes.

 9       Q    Which other documents did you give him?

10       A    To my recollection, I think it was stock      11:25:45

11    purchasing.

12       Q    Anything else that you recall?

13       A    From our side -- our side, that's it.  But

14    after, when it was done, they sent something else.

15       Q    What else did they send?                      11:26:17

16       A    From their side.  What I mean by that is from

17    Samyang Korea, they were -- this document and stock

18    purchase and trademark.

19       Q    So just to make sure I understand, you gave

20    them -- you gave Samyang Korea the stock purchase      11:26:50

21    agreement and the distribution and sales agreement.

22    And from their side, you received back the stock

23    purchase agreement, the distribution and sales

24    agreement and the trademark agreement; is that

25    correct?                                              11:27:06
```

Page 192

```
 1        A    I probably received stocks as well.

 2        Q    Like as in stock certificates?

 3        A    Yes, I'm talking about stock certificates.

 4        Q    Okay.

 5        A    That's my recollection right now.  If I think    11:28:01

 6    of anything else, I'll tell you.

 7        Q    Okay.  And had you discussed the terms of the

 8    stock purchase agreement prior to Mr. Kim going to

 9    Samyang Korea with that document?

10        MR. McDONOUGH:  Vague and ambiguous.              11:28:37

11    Discussed with who?

12    BY MS. BOWMAN:

13        Q    And I'm talking about discussed with your

14    father the terms of the stock purchase agreement.

15        A    Between Byung Tae Kim and my father or myself    11:29:07

16    and my father?

17        Q    You and your father.

18        A    So what was your question, please?

19        Q    My question is, did you discuss the terms of

20    the stock purchase agreement with your father prior    11:29:16

21    to Mr. Kim taking the stock purchase agreement to

22    Korea?

23        A    At the time, I discussed and reached an

24    agreement with my father in regards to this and

25    purchase and trademark before the agreement was        11:30:14
```

Page 193

1    signed.

2        Q    Did you discuss the purchase price with your

3    father?

4        A    Yes.

5        Q    And did you and your father agree on the          11:30:34

6    purchase price for the stock purchase agreement?

7        A    Rather than an agreement, my -- it was my

8    father's request.

9        Q    Do you know how -- do you know who determined

10   the purchase price?                                         11:31:14

11       A    At the end, the decision was made together

12   between me and my father.

13       Q    How did you determine the purchase price?

14   What did you base it on?

15       A    My father brought up a price first.              11:31:55

16       Q    Do you know what he based his initial price

17   on?

18       A    I do not know what he based it on.

19       Q    Did you agree to the initial price that he

20   suggested, or did you ask for a different price?          11:32:18

21       A    Initially, I said I did not want to do it.

22       Q    But did you ultimately end up paying the

23   price that he initially suggested?

24       A    Can you repeat that once more, please.

25       Q    Sure.  The price that your father initially      11:33:03

Page 194

```
 1    working at Sam Yang (U.S.A.), and the business was

 2    such that it was not a worthy investment.

 3        Q    Okay.  So you meant you didn't want to

 4    purchase Sam Yang (U.S.A.), correct?

 5        A    That's how I felt.                          11:35:42

 6        Q    But you purchased it anyway.

 7        A    I bought it because I had no choice.  My

 8    father forced me to purchase it.  He requested -- he

 9    made requests.  He demanded of me to purchase it and

10    at last, he pleaded with me to purchase it.          11:36:09

11        Q    And so this purchase -- this purchase that

12    was effected by the stock purchase agreement was at

13    the same time that the distribution and sales

14    agreement and trademark agreements were signed as

15    well, correct?                                       11:36:25

16        A    Are you talking about at the time frame of

17    signing?

18        Q    Correct.

19        A    They were all done on the same date.

20        Q    And were they all part of the same          11:36:57

21    transaction for you to purchase Sam Yang (U.S.A.)?

22        A    That's correct.

23        Q    Okay.  And you were informed from Mr. Kim as

24    soon as the agreements were signed by your father,

25    correct?                                             11:37:29
```

Page 196

```
 1        A    I was notified after it was signed.

 2        Q    And very soon thereafter, you -- you

 3   transferred the money for the purchase, correct, the

 4   purchase of Sam Yang (U.S.A.)?

 5        A    By then, money was already there.        11:38:15

 6        Q    When did you transfer the money for the

 7   purchase?

 8        A    Almost the same timing as the signing.

 9        Q    Were you aware that Samyang Korea would be

10   announcing its bankruptcy or restructuring           11:38:38

11   procedures as soon as the agreements were signed and

12   the money was transferred?

13        MR. McDONOUGH:  Vague and ambiguous,

14   overbroad, possibly speculation.

15        You may answer.                                 11:39:15

16        THE WITNESS:  I heard rumors.

17   BY MS. BOWMAN:

18        Q    Did you know that Samyang Korea was going

19   to -- strike that.

20        Did you and your father discuss the fact that  11:39:32

21   Samyang Korea was going to enter bankruptcy or

22   insolvency proceedings prior to signing of the

23   distribution agreement?

24        A    My father was the founding -- or my father

25   was the founder of the company.  He did not readily  11:40:24
```

                                                     Page 197

1   break now.

2         Again, don't concern yourself with why she's

3   asking the questions.  Just answer the questions to

4   the best of your ability.

5         THE WITNESS:  I understand, but the          12:42:12

6   questioning is somewhat -- I don't know why.

7         MR. McDONOUGH:  Okay.  And again, we can talk

8   about it.  But if you don't understand the question,

9   just tell her you don't understand it.  You don't

10  need to quibble with her about why she's asking it.   12:42:27

11  Just say to Ms. Bowman, I'm sorry, I don't

12  understand your question.

13        THE WITNESS:  Ah, I apologize.  I will --

14  I'm going to -- I --

15        MR. McDONOUGH:  Okay.  They need to take        12:42:45

16  another call, so we're going to go off the record,

17  and we'll clear this up after the lunch break.

18        THE WITNESS:  Thank you.

19        THE VIDEOGRAPHER:  Off the record.  12:42.

20        (Lunch recess.)                               12:42:54

21        THE VIDEOGRAPHER:  Okay.  The time is 2:06.

22  We are back on the record.

23  BY MS. BOWMAN:

24    Q   Ms. Chun, I believe before lunch, we were

25  discussing the period in the mid-2000s when -- when   02:06:59

                                              Page 216

1     you first learned that Korea domestic Samyang

2     products were being sold in the U.S., and I asked

3     you if at that time you believed Sam Yang (U.S.A.)

4     was the only company that had a right to import

5     Samyang products into the United States.          02:07:21

6            Was that your belief?

7     A    Yes.

8     Q    And did you also believe at that time that

9     Sam Yang (U.S.A.) was the only company that had the

10    right to use Samyang Korea's trademark in the United   02:08:02

11    States?

12    A    Yes.

13    Q    But were you aware that Samyang Korea

14    products were being sold in the United States that

15    were not imported by Sam Yang (U.S.A.), correct?    02:08:29

16    A    You're still talking about mid-2000s?

17    Q    Yes.

18    A    Yes, in small quantity.

19    Q    And you were aware -- strike that.

20           And you believed that one of your employees    02:09:04

21    from Sam Yang (U.S.A.) inquired as to the stores

22    where those products were being sold, correct?

23           MR. McDONOUGH:  I believe that misstates

24    testimony.

25           THE WITNESS:  You mean I instructed?      02:09:48

                                        Page 217

```
 1      that my father had breached his duty for a long time

 2      and that In Jang Chun has been pestering my father.

 3      So when my father conveyed this to me in this

 4      regard, I wrote that.

 5          Q    What did you understand the breach of duty    02:57:54

 6      that your brother accused your father of to be?

 7              MR. McDONOUGH:  Lacks foundation, and it

 8      calls for speculation.

 9              You may answer.

10              Maybe I should withdraw that speculation      03:00:25

11      objection.  I don't know what's coming here.

12              I still do, all kidding aside, maintain that

13      speculation objection.

14              THE INTERPRETER:  Okay.  Don't talk anymore.

15      I have to try to get all this.                        03:00:49

16              THE WITNESS:  Okay.  As of the end of 1997,

17      Korea was faced with Asian financial crisis,

18      commonly referred to as IMF Crisis.

19              And also, Korea was going through foreign

20      currency crisis as well.  And Samyang Korea/Samyang   03:01:11

21      Foods was going through extremely difficult

22      situation where they had to sell Samyang Korea's

23      head office building, as well as golf course, as

24      well as a company called Yujisaryo, which was in the

25      business of farm animal and related businesses.       03:01:39
```

Page 234

```
 1        Q    So is it the breach that your brother was

 2   accusing your father of, of not really receiving the

 3   board approvals that are in the board of directors

 4   minutes meetings regarding the sale of Sam Yang

 5   (U.S.A.) to Calypco to you?                        03:17:28

 6             MR. McDONOUGH:  Lacks foundation, calls for

 7   speculation.

 8             THE WITNESS:  This doesn't -- this doesn't

 9   really have much to do with anything.  The name

10   Calypco -- my father told me to use Calypco rather   03:18:41

11   than using a family name, so this is not that

12   important.

13        And at the time I wrote him this letter

14   stating that after five years, legally, there's

15   absolutely no problem about -- because I wanted to   03:20:11

16   console him.

17        At the time, he was 90 years old, and

18   although he was the chairman of the company, he was

19   just an old man.  So whenever my younger brother

20   threatened him of going to jail, he would be very    03:20:28

21   afraid.

22        So I would tell him that we have board

23   resolutions, as you can see here, with all of the

24   board members' chops affixed in the back.  So I told

25   my father not to worry that this has legal effect.   03:20:50
```

                                                    Page 240

```
 1    So that's what this letter is all about.
 2        Q   Did your father ever tell you that the
 3    initial board meeting that's referenced in these
 4    minutes did not occur?
 5        A   This was provided to me in -- on or about    03:21:29
 6    middle of January in 1998 by my father.
 7            THE INTERPRETER:  Okay.  Strike that.
 8            THE WITNESS:  This was provided to me on or
 9    about middle of January in 1998 by Samyang Korea/
10    Samyang Foods.                                        03:22:01
11    BY MS. BOWMAN:
12        Q   Why did you write in this letter:
13            "Even if the initial board meeting
14            was not convened, father would have
15            had the most number of shares."?          03:22:12
16            Why did you mention the board meeting not
17    being convened?
18        A   Well, in Korea, sometimes board of directors
19    meeting convene, and sometimes it doesn't convene.
20    And sometimes the board of directors meeting is held   03:23:50
21    for some small issues or big issues.  Or sometimes
22    the board of directors meeting is not held.
23            And in Korea, it is much different than the
24    U.S.  And when a person is a chairman in Korea,
25    especially a somewhat larger-sized chairman, they    03:24:16
```

                                              Page 241

```
 1   are considered almost like an emperor.  So sometimes
 2   they hold board of directors meeting, and sometimes
 3   they don't.  And I said this to alleviate his
 4   worries since my father was much concerned.
 5        MS. BOWMAN:  Okay.  I think maybe we should      03:24:42
 6   take a break.
 7        THE INTERPRETER:  Thank you.
 8        MS. BOWMAN:  We've been going for a while.
 9        THE VIDEOGRAPHER:  Off the record, 3:24.
10        (Recess.)                                       03:24:57
11        THE VIDEOGRAPHER:  Okay.  The time is 3:51.
12   We are back on the record.
13   BY MS. BOWMAN:
14     Q   Okay.  Ms. Chun, I wanted to ask you a little
15   bit about Korean companies and how they worked,      03:51:37
16   which you started to mention before the break.
17        You said that in Korea, unlike in the U.S.,
18   the chairman is almost like an emperor.  So did you
19   mean by that that when the chairman makes a
20   decision, the employees basically follow it without  03:51:55
21   really asking questions?
22     A   Yes, that's possible.
23     Q   So I guess to compare to American companies,
24   does the -- does the chairman basically have the
25   final say on pretty much every decision that's made? 03:52:48
```

Page 242

```
 1           MR. McDONOUGH:  Vague as to "disrespectful"
 2    in this context.
 3           You may answer.
 4    BY MS. BOWMAN:
 5       Q   You can answer.                          03:59:04
 6       A   Well, in my generation -- you know how old I
 7    am.  That question was asked to me in the beginning
 8    of the questions, so you know how old I am, right?
 9    I'm trying to talk about my generation.  Your
10    generation -- your generation and my generation are  03:59:43
11    different.
12           Well, in -- in our generation, we cannot
13    address our parents in a disrespectful manner.
14    That's just not allowed.  Although I may say this
15    and that, I don't want to do it, please give me my  04:00:34
16    money back and whatnot, ultimately, I would obey
17    what my father would say.
18           In our generation, we respect our parents by
19    listening to what they tell us and not doing
20    whatever I want.  I'm sure you may not understand,  04:00:56
21    but Koreans who grew up back then would understand
22    what I'm talking about.
23       Q   So when you said you had to obey your father,
24    it was needing to obey him because he was your
25    father and not because he was the chairman of       04:01:17
```

Page 245

1    Samyang Korea?

2        A    Rather than in the context of obeying my

3    father, I felt that I did a good deed for my father.

4    I did a good deed to my father who was the founder

5    of the company, and I did a good deed to Samyang        04:02:06

6    Korea.

7        Q    So it was out of respect to your father and

8    the company that he had built?

9        A    Yes.

10       Q    Did you feel the same amount or the same        04:02:26

11   degree of respect for your brother when he became

12   the chairman of Samyang Korea?

13       A    Not at all.

14           In Jang Chun, from year 2001 onwards to

15   present, has harassed me by threatening to shut down     04:03:17

16   Sam Yang (U.S.A.) continuously for many years, and

17   even my father knows about that.

18       Q    How did he threaten to shut down Sam Yang

19   (U.S.A.)?

20       A    He has harassed and threatened me by changing   04:06:12

21   the payment terms initially.  And in the beginning,

22   our payment term was DA; that means we were to make

23   payment directly to the company.  And thereafter, he

24   changed the term on the payment to LC.  What does

25   that mean?                                               04:06:36

                                                    Page 246

```
 1          You may answer.
 2          THE WITNESS:  They probably have some other
 3    reasons, some other reasons between In Jang Chun and
 4    Jung Soo Kim as to what they want to do by
 5    establishing a new company.  I'm sure they have      04:23:54
 6    their own reasons.
 7    BY MS. BOWMAN:
 8      Q   And that's just speculation, correct?  You
 9    don't actually have any basis for thinking that
10    they're starting a new company?                      04:24:04
11      A   Well, if we are shut down, they'll probably
12    come in.  That sounds like a reality.
13      Q   But again, that's just you speculating based
14    on what you think is likely to happen.  You don't
15    know any specific facts that make you think they're  04:24:42
16    trying to start a new company, correct?
17      A   I'm giving you a hypothetical answer, because
18    you asked me a hypothetical question.
19          MR. McDONOUGH:  That's true.
20          MS. BOWMAN:  Actually -- not even worth going  04:25:25
21    over.
22      Q   Okay.  Ms. Chun, forgive me for asking, but
23    when did your -- when did your father pass away,
24    approximately?
25      A   Three years ago.  It's been three years.      04:25:58
                                                 Page 253
```

```
 1     That was in July 2014.

 2          Oh, and for your reference, my father was

 3     installed as an honorary chairman in year 2011.  At

 4     the same time, In Jang Chun became the chairman.

 5     And then thereafter, a few months after, he kind of      04:26:46

 6     became ill and then passed away in 2014.

 7          And I believe the payment term was changed

 8     when In Jang Chun became the chairman.  And I think

 9     payment term was changed into LC at that time in

10     year -- when my brother became the chairman as well;    04:28:08

11     however, my father wasn't like that.

12          My father was very understanding.  And if I

13     said, oh, father, I'm going through a difficult

14     time, then he would say, oh, is that right?  And I

15     said, "I need a little bit more time."                   04:28:28

16          And then he said, "Oh, okay.  I will wait for

17     you."

18          And then if I said, oh, my God, the products

19     have rotten smell, and then he will say, well, look

20     into it.  Look into it.                                  04:28:41

21          And if I said I was having difficult time, he

22     will wait for me.  And also, all the time that I did

23     business with Samyang Korea, I never not paid the

24     payments that I owe.  And ultimately, balance became

25     zero.  So my father also acknowledged me and also       04:29:06
```

Page 254

```
 1    trusted me with my creditworthiness.

 2       Q    But your brother, In Jang Chun, did not trust

 3    you the same way that your father had?

 4       A    No, it's not that he didn't trust me, per se.

 5    I don't think that's the reason behind it.  He has        04:29:55

 6    his own purpose of doing things.  And his purpose is

 7    to shut me down so that I close my doors, that, you

 8    know, he wants to kill me.

 9          So what I mean by that -- what I mean by he's

10    trying to kill me is that he wants to kill my            04:30:24

11    business, okay?  I want to make sure that's on

12    there.
```

```
13          Well, there's a Korean attorney present here,

14    so she will probably know that there are many

15    Korea -- Korean dramas with the same theme where,        04:31:01

16    you know...

17          MR. McDONOUGH:  Well, wait a minute.  Michael

18    Jin might know better than anybody else about that.

19          THE WITNESS:  Well --

20          MS. BOWMAN:  Objection; calls for speculation.    04:31:23

21          MR. McDONOUGH:  It doesn't.

22          THE WITNESS:  It's like a muddled story of --

23    of people doing things, and it will be as to In Jang

24    Chung and Jung Soo Kim are those bad heroines of the

25    drama, and I am the victim.                              04:31:49
```

                                            Page 255

```
 1          MS. SHIN:  I feel like my habit of watching

 2    Korean drama is exposed here.

 3    BY MS. BOWMAN:

 4       Q   Ms. Chun, are you currently involved in a

 5    lawsuit against your brother involving your father's    04:32:01

 6    estate?

 7          MR. McDONOUGH:  I suspect that's irrelevant

 8    and not calculated to lead to the discovery of

 9    admissible evidence and possibly invasion of

10    privacy.                                                04:32:25

11          But you may answer.  It's a yes-or-no

12    question.

13          THE WITNESS:  Yes.

14    BY MS. BOWMAN:

15       Q   When did the lawsuit begin?                      04:32:50

16       A   Since I am situated here, I'm not exactly

17    sure.  But according to Korean law, to my

18    understanding, the lawsuit has to be lodged within

19    one year of passing.  So I believe the suit may have

20    been lodged one or two days prior to the expiration    04:33:41

21    date, but I'm not really sure.

22       Q   Okay.  I wanted to turn back to this letter

23    that we were looking at before, Exhibit 1069-C.  I

24    just had a few more questions about this.

25          Okay.  In the second paragraph, when you say,    04:34:17

                                                    Page 256
```

1    "It would be proper to transact via normal method,"

2    what did you mean by that?

3            THE REPORTER:  What method?

4            MS. BOWMAN:  Normal.

5            THE WITNESS:  As I were to explain the          04:36:53

6    circumstances back then, if we look at the fax,

7    since it states that it's a re-fax, that means the

8    first fax came prior to this date.

9            So after this fax was first received, I had a

10   conversation with my father about this fax.  But by     04:37:16

11   this time, my father and I endured long period of

12   this back and forth where whenever I had issues, he

13   will come onboard and help me and whatnot.

14           But we were both very tired by this time.

15   And by this time, my father was no longer the           04:37:41

16   chairman but has became an honorary chairman.  That

17   means he was no longer in the front line but in the

18   back.  And that was the background of what the

19   circumstances was.

20           And my father and my mother have some age gap    04:38:04

21   between the two of them.  And by this time, I have

22   been practicing meditation for a long time, which

23   was Oriental yoga.  So my father was telling me,

24   "Why don't you wrap everything up over there and

25   come back and stay with your mom.  And perhaps I can    04:38:33

                                                    Page 257

```
 1     give you something that your mom has."
 2          So that's when I suggested, based on his
 3     suggestion that he could give me something that my
 4     mother owns -- rather than that, I am saying it will
 5     be better to just do a normal transaction.      04:38:58
 6       Q   And by "wrap everything up," did you
 7     understand your father to mean sell Sam Yang
 8     (U.S.A.) back to Samyang Korea?
 9       A   No, that's not what we're talking about, not
10     selling Sam Yang (U.S.A.).  I purchased Sam Yang   04:39:49
11     (U.S.A.), so that's mine.  But what my father and I
12     were talking about is the distribution.
13       Q   So on the last page of this letter -- where
14     you talk about sending --
15          THE INTERPRETER:  Oh, hang on.  Excuse me.  I   04:40:11
16     missed something.
17          THE WITNESS:  What stayed in the letter, the
18     three items, stopping export to Korea altogether,
19     increasing prices, stopping DA transaction, things
20     like that was stressing me, and my father felt my   04:40:45
21     stress as well.
22          THE INTERPRETER:  That portion was in the
23     middle somewhere in her testimony.
24     BY MS. BOWMAN:
25       Q   Okay.  And so that's why you were considering   04:40:59
```

Page 258

```
 1    terminating the distribution agreement at that
 2    point?
 3         MR. McDONOUGH:  Misstates testimony and
 4    evidence.
 5         You may answer.                          04:41:19
 6         THE WITNESS:  At the time, my father, looking
 7    at this fax and myself, looking at this fax, who
 8    would not be angry?  So out of anger -- and we --
 9    you know, this was said.  And it was -- it was like
10    having regrets between my father and I, my father   04:42:49
11    saying, "Oh, my God.  I can't believe this is
12    happening, and I'm in my age of 90 years old."
13         And my father's situation was that although
14    he did not like his son, he still have -- had to
15    give the company to his son, and he became the      04:43:13
16    honorary chairman without any authority.
17         So although I had written my letter this way,
18    what would me going to Korea being with my mother
19    will bring?  That will be a temporary solution,
20    whereas my mother will soon pass away also.  And the 04:43:35
21    reality is I still had 80 years left to this
22    agreement.  So although I had written this letter
23    this way, it ultimately just fizzled out.
24    BY MS. BOWMAN:
25         Q    So on the last page of this letter, near the  04:44:02
```

                                        Page 259

```
 1            THE REPORTER:  "We treat it" what?

 2            THE INTERPRETER:  "Lightly."

 3            THE WITNESS:  And one more thing.  As you can

 4    see, the date is in year 2013.  In year 2013, at the

 5    time, there was a price fixing lawsuit that was          04:57:58

 6    brought up.  And then although we were not involved

 7    at all from our company, both consumer and the

 8    wholesalers sued on antitrust lawsuit.

 9            So thereafter, I was fully wrapped up by

10    hiring an attorney and responding to such lawsuit.       04:58:27

11    And I believe Samyang Korea became wrapped up with

12    the antitrust lawsuit as well, and they were wrapped

13    up on their end as well.

14            So in conclusion, because of that, all these

15    talks went back to the starting point or original       04:58:48

16    point.

17    BY MS. BOWMAN:

18        Q   So I understand your point to be that after

19    you sent the initial letter when you were very

20    angry, you didn't really consider terminating the       04:59:04

21    distribution agreement seriously.  What I don't

22    understand -- and this is my question now, which is,

23    why did you continue to discuss termination until

24    March of 2013 if you weren't interested in

25    termination following December 2011?                     04:59:21
```

Page 264

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12       Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [ ] was not requested.

16       I further certify that I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19       IN WITNESS WHEREOF, I have this date subscribed

20   my name.

21       Dated: 10/23/2017

22

23

         NADIA NEWHART

24       NADIA NEWHART

25       CSR NO. 8714

                                              Page  273

# EXHIBIT 10

Confidential



SAMYANG0025381

Confidential



International delivery
by FedEx Express

Envelope
For International Use

GLOBAL EXPRESS®
GUARANTEED
UNITED STATES POSTAL SERVICE

SAMYANG0025386

Confidential

*From Mun-kyung*

Ms. Michelle Chun
10816 Norwalk Boulevard
Santa Fe Springs, CA 90670-3330

*To: Joong-yun Chun*

*85-606 Hyundai APT*

*Apgujeong-dong, Gangnam-gu*

Seoul, 135-110, KOREA

SAMYANGO025384T

Confidential



Ms. **Michelle Chun** *Mun-kyung*
10316 Norwalk Boulevard
Santa Fe Springs, CA 90670-3330

*To: Joong-yun Chun*

*85-606 Hyundai APT*

*Apgujeong-dong, Gangnam-gu*

Seoul, 135-110, KOREA

SAMYANG0025385T

Confidential

*To Dad and Mom*                                        *12-19-2011*

*Hello?*
*I am sending you a copy of the board of directors resolution that you mentioned over the phone.*
*I am informed that there is no problem legally if it has been 5 years since the breach of duty. Even if the initial board meeting was not convened, father would have had the most number of shares at the time, and I am assuming he did the same with other matters.*

*I think you should look into this through someone else, and it would be proper to transact via normal method.*

*This is between one company to another. If mom's personal money were to be received, would she feel good about that?*

*Within a few days, this year will end and the new year will begin. As soon as I arrived on November 28th, and I haven't even had the chance to recover from jet lag, and everyday until now, I've been hearing not only about the breach of duty, but I've also been accused of being a thief and a swindling bitch who has ripped off the payment of the goods. And according to the FAX that was received on the 29th:*
*<I am enclosing the FAX>*
*(1) Suspension of all U.S. export activity*
*(2) Price increase*
*(3) Discontinuation of the credit-based payment term*

SAMYANG0025387T

Confidential



*This is not a business negotiation; it is telling me to die and disappear at once, without being able to make any noise at a dead-end and not even able to breathe—*
*this is basically a breach of contract.*
*Rather, this is inducing and prompting us to bring the lawsuit from our side.*

*How can this be, even after my continuous suffering in patience?*
*Do you want the lawsuit to happen?*
*Do you want me to hang myself and die?*

*For the past 10 years and more, I am also the daughter of the company founder. I have been subjected to all sorts of humiliation and indignity from a sibling who is more than 10 years younger than me.*

*Coming to the company one day suddenly, and behaving in a rude manner like a henchman or a loan shark, the shipment halted and made it impossible to display the ramen products on the market shelves; more so, even exerted threat and intimidation to write a will, and also acted rudely in front of the employees.*

*In what universe does it make any sense for any businessperson to suspending the U.S. market in this day and age, which is not the period of Goryeo or Chosun Dynasty?*

SAMYANG0025388T

3

*On the morning of departure from Korea, I said, send the official letter regarding the price that Jung-soo wants, but I did not want my employees to know about this.*
*Only the Managing Director See-young Lee knows about it.*

*I think it would be best to do this verbally and make a decision when the agreement has been reached.*

*When things settle down, I would like to run a meditation center in Korea and live quietly in meditation.*

*I look forward to your wise decision.*

*Take care,*

*Respectfully, Mun-kyung*

SAMYANG0025389T

Confidential

## Meeting Minutes of the Board of Directors

On January 24, 1998, 10:00 AM, the board meeting was held at Samyang Foods Co., Ltd.'s *Wolgok* company building located at 82-9 Hawolgok-dong Seongbuk-gu, Seoul.

Among 13 directors, 7 directors in attendance

At the stated hour, CEO and chairman Joong-Yoon Chun took a seat and announced beginning of the session, starting the deliberation of the bill.

The first item on the agenda:  A motion was made for selling the investment stocks of another corporation, and the moderator explained that we would like to sell the stocks of Sam Yang U.S.A. held by our company on the terms described below, and requested the board's approval on this matter, and all of the directors in attendance passed the bill.

See Below

1. Terms of Sale
   a. Purchaser:  CALYPCO, INC.
          LIM, CHOON TAIK
   b. Name of Event:  Sam Yang U.S.A. Inc.
   c. Number of Shares:  550 shares ($@10,000)
   d. Sales Price:  ₩3,000,000,000
2. Cause for Sale:  Improvement of financial structure

The forgoing agenda is hereby concluded and the moderator declared adjournment at 10:30 AM. In order to clarify the progress and conclusion of above proceeding, this meeting minutes has been prepared and the moderator and the directors in attendance signed and sealed as follows.

January 24, 1998

Samyang Foods Co., Ltd.  Board of Directors
Moderator, CEO, Chairman,  Joong-Yoon Chun

SAMYANG0025382T

Confidential



| | | |
|---|---|---|
| CEO and President, | In-Chang Chun | |
| Director in Attendance, | In-Soo Ahn | |
| Director in Attendance, | Myung-Soo Sohn | |
| Director in Attendance, | Seok-Jeon Kang | |
| Director in Attendance, | Dong-Hyung Lee | |
| Director in Attendance, | Dahl-Sihk Choi | |
| Auditor, | Heung-Joo Kim | |

SAMYANG0025383T

Confidential

# Samyang Foods Co., Ltd.

Address 82-9, Hawolgok 1-dong, Songbuk-gu, Seoul, 136-131, Republic of Korea
Home Page : http://www.samyangfood.co. kr
E-mail : gongwook@hotmail.com
Telephone : +82-2-940-3340-4, 940-3292
Facsimile : +82-2-919-6180

To : S. C. CONTINENT CORPORATION                                    Date: DEC. 29, 2011.
Attn. : President Mun Kyung Chun, Managing Director Si Young Lee,
          General Manager Woonbae Yeo
From : Overseas Sales Team                                          Total page(s) :2
                                                                    including this covering

Subject: Proposal to normalize the transaction relations in 2012

We wish your company's continued prosperity.

Our company has continuously requested the reduction of price and payment terms since the
Lehman Brothers situation in 2008, but your company has continued to postpone responding to
our request using the status of special relations, stating the reasons of uncertainty of the U.S.
economy and weakening international competitiveness. Our company has reached a situation
where we have to stop export to U.S. if there is any further delay in reduction of price and payment
terms. A company has a duty to generate profit and pay dividend to shareholders. However, it is
impossible to generate profit in the transaction with your company due to deficit export. This is to
notify the reduction and change in the terms of transaction with your company in 2012 as below
under the principle of international transaction and in consideration of the equity with other
exclusive agents in other countries for your reference.

1) Price: Our export price is the same all over the world based on cost and expected exchange
rate. However, export to your company is made at the 15% discounted price ($6.60 based on
Samyang ramyun 20X) from the base export price of this company (Samyang Ramyun 20X
base price $7.60), which is provided at short of the cost of this company for your special
relations. Therefore, this company will normalize all the prices for shipping from January 1,
2012 to the base price of this company in order to establish a more reasonable transaction
order in the practice of transaction with your company.

2) Payment terms: Currently, export is made to all the overseas agents of this company at 100%
T/T payment before shipping or L/C AT SIGHT. Currently your company has been changed
from the existing T/T IN ADVANCE & L/C AT SIGHT condition to 90 days DA due to the
recession of the U.S. economy and the MFN of special relations, but we would like to reduce
to the previous payment terms as of January 1, 2012 and ask for your cooperation. Our
company has received correction instructions many times due to transaction equity with
other agents and through ex officio investigation by the Fair Transaction Committee and
audits of Tax Offices, but for transaction safety of your

SAMYANG0025390T

Confidential

company, in order to minimize the problems from sudden change in payment terms, we have gradually proceeded with minor reduction in 2010 and 2011 and we believe that we have entered the stage where we can minimize the risk even if we change the payment terms now.

3) Therefore, we will issue PRO-FORMA INVOICE normally regarding the container ordered after January 1, 2012 and will ship when the payment is confirmed. Therefore, please pay as scheduled for the unpaid amount as of December 31, 2011 to match the 3 months after shipping terms after accounting audit.

Thank you.

Sincerely,
Bong-hun Kim/Gong-wook Kim
Head of Sales Department, Samyang Food Co., Ltd. /Overseas Sales Team leader (Acting)

CC.

SAMYANG FOODS, *a Ramen Manufacturer with a proud history of 40 years' tradition based on Honesty and Credit*

SAMYANG0025391T

Confidential



SAMYANG0025381

EXHIBIT 1069-C
WIT: Chun
DATE: 10.20.17
NADIA NEWHART, CSR 8714

Confidential



International delivery
by FedEx Express

Envelope
For International Use

GLOBAL EXPRESS®
GUARANTEED
UNITED STATES POSTAL SERVICE

SAMYANG0025386

Confidential



Ms. Michelle Chun
10316 Norwalk Boulevard
Santa Fe Springs, CA 90670-3330

전 남 도 천안
시 서북구 성정동 성정APT
101동 604호
Seoul, 135-110, KOREA

SAMYANG0025384

Confidential



Ms. **Michelle Chun**
10316 Norwalk Boulevard
Santa Fe Springs, CA  90670-3330

받는사람
안 기아
보내는사람 양천구 한대 APT
855 609호
Seoul, 135-110, KOREA

SAMYANG0025385

Confidential

아버지 · 엄마께                    12-19-2011                    ①

안녕 하세요 ?
전화로 말씀 하신 이사회 결의서 사본 보내
드립니다.
배임은 5년이 지나면 법적으로는 아무 이상이
없다고 합니다. 설제 이사회를 열지 않았다
해도, 그 당시 아버지 주식 지분이 제일 많았을
테고. 다른 것 들도 그렇게 하셨을 텐데요.

다른 사람 통해 하면 알아오시고 정상적인 방법
으로 거래 하는 것이 타당 하다고 생각 합니다.

회사대 회사인데, 엄마 개인 돈을 왜 넣는다면,
엄마 기분이 좋겠어요 ?

이제 머칠이면, 올해가 지나고 새해가 옵니다.
올 니다
11월 18일 에 도착하자 마자 시작도 제대로
적응하지 못한채, 매월 매월 지금까지,
배임이다, 뭐 갔 때에 따운 도득년 에 시기꾼년
오니도 모자라
지난 29일자 FAX 접수한 바에 의하면
<FAX 동봉 합니다>
① 미국 수출 전면 중단
② 가격 인상
③ 외상 거래 중단

SAMYANG0025387

Confidential

②

○ 이 내용은 거래 하자는게 아니라 숨도 못쉬게, 막다른 골목에서 소리 한번 못내고, 단 한번에 죽어서 없어 지라는 내용 인데 일종의 계약 파기 인 셈이지요. 오히려 우리쪽에서 소송을 하게끔, 유도하고 부축이고 있습니다.

계속 참자 참자 하니까 이러도 되는겁니까? 소송 하는걸 뭘 하십니까? 목 매달아서 죽는걸 뭘 하십니까?

지난 10년 넘게, 저도 창업주 의 딸 입니다. 10년 이상 차이나는 동생에게서 갖은 수모, 치욕 다 당했읍니다.

입소 까지 찾아온 해컬사, 사채업자가 하듯이 무례하게, 어느날 갑자기 선적중단이 되어 마켓 선반에 라면들을 진열도 못하게 하는가 하면, 유언장 쓰라고 협박, 공간 까지, 직원들 앞에서 무례하게 행동 하였읍니다.

세상에 어느 장사꾼이 고려시대, 이조시대도 아닌 요즘 세상에 미국 시장 중단 한다는것이 말이 됩니까?

SAMYANG0025388

Confidential

③

한국에서 출발 하던날 아침에 청수가
원하는 가격을 공문으로 보내라고 하였었는데,
우리직원들이 눈치채는것을 원하지
않습니다.
이시영 상무만 알고 있습니다.

구두로 하시다가 합의가 되면 그때 문서
하시는게 좋을듯 합니다.

정리되면 한중에 가서 명상센타 하면서,
무척 하면서 조용히 살고 싶습니다.

현명한 판단 바라겠습니다.

아녕히 계십시오.

문영 드림

Confidential

# 理事會 議事錄

西紀 1998年 1月 24日 午前 10時 서울特別市 城北區 下月谷洞 82-9 三養食品(株) 月谷社屋 會議室에서 理事會를 開催하다.

理事 13名中　出席理事 7名

定時에 代表理事 會長 全 仲 潤 議長席에 着席하여 開會를 宣言하고 議案審議에 들어가다.

第1號議案 : 他法人 出資株式 處分의 件을 附議하고 議長은 當社에서 所有하고 있는 삼양U.S.A 株式을 다음과 같이 處分코자 한다는 說明을 하고 本理事會에서 承認하여 줄 것을 提議同意를 구한 바, 出席理事 全員 贊成可決하다.

다　음

1. 處分內容
   가. 買受者 : CALYPCO, INC.
                LIM, CHOON TAIK
   나. 種目名 : 삼양U.S.A(주)
   다. 株式數 : 550주 ($@10,000)
   라. 處分額 : 3,000,000,000원
2. 處分理由 : 財務構造改善

以上 議案을 議了하고 議長은 10時 30分 에 閉會를 宣言하다.
위 議事의 經過와 結果를 明確히 하기 위하여 本 議事錄을 作成하고 議長 및 出席理事 다음에 記名捺印하다.

1998年 1月 24日

三養食品株式會社 理事會
議長 代表理事 會長　全 仲 潤

SAMYANG0025382

Confidential



代表理事 社長　全　寅　壯

出席理事　　　安　麟　洙

〃　　　　　孫　明　秀

〃　　　　　姜　錫　田

〃　　　　　李　東　衡

〃　　　　　崔　達　植

監　事　　　金　興　洙

SAMYANG0025383

Confidential

# *Samyang Foods Co., Ltd.*

Address : 82-9, Hawalgok 1-dong, Songbuk-gu, Seoul, 136-131, Republic of Korea

Home Page : http://www.samyangfood.co.kr

E-mail: gongwook@hotmail.com

Telephone : +82-2-940-3340~4, 940-3292

Facsimile : +82-2-919-6160

To : S.C CONTINENT CORPORATION

Attn. : 전몽경 사장님, 이시영 상무님, 어윤배 부장님

From : 해외영업팀

Subject : 2012 년 거래 관계 정상화를 위한 제안

Date : DEC. 29, 2011.

Total page(s) : 2

including this covering

귀사의 일익 번창하심을 기원드립니다.

당사에서는 2008 년 라면브랜더스 사태이후 가격 및 결제 조건의 환원을 지속적으로 요청드렸으나, 귀사에서는 미국 경제의 불확실성 및 국제 경쟁력 약화를 이유로 당사의 요청을 묵수관계의 지위를 이용 계속해서 미루어 오셨으나, 당사에서는 더 이상 가격 및 결제 조건의 환원을 미룰시 미국으로의 수출을 전면 중단할 수밖에 없는 지경에 이르렀습니다. 기업은 이익을 창출하여 주주들에게 배당금을 지급하여야하는 의무가 있습니다. 그러나 귀사와의 거래는 적자 수출로 인한 기업 운영의 이익창출이 불가능한바 아래와 같이 2012 년 에 귀사와의 거래에 있어 다른 국가의 독점 AGENT 와의 형평성 및 원가 상승 및 국제 거래 현행상 아래와 같이 조건을 환원 및 변경을 통지 드리오니 업무에 참조 하시기 바랍니다.

1) 가격 : 당사의 수출가격은 원가 및 예상 환율에 의거 전세계 동일한 가격으로 수출되어지고 있습니다. 그러나 귀사의 수출가격은 묵수관계의 최혜국 대우로 당사의 기존 수출가(상양라면 20 입 기준가 $7.60)에 15% 할인된 (삼양라면 20 입기준 $6.60) 가격에 수출되어지고 있는바, 당사의 원가에 못 미치는 가격으로 수출을 하고 있습니다. 이에 당사에서는 2012 년에 귀사의 거래관행에 보다 합리적인 거래 질서를 확립코자 2012 년 1 월 1 일부터 선적되는 모든 가격을 당사의 기준가로 정상화 시키고자 합니다.

2) 결제 조건 : 현재 당사의 모든 해외 AGENT 는 선적전 100% T/T 결제 이거나 L/C AT SIGHT 로 수출되어 지고 있습니다. 현재 귀사는 기존 T/T IN ADVANCE & L/C AT SIGHT 조건에서 미국 경기의 불황 및 묵수관계의 최혜국대우로 90 DAYS DA 라는 거래로 변경이 되었으나, 기존의 결제조건으로 2012 년 1 월 1 일부터 환원코자 하오니 협조 당부 드립니다. 당사에서는 다른 AGENT 와의 거래 형평성 및 이로 인한 공정위의 직권조사 및 세무서 감사등을 통한 시정 지시를 여러 차례 받아왔으나, 귀사의 거래안전을 위하여

Confidential

2011-DEC-16 09:14 From:                                    To:5629469915              P. 2

갑작스러운 결제 조건 변경으로 문제 발생을 최소화 하고자 2010 년, 2011 년 미수金소를 점차 진행하여 이제는 결제 조건변경을 하여도 그 리스크를 최소화 할 수 있는 단계에 접어 들은 것으로 판단합니다.

3) 이에 2012 년 1 월 1 일이후 발주되는 컨테이너에 대하여 정상적으로는 PRO-FORMA INVOICE 를 발행하고, 결제가 확인된 후에 선적등록 하겠습니다. 그러므로 2011 년 12 월 31 일자 미수에 대해서는 회계감사를 거쳐 선적완료부터 3 개월 조건에 맞게 일정대로 결제 부탁드립니다.

감사합니다.


김봉훈 / 강공숙 배상
삼양식품 영업본부장 / 해외영업팀장(대)


cc

_SAMYANG FOODS, a Ramen Manufacturer with a proud history of 40 years' tradition based on Honesty and Credit._

SAMYANG0025391

# EXHIBIT 11

MAR-13-2013 14:19 From:

2013-3-13



**Samyang U.S.A., Inc.**

Tel. (562) 946-9977

10316 Norwalk Blvd., Santa Fe Springs, CA 90670

Fax (562) 946-9916

3-13-13

To: Samyang Foods Co., Ltd.  Managing Director Bonghoon Kim, Manager Gong-wook Kim
From: Samyang USA, Inc. Managing Director Si Young Lee
Date:

Subject: Termination of exclusive sales rights and distribution and sales rights in America

Upon reviewing the agreement to terminate exclusive sales rights and the non-exclusive distribution agreement that Samyang Food Co., Ltd. sent to our company, our position is as follows.

1. Termination Agreement

As a result of commissioning a review of the draft agreement prepared by your Attorney to our Attorney, there was a concern that overall legal interpretation is not clear as it is too complicated unlike the original exclusive agreement which is relatively simple. Accordingly, our position is that the agreement at the level of the original agreement is desirable. In other words, we would like to prevent conflicts of interest from its interpretation in the future by simple content of terminating or cancelling the original agreement.

2. Non-exclusive Distribution Agreement

Both parties have already understood that it is possible to accommodate the operation of agency in the U.S. according to the distribution agreement presented by your company based on the premise that it includes the regions of the present level. This is a decision that considered loss and minimum profitability, taking into consideration basic facilities and expenses to operate an agency. Such a conclusion had to be drawn, even considering our sales experience and the already solidly built sales organization. We thank you for understanding the above, and expect that the distribution agreement will proceed based on such understanding.

We hope for your understanding and additional agreement as soon as possible regarding the interim conclusion as above for the matter of termination of exclusive sales agreement.

MAR-13-2013 14:19 From:

2013-3-13



## Samyang U.S.A., Inc.

Tel. (562) 946-9977          10316 Norwalk Blvd., Santa Fe Springs, CA 90670          Fax (562) 946-9918

3-13-13

수신: 삼양식품(주) 김평훈 상무, 김공옥 과장
발신: 삼양 USA(주) 이시영 상무
발신일:

제목: 독점판매권 해지와 미주 유통판매권

　　삼양식품(주)가 당사로 송부한 독점판매권 해지계약서와 비독점 유통
계약서의 사본을 검토 한 당사의 입장은 아래와 같습니다.

1. 해지계약

　　귀사의 변호사가 작성한 계약서 초안을 변호사에게 의뢰해 검토한 결
과 비교적 단순한 원 독점계약서와 달리 지나치게 과잡해 그 법률적인 해석
이 전체적으로 명확하지 못한 점들이 있다는 우려가 도출되었습니다. 이에
당사는 원계약서 수준에 상응하는 합의서/계약서 정도가 바람직하다는 입장
입니다. 즉, 원계약서를 파기, 또는 해지하는 단순한 내용으로 추후에 그 해
석에 따른 이해 상충을 미연에 방지하고자 합니다.

2. 비독점 유통계약

　　귀사가 제시한 유통계약에 따른 미주 대리점 운영을 수용할 수 있는
전제 조건은 현재 수준의 지역을 포함하는 경우 가능할 것이란 것을 이미
양사가 이해를 한 사항입니다. 이는 대리점을 운영하는 기본적인 시설과 경
비를 감안하여, 손실과 최소한의 수익성을 고려한 결정으로, 당사의 판매경
험과 이미 견실히 구축된 판매조직을 감안하고서라도 이런 결정이 도출 될 수
밖에 없는 점에 이해를 해주신 귀사에 감사하며, 유통계약은 이와 같은 이해
에 따라 진행될 것을 기대합니다.

　　독점판매 계약해지 건에 관한 이상과 같은 중간 결론에 대해서 귀사의
이해와 조속한 추가적인 합의를 기대합니다.

SAMYANG0003490

EXHIBIT 1119
WIT: Chun
DATE: 10.20.17
NADIA NEWHART, CSR 8714

# CERTIFICATION OF TRANSLATION

# and

# DECLARATION

State of California     )
                        )     S. S.
Los Angeles County      )

      I, Soomi Ko, the undersigned, declare under penalty of perjury that I am a duly certified Korean Court Interpreter approved by the United States District Courts, certified by the State of California and the Los Angeles County Superior Courts, with competent knowledge of Korean and English, and that I have truthfully and correctly translated **35 Exhibits listed below re: Sam Yang (USA), Inc. v. Samyang Foods Co., Ltd., et al., Case no. 2:15-cv-07697 AB (KSx)** from Korean to English in accordance with Fed. R. Evid. 901 and that the said translation is, to the best of my knowledge and belief, a true and correct translation. I further declare under penalty of perjury that I am neither counsel for, related to, nor employed by any of the parties, and that I have no financial or other interest in the outcome of any action related to this translation. I declare under penalty of perjury that the foregoing is true and correct.

List of Exhibits Translated

| | |
|---|---|
| Ex. 1006_TRANS.pdf | Ex. 1071_TRANS.pdf |
| Ex. 1007_TRANS.pdf | Ex. 1072_TRANS.pdf |
| Ex. 1010_TRANS.pdf | Ex. 1073_TRANS.pdf |
| Ex. 1012_TRANS.pdf | Ex. 1074_TRANS.pdf |
| Ex. 1023_TRANS.pdf | Ex. 1075_TRANS.pdf |
| Ex. 1024_TRANS.pdf | Ex. 1076_TRANS.pdf |
| Ex. 1027_TRANS.pdf | Ex. 1077_TRANS.pdf |
| Ex. 1029_TRANS.pdf | Ex. 1084_TRANS.pdf |
| Ex. 1036_TRANS.pdf | Ex. 1093_TRANS.pdf |
| Ex. 1038_TRANS.pdf | Ex. 1104_TRANS.pdf |
| Ex. 1044_TRANS.pdf | Ex. 1109_TRANS.pdf |
| Ex. 1045_TRANS.pdf | Ex. 1112_TRANS.pdf |
| Ex. 1048_TRANS.pdf | Ex. 1113_TRANS.pdf |
| Ex. 1051_TRANS.pdf | Ex. 1114_TRANS.pdf |
| Ex. 1052_TRANS.pdf | Ex. 1115_TRANS.pdf |

| Ex. 1053_TRANS.pdf | Ex. 1119_TRANS.pdf |
|---|---|
| Ex. 1068_TRANS.pdf | Ex. 1120_TRANS.pdf |
| Ex. 1069_TRANS.pdf | |

Executed on 19th of December,

Soomi Ko
California State Certified Court Interpreter
#300732
Direct: (213) 999-7848
soomi@komartin.com
www.komartin.com

Ko & Martin Certified Interpreters and Translators
Specializing in Korean and Chinese Languages

# EXHIBIT 12

```
 1              UNITED STATES DISTRICT COURT
 2      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
 3
        _____
 4   SAM YANG (U.S.A.) INC.,        )
 5   ROYPAC, INC., dba S.C.         )
 6   CONTINENT CORPORATION,         )
 7             Plaintiffs,          )
        vs.                         ) No. 2:15-cv-07697
 8   SAMYANG FOODS CO., LTD.; and )     AB (KSx)
 9   Does 1 through 20, inclusive,)
10             Defendants.          )
        _____)
11   SAMYANG FOODS CO., LTD.,       )
12           Counter-Claimant,      )
        vs.                         )
13   SAM YANG (U.S.A.) INC.,        )
14   ROYPAC, INC. dba S.C.          )
15   CONTINENT CORPORATION;         )
     MUN-KYUNG CHUN, and Does 1     )
16   through 20, inclusive,         )
17           Counter-Defendants. )
        _____)
18         VIDEOTAPED DEPOSITION OF SEE YONG LEE
19               Los Angeles, California
20             Wednesday, December 21, 2016
21
22   Reported by:
23   KATHLEEN E. BARNEY
     CSR No. 5698
24   Job No. 2495581
25   PAGES 1 - 127
```

                                                    Page 1

1        THE WITNESS:  Well, as far as Roypac is

2   concerned with Sam Yang (U.S.A.), it only handled

3   products that were being imported from Korea.

4   BY MR. RHOW:

5      Q    So as to the products being imported from

6   Korea, Roypac was handling everything relating to

7   those products, correct?

8      A    Correct.

9      Q    And that was from 2001 to the present?

10     A    Yes.

11     Q    While you were at Sam Yang (U.S.A.), did the

12  paycheck you receive indicate that you were being

13  paid by Sam Yang (U.S.A.) or some other entity?

14        MR. MCDONOUGH:  Vague and ambiguous.

15  Overbroad as to time.

16        THE WITNESS:  Well, currently I receive

17  checks from S.C. Continent.

18  BY MR. RHOW:

19     Q    Let's start in 2001.  From 2001 to the

20  present, tell me the various employers you had who

21  have paid you your various salaries.

22     A    When you say "employers," who are you

23  referring to?

24     Q    Was Sam Yang (U.S.A.) your employer?

25        MR. MCDONOUGH:  He is referring to at any

Page 41

```
 1    (U.S.A.) ever distribute non-Sam Yang ramen?

 2       A    My understanding is that it did not.

 3            MR. RHOW:  Let's take a break.

 4            THE VIDEOGRAPHER:  11:03.  Off the record.

 5            (Recess.)

 6            THE VIDEOGRAPHER:  On the record.  11:28.

 7    BY MR. RHOW:

 8       Q    When did the Union Foods relationship begin?

 9       A    I'm not really sure.

10       Q    Do you know how long it lasted?

11       A    It maintained for approximately five years.

12       Q    Did it begin after the L.A. factory was

13    closed or sold?

14       A    Correct.

15       Q    In terms of dollar amount, if that -- I don't

16    know if that is the right way to measure it, but

17    what was the monthly dollar amount of orders that

18    Sam Yang (U.S.A.) was placing with Union Foods?

19            MR. MCDONOUGH:  Vague as to time.

20            You can answer.

21            THE WITNESS:  I'm not really sure.

22    BY MR. RHOW:

23       Q    And I believe you said in your earlier

24    testimony that the OEM products were being sold in

25    Guatemala; is that right?
```

Veritext Legal Solutions
866 299-5127

1      A    Yes, correct.

2      Q    Anywhere else?

3      A    I don't recall as to other areas.

4      Q    Do you know why Guatemala?

5      A    Well, that transaction had been ongoing even

6  prior to that relationship.

7      Q    When you say "transaction," you mean the sale

8  of Sam Yang ramen in Guatemala?

9      A    That's correct.

10     Q    And those are ramen products sold by Sam Yang

11  (U.S.A.) to folks in Guatemala?

12     A    Correct.

13     Q    And in selling those products, Sam Yang

14  (U.S.A.) would get money back?

15     A    I believe it received the payments.

16     Q    Who authorized Sam Yang (U.S.A.) to sell

17  products in Guatemala?

18     A    That, I don't recall.

19     Q    Do you know if Samyang Korea ever authorized

20  Sam Yang (U.S.A.) to sell products in Guatemala?

21     A    Since I'm not in charge of such tasks, so I

22  don't know.

23     Q    Who would be in charge?

24     A    That would be the director who was in charge

25  of sales at the time.

Page 50

```
 1    want to make sure when I say Sam Yang (U.S.A.) --
 2    well, let me just ask it.
 3          Did S.C. Continent ever sell products with
 4    the Sam Yang brand name in territories other than
 5    the United States?
 6    A    What Sam Yang products are you referring to?
 7    Q    Any Sam Yang products.
 8    A    A small amount of Sam Yang products from
 9    Korea was attempted in Mexico.  However, the
10    response was not very good.
11    Q    When was that?
12    A    I don't recall.
13    Q    More than ten years ago?
14    A    Correct, I believe so.
15    Q    More than 15 years ago?
16    A    I would say between 10 to 15 years.
17    Q    Going back to your answer, I just want to
18    clarify.  Was it Samyang Korea who attempted to make
19    the sale in Mexico or was it S.C. Continent?
20    A    That would be S.C. Continent.
21    Q    So after that attempt by S.C. Continent to
22    sell in Mexico 10 to 15 years ago, S.C. Continent
23    did not make any further effort to sell in Mexico,
24    correct?
25    A    Actually, the effort has been put in
```

Page 52

```
 1    continuously.

 2        Q    Did it ever sell any products with the Sam

 3    Yang brand name in Mexico since that sale 10 to 15

 4    years ago?

 5            MR. MCDONOUGH:  I think it misstates

 6    testimony.  When you say "that sale," I think it was

 7    an attempted sale 10 to 15 years ago.  I might have

 8    misunderstood it.

 9    BY MR. RHOW:

10        Q    Let me clarify that.

11            10 to 15 years ago, S.C. Continent sent

12    products to Mexico, correct?

13        A    Correct.

14        Q    It was a small amount, correct?

15        A    Correct.

16        Q    Did it result in any actual sales?

17        A    The recipient of the product was not very

18    interested, so it did not move forward.

19        Q    So there were no sales?

20        A    No.  What I'm saying is sales did

21    materialize.  However, it did not continue

22    thereafter.

23        Q    So there was the one batch that you sent to

24    Mexico that resulted in some sales 10 to 15 years

25    ago, correct?
```

Page 53

```
 1       A    Actually, Sam Yang products were sent from
 2   the U.S. through companies that export products to
 3   Mexico.
 4       Q    I'm getting confused again.
 5            THE INTERPRETER:  From time to time, I may
 6   have to inquire --
 7            MR. RHOW:  Go for it.
 8            THE INTERPRETER:  -- the singular or plural
 9   of a subject because that's not readily available in
10   Korean.
11   BY MR. RHOW:
12       Q    We're going to get to this answer in a
13   second.  Buy my only question is, since that small
14   batch you sent to Mexico 10 to 15 years ago, has
15   S.C. Continent specifically ever sent any further
16   products to Mexico?
17       A    No, it did not.
18       Q    What you've testified, though, is that you're
19   aware of other companies that have sent Sam Yang
20   products to Mexico, correct?
21       A    Correct.
22       Q    When did you first learn that?
23       A    Well, my recollection is that at the time,
24   those companies did not only export ramen, but there
25   were many other products they were exporting as
```

Page 54

1      During the time you've been at either Sam

2   Yang (U.S.A.) or at S.C. Continent, are you aware of

3   any employees of those companies traveling to Mexico

4   for business related to Sam Yang ramen?

5      A   I don't really recall.

6      Q   You mentioned, I believe -- and at this point

7   if I heard it wrong, that would not be surprising,

8   but -- that you're aware of efforts since that small

9   batch was sent 10 to 15 years ago to increase sales

10   in Mexico.  What were those efforts?

11      A   Well, we looked into whether or not there

12   would be companies that can be in business with us

13   in Mexico.

14      Q   When did you look?

15      A   About ten years ago, at that time.

16      Q   Other than that effort ten years ago, what

17   other efforts do you recall?

18      A   Thereafter there were issues relating to

19   products from Samyang Foods.  Therefore, we could

20   not make more efforts.

21      Q   So regardless of the reasons why, you did not

22   take further efforts in Mexico, based on what you're

23   saying, since that effort ten years ago, Sam Yang

24   (U.S.A.) and S.C. Continent have not made further

25   efforts to increase sales in Mexico, correct?

                                        Page 58

1       A    Correct.  Well, a reason being we could not

2   sell Sam Yang products.  Therefore, we made no

3   effort.

4       Q    The issue with the Sam Yang products, when

5   did that first arise?

6       A    That commenced from year 2008.

7       Q    Has -- did those issues prevent you from

8   selling in L.A.?

9       A    Correct.

10      Q    You didn't sell any Sam Yang ramen products

11  in L.A. in 2008?

12           MR. MCDONOUGH:  Misstates testimony.

13  Argumentative.

14           You may answer.

15           THE WITNESS:  We sold it.

16  BY MR. RHOW:

17      Q    And you sold Sam Yang products in 2009,

18  right?

19      A    Correct.

20      Q    In fact, up until the time that Samyang Korea

21  terminated the distributorship, Sam Yang (U.S.A.)

22  and S.C. Continent was selling ramen all the way

23  through?

24      A    Correct.

25      Q    Let's talk a little bit about Canada.  Did

```
1    Sam Yang (U.S.A.) or S.C. Continent ever make any
2    efforts to sell in Canada?
3        A    Yes.
4        Q    When?
5        A    We made efforts until year 2000, 2001.
6        Q    What were those efforts?
7        A    We had agents located in Canada and we
8    exported.
9        Q    Since 2001, Sam Yang (U.S.A.) and S.C.
10   Continent have not undertaken any efforts to sell
11   Sam Yang product in Canada, correct?
12       A    It's not that -- well, it's not that we did
13   not make efforts, but rather under our
14   authorization, Samyang Foods sold product directly
15   in Canada.
16       Q    What do you mean by "authorization"?
17       A    Well, we had to provide authorization since
18   we had the sales right of Canada region.  Sam Yang
19   (U.S.A.) had that sales authorization.
20       Q    So what happened to the authorization in
21   2001?
22       A    We authorized sales of the product throughout
23   Canada for the term that is limited not to exceed
24   one year to Samyang Foods.
25       Q    I'm a little confused again.  What would not
```

Page 60

```
 1   exceed one year?

 2       A   We authorized for the period of one year so

 3   that Samyang Foods can distribute in Canada.

 4       Q   Has Sam Yang (U.S.A.) or S.C. Continent sold

 5   any Sam Yang product in Canada since 2001?

 6       A   No.  Because we thought sales in the Canada

 7   area would end after -- strike that.

 8           No.  Because we thought the sales in the

 9   Canada area would end up with Sam Yang (U.S.A.) from

10   Samyang Foods after one year.  However, we were

11   pressured through some person in between.

12       Q   All right.  Let me try to break this down.  I

13   still don't have the story.

14           In 2001, I think what you're telling me is

15   Sam Yang (U.S.A.) gave a one-year right to Samyang

16   Korea to distribute directly to Canada, right?

17       A   We did not provide sales right to them, but

18   we allowed the company to sell for one year.

19       Q   And after the one year, Samyang Korea was

20   still selling in Canada?

21       A   Yes.

22       Q   And --

23       A   Well, that is because we were pressured

24   through an individual connection.

25       Q   What did Sam Yang (U.S.A.) do to stop Samyang
```

Page 61

1    Korea from selling in Canada after that one year?

2       A   We made many efforts by asserting our rights.

3    However, it was difficult to stop them.

4       Q   Did Sam Yang (U.S.A.) attempt to simply --

5    strike that.

6           Did Sam Yang (U.S.A.) make independent

7    efforts to sell in Canada despite the fact that

8    Samyang Korea was selling in Canada?

9       A   At the time, since Sam Yang (U.S.A.) allowed

10   the sales of Samyang Foods in Canada and that rights

11   were going to come back to Sam Yang (U.S.A.) after

12   one year, so we were gearing up to start after the

13   first year.

14      Q   After the first year, did you start?  Just

15   give me a yes or no first.

16      A   No, we did not.

17      Q   After that one year, regardless of the reason

18   why, Sam Yang (U.S.A.) and S.C. Continent never

19   undertook any efforts to sell in Canada, correct?

20          MR. MCDONOUGH:  Vague and ambiguous.

21   Overbroad.  Argumentative as to "any efforts."

22          You may answer.

23          THE WITNESS:  Correct.

24   BY MR. RHOW:

25      Q   Who is the individual you've been mentioning

                                        Page 62

1     a couple of times that put the pressure on?

2         A    It's the chairman.  Chairman and the father.

3         Q    Did you believe that Sam Yang (U.S.A.) could

4     disobey an instruction from the chairman of Samyang

5     Korea at the time?

6         A    Well, I thought that.  However, since he is

7     the father, we had no choice.  Since he was the

8     father, we could not lodge a lawsuit against him.

9         Q    Why was the fact that he is the father --

10    first of all, father of who?

11        A    Well, he is the father of our president,

12    Mun-Kyung Chun.

13        Q    And so why is the fact that he is the father

14    of Sam Yang (U.S.A.)'s president a reason why you

15    could not disobey him?

16        A    Well, if a lawsuit is to be lodged against

17    the father, that will end the relationship of father

18    and daughter.  That's why we couldn't.

19        Q    Did M.K. Chun want to sue?

20             MR. MCDONOUGH:  Calls for speculation.

21    Potentially implicates attorney-client privilege.

22             You may answer.

23             THE WITNESS:  I don't know exactly.

24    BY MR. RHOW:

25        Q    Did you want to sue?

                                        Page 63

```
 1        A    Yes.
 2        Q    Did M.K. Chun tell you that Sam Yang (U.S.A.)
 3   was not going to pursue a lawsuit on this issue?
 4        A    No.
 5        Q    Did she have any opinion or -- strike that.
 6             Did you hear any opinion from her as to what
 7   should be done with regard to Samyang Korea's direct
 8   sales into Canada?
 9        A    Since she was getting a lot of pressure from
10   her father, she worried a lot about her relationship
11   with her father, and she had a lot of worries and
12   concerns.
13        Q    And so because of those worries, she chose
14   not to do anything about Samyang Korea's direct
15   sales into Canada?
16        A    Well, we had the rights.  However, since she
17   was continuously receiving pressure, you know,
18   she -- we really did not know what to do.
19        Q    And so as a result of that pressure, Sam Yang
20   (U.S.A.) never took any formal actions to stop
21   Samyang Korea's direct sales into Canada?
22        A    Correct.
23        Q    I'm going to go back -- sorry -- to one
24   issue.  On Union Foods, why didn't Sam Yang (U.S.A.)
25   simply import ramen from Samyang Korea as opposed to
```

Page 64

1    Q   Was it a report on the types of activities

2    that Sam Yang (U.S.A.) was doing to increase the

3    brand awareness of Sam Yang in the United States?

4    A   As to the content, I don't really recall

5    right now.

6    Q   In 2000 when you returned, and given the fact

7    that Sam Yang (U.S.A.) is now a separate company,

8    did you believe that Sam Yang (U.S.A.) was

9    responsible for doing its own marketing at that

10   point?

11   A   Yes.

12   Q   After 2000 did you believe Sam Yang (U.S.A.)

13   was responsible for its own efforts to increase

14   brand awareness of Sam Yang in the United States?

15   A   Yes.

16   Q   After 2000 did you believe that Sam Yang

17   (U.S.A.) was responsible for increasing sales of Sam

18   Yang products in the United States?

19   A   No matter what company you are, there is

20   usually support as to advertisement and whatnot when

21   you enter into business with them.  But as far as

22   Samyang Foods Korea is concerned, there were no

23   support after 2002.

24   Q   And you're aware of that?  You knew that,

25   right?

Page 71

```
 1            MR. MCDONOUGH:  Misstates testimony.

 2     Argumentative.  Asked and answered.

 3            THE WITNESS:  I don't recall for certain.

 4     BY MR. RHOW:

 5       Q    Let's go back to the question or the line of

 6     questioning I was on.

 7            Since you came back to Sam Yang (U.S.A.), did

 8     you believe Sam Yang (U.S.A.) was supposed to do

 9     whatever it could to increase sales of Sam Yang

10     branded product in the U.S.?

11            MR. MCDONOUGH:  Asked and answered.

12            You may answer again.

13            THE WITNESS:  Correct.  Well, however, when

14     Samyang Foods deals with -- whether it be their own

15     branch offices or agents or companies that they deal

16     with, they generally support in regards to

17     advertising.  But Samyang Foods did not support us.

18     BY MR. RHOW:

19       Q    That's coming across loud and clear.

20     Regardless of the amount of support you were getting

21     from Samyang Korea, you still believed at all times

22     that Sam Yang (U.S.A.) should undertake its best

23     efforts to increase sales of Sam Yang branded

24     products in the U.S., right?

25       A    Correct.
```

Veritext Legal Solutions
866 299-5127

1      Q    And Michael, does Michael speak Korean?

2      A    He speaks English better than Korean.

3      Q    All right.  Let's go to the next person, who

4   I think is Gary.  What territories or markets was

5   Gary responsible for, if you recall?

6      A    He was mainly in charge of Chinese ethnic

7   markets in Garden Grove and Torrance -- no.  Mostly

8   Gardena also.

9      Q    Any other markets?

10      A    No.

11      Q    Mr. Yeo, what markets or territories has he

12   been responsible for?

13      A    He was mainly in charge of Los Angeles area

14   and Irvine, and in charge of wholesalers, both East

15   Coast and West Coast.

16      Q    For Mr. Yeo, in terms of the L.A. market and

17   what he is responsible for, are you saying he was

18   responsible for selling directly to specific stores

19   in L.A.?

20      A    Correct.

21      Q    But he was also responsible for wholesalers

22   and relationships with those folks?

23      A    Correct.

24      Q    And can you explain generally when you say

25   wholesaler, what do you mean in the context of ramen

Page 87

1   and Sam Yang products?

2      A   The wholesalers do not carry Sam Yang

3   products only.  They carry many other products as

4   well as Sam Yang products.

5      Q   And is it your understanding that those

6   wholesalers then sell to individual stores or

7   chains?

8      A   Correct.

9      Q   And Mr. Yeo is -- I'm sorry -- is Korean his

10  first language?

11     A   Yes.

12     Q   Does he speak English?

13     A   A little bit.

14     Q   Let's move to the last person.  This was the

15  unknown individual who worked from 1997 to 2007.  Do

16  you recall what territories or market that person

17  was supposed to be covering?

18     A   I don't recall for sure because that person

19  was charged in one area and then switched to another

20  area, and then since that person quit, so I don't

21  know.

22     Q   What areas were you in charge of?

23     A   I'm more like a controlling person of

24  overall, and in order for me to do market research,

25  I personally go to one market.

Page 88

```
 1      Q   So you will travel to a market to do
 2  research?
 3      A   Correct.
 4      Q   And why is it important to go to a market to
 5  do research?
 6      A   I'm not just going there for research, but by
 7  being in charge of that one market as far as
 8  ordering and whatnot, I can get a firsthand
 9  experience as to what is actually going on in the
10  market.
11      Q   So to increase sales at a market, one of the
12  things that you think is important is to physically
13  travel to the market to see what is going on
14  firsthand, right?
15          MR. MCDONOUGH:  Misstates testimony.
16          THE WITNESS:  Correct.
17  BY MR. RHOW:
18      Q   And it's important for you to develop a
19  relationship with the individuals at the market who
20  may be responsible for buying ramen, right?
21      A   Correct.  That is the most important thing.
22      Q   That, amongst all things, the most important
23  thing you could do to increase your sales is develop
24  that personal relationship with that person
25  responsible for buying ramen, right?
```

Page 89

```
 1        A    Correct.

 2        Q    It's also important to go to the market to

 3   see where the Sam Yang product is being placed on

 4   the shelves; is that true?

 5        A    Correct.

 6        Q    And, by the way, having your office in Santa

 7   Fe Springs is helpful because that means you can

 8   drive to the various markets that are reasonably

 9   close to your office, right?

10        A    Correct.

11        Q    You did not develop those kind of

12   relationships with stores on the East Coast, right?

13        A    Correct.

14        Q    You didn't have an office on the East Coast?

15        A    Are you referring to Sam Yang S.C. Continent?

16        Q    Yes.

17        A    Correct, we don't have any.

18        Q    And you didn't hire any employees on the East

19   Coast to visit markets and develop those

20   relationships, correct?

21        A    Correct.

22        Q    How often do you visit markets in a given

23   week?

24             MR. MCDONOUGH:  Vague and ambiguous.

25   Overbroad as to locations, time, et cetera.
```

Page 90

```
 1              You may answer.
 2              THE WITNESS:  Are you referring to me or
 3       other salespersons?
 4       BY MR. RHOW:
 5          Q    Fair question.
 6              So in terms of the sales force that you had,
 7       let's say, in 2010 to whenever the distribution
 8       agreement was terminated, on average how often
 9       during the week would one of the sales team be
10       visiting a market or a store?
11          A    Well, they will be going out to their own
12       territories every day, daily.  Whether they could
13       yield a purchase order or not, they go out to
14       locations every single day in order to foster the
15       relationship.
16          Q    Do you believe that those daily visits are
17       important to increasing sales in a territory?
18          A    Yes.
19          Q    Why?
20          A    Maintaining and fostering relationships is
21       the most important thing.  That is why.
22              MR. MCDONOUGH:  It's been about 45 minutes.
23       Can we take a quick one?
24              MR. RHOW:  Yes, let's take it.
25              THE VIDEOGRAPHER:  Off the record at 2:25.
```

                                                    Page 91

```
 1            (Recess.)

 2            THE VIDEOGRAPHER:  On the record at 2:49.

 3    BY MR. RHOW:

 4        Q    I wanted to talk a little bit about Sam

 5    Yang -- I'm sorry, S.C. Continent's relationship

 6    with wholesalers.  Okay?

 7        A    Okay.

 8        Q    I think you said a wholesaler is an entity

 9    that is selling both Sam Yang products and other

10    products?

11        A    Correct.

12        Q    And were the wholesalers that Sam Yang

13    (U.S.A.) -- strike that.

14            Were the wholesalers that S.C. Continent had

15    relationships with also selling ramen from

16    competitors?

17        A    Correct.

18        Q    What would S.C. Continent do to increase

19    sales of Sam Yang ramen by wholesalers versus

20    competitor ramen?

21        A    Those that are located far away, for those

22    distributors we would deal over the phone.  And

23    since they have their own salespeople and managers

24    for different areas and markets, we cannot control

25    them going out to markets in their own area.  So we
```

Page 92

1    will call often to maintain and foster

2    relationships.

3         Q    With who?

4         A    When we made the telephone call, that would

5    be with a manager of their company or a person who

6    is in charge, and through this telephone call we

7    would obtain market information.

8         Q    The person that S.C. Continent was calling

9    was an employee of the wholesaler or of the market

10   buying from the wholesaler?

11        A    No, we would place calls to the wholesaler.

12        Q    Did S.C. Continent ever place calls to the

13   stores or markets buying from the wholesaler?

14            MR. MCDONOUGH:  Vague and ambiguous.

15   Overbroad.

16            And I'm a little unclear.  Are we talking

17   about any particular region or anywhere in the

18   United States?

19   BY MR. RHOW:

20        Q    You can answer that one.

21        A    What was your question?

22        Q    Okay.  Let me -- I'm purposely starting off

23   broad, but I'll try to break it down as much as I

24   can.

25            In connection with the wholesale

1   relationships that S.C. Continent had, did S.C.

2   Continent ever contact the stores or the markets

3   that S.C. Continent believed was buying from those

4   wholesalers?

5          MR. MCDONOUGH:  To be clear, he is referring

6   to anywhere in the United States.  He is starting

7   broad and then he will narrow if he chooses to do

8   so.  Anywhere in the United States.

9          THE WITNESS:  No, we did not go there because

10  we do not do our business that way.  Because if we

11  were to go out to the market where the salesmen are

12  from the wholesale distributor is in charge of and

13  say this and that, that would impact the wholesale

14  distributors whom we deal with.  So we do not deal

15  that way.

16  BY MR. RHOW:

17      Q   In what territories did Sam Yang -- strike

18  that.

19          In what territories did S.C. Continent rely

20  on wholesalers to increase its sales?

21      A   Mainly East Coast.

22      Q   Anywhere else?

23      A   As far as L.A. area is concerned, we rarely

24  go to the wholesale distributor.  It's just a matter

25  of stopping by when we pass by the wholesale

                                        Page 94

1    distributor or when we need to collect payment, to

2    that extent.

3              However, for those that are located in the

4    East Coast, we make daily phone calls in the morning

5    to various locations in order to obtain information

6    and e-mail exchanges are going on and whatnot.  And

7    that's how we foster and maintain that relationship.

8        Q    So as to the East Coast market, S.C.

9    Continent relies on wholesalers to increase sales of

10   Sam Yang products, right?

11       A    Correct.

12       Q    Those wholesalers are not required to favor

13   Sam Yang ramen over ramen sold by competitors?

14       A    Correct.

15       Q    Those wholesalers sell a range of ramen

16   competitor products?

17       A    Correct.

18       Q    In fact, by using a wholesale relationship on

19   the East Coast, based on what you told me, S.C.

20   Continent should not be trying to sell directly to

21   markets that have relationships with those same

22   wholesalers?

23            MR. MCDONOUGH:  Misstates testimony.

24   Argumentative.  Lacks foundation.

25            You may answer.

Page 95

```
 1              THE WITNESS:  Correct.
```

 2   BY MR. RHOW:

 3       Q   Does S.C. Continent have any wholesaling

 4   relationships in the Midwest?

 5       A   There is a company called Wang Global located

 6   in Texas.  W-A-N-G.

 7       Q   And what areas does Wang Global cover?

 8       A   Centered around Texas and areas nearby.

 9       Q   How long has S.C. Continent had a

10   relationship with Wang Global?

11       A   I think it's been more than 15 years.

12       Q   Other than Wang Global, other than the

13   wholesalers on the East Coast, does S.C. Continent

14   have any other wholesaling relationships?

15           Let me withdraw.

16           Other than the wholesale relationships in

17   Southern California, East Coast, and Wang Global,

18   did S.C. Continent have any other wholesaling

19   relationships?

20           MR. MCDONOUGH:  I'll object.  In this context

21   only, I'll object to the use of "East Coast" as

22   vague and ambiguous and overbroad, and I would ask

23   that you guys identify what cities you're talking

24   about on the East Coast at some point in this Q

25   and A.

Veritext Legal Solutions
866 299-5127

```
 1    stopped.

 2          MR. MCDONOUGH:  Go ahead.

 3          THE WITNESS:  That is because Sam Yang ramen

 4    had stale smell.  That's why they quit business.

 5    BY MR. RHOW:

 6      Q   Okay.  We'll get to that, I promise you.

 7    You'll get a chance to talk all you want about that.

 8          MR. MCDONOUGH:  Probably not today.

 9    BY MR. RHOW:

10      Q   My question really had nothing to do with

11    that, but it's on the record.

12          But what you said confuses me further because

13    the 25 companies you're talking about that are now

14    15 companies, are those wholesalers?  Are those

15    markets?  Or both?

16      A   I'm only referring to wholesale distributors.

17      Q   Because you listed for me about four or five

18    names.  And now you're saying -- were there 15

19    names?

20      A   25?  No.  It is correct, it's 15.

21      Q   I heard Wang Global, Lee Brothers, Grand

22    Center, Haitai, that's four, maybe five if you break

23    Wang Global and Soul Foods down too.  What are the

24    other nine or ten or eleven, whatever it is?

25          MR. MCDONOUGH:  Argumentative.  Harassing.
```

                                            Page 100

```
 1          THE WITNESS:  Well, I'm actually talking
 2     about total of ten, but in Baltimore there was Lee
 3     Brothers, as well as DY Imports.
 4     BY MR. RHOW:
 5        Q    To save time, I'm going to -- we'll handle
 6     this later, but in terms of the territories that the
 7     wholesalers covered, have you told me all the
 8     territories that might potentially be covered by the
 9     wholesalers?
10        A    Yes, I have told you everything in regards to
11     the East Coast.
12        Q    Okay.  And, trust me, this is not going to
13     change the case, but in terms of, for example,
14     Washington state, was there a wholesaler covering
15     Washington or were you directly selling into
16     Washington?
17        A    We went through a wholesale distributor for
18     that state.
19        Q    So, again, I had asked you before, are all --
20     have you listed for me all the territories covered
21     by a wholesaler, and Washington wasn't one of them.
22     I had a feeling that maybe it was incomplete.
23          MR. RHOW:  Maybe we'll just wait on this one,
24     Eric.  In terms of what I really want, rather than
25     catalog it through this gentleman's memory, is
```

Page 101

```
 1    Northern California, what was the strategy in
 2    Northern California?
 3            MR. MCDONOUGH:  Vague as to time.
 4            You may answer.
 5            THE WITNESS:  Well, as far as San Francisco
 6    area is concerned, there will be Haitai L.A. that
 7    would distribute.  And also Korean Farms.  However,
 8    there are other numerous companies as well.  As far
 9    as ramen products are concerned, we distributed
10    through two companies.
11    BY MR. RHOW:
12       Q   And were those two companies wholesalers?
13       A   Correct.
14       Q   What are the names of those two companies?
15       A   It is those two companies which I mentioned
16    earlier, Haitai and Korean Farms.
17       Q   Do you know what a -- or ever heard of a
18    concept of a business plan?
19       A   Yes.
20       Q   Did S.C. Continent ever prepare a regular or
21    annual business plan that would lay out a strategy
22    for increasing sales in North America?
23            MR. MCDONOUGH:  Vague.  Ambiguous.
24    Overbroad.
25            You may answer.
```

Page 103

1            THE WITNESS:  Well, even though we did not

2     generate business plan, sales representatives will

3     hold meetings and come up with strategy and planning

4     and whatnot.

5            I'm sure you will comment on what I'm about

6     to say, but you know it was useless to come up with

7     a plan since the payment term was LC at site.  We

8     were heavily pressured to come up with the funds to

9     pay for the goods.  And even if we placed order on

10    certain volume, we would not get the shipment.  So

11    it was useless to come up with planning because we

12    never got the volume that we requested.

13           To give you an example, there's a new product

14    called Pul Daek, P-U-L, D-A-E-K, meaning fire

15    chicken.  So this product was launched last year,

16    but we finally got the product recently.  That's

17    just one of the reasons as to why it was useless to

18    come up with a plan.  And, for example, we had

19    orders from U.S. trading in Chinese market, but we

20    cannot fulfill those orders.

21    BY MR. RHOW:

22       Q   I am going to comment.  So just to parse out

23    your answer, during the time period that you've been

24    at S.C. Continent, you have not seen or prepared

25    written business plans that would lay out a strategy

                                             Page 104

```
 1    for increasing sales?  I just need a yes or no
 2    first.
 3        A    It's ambiguous for me to say the answer one
 4    way or another.
 5        Q    Have you ever seen a written business plan?
 6        A    We cannot actually prepare such document, but
 7    there are documents in some brief summary form which
 8    we generated and instructed based on.
 9        Q    Do you still have those?
10        A    I don't think we do.
11        Q    Let's talk a little bit about this LC at
12    site.  Is that the phrase you used?
13        A    Yes.
14        Q    Is it your testimony that S.C. Continent has
15    always operated under an LC at site protocol with
16    Samyang Korea?
17        A    As of March 14, 2012.
18        Q    Meaning prior to March 14, 2012, you were on
19    a credit protocol with Samyang Korea?
20        A    Originally the term of the payment was DA 90
21    days.  And from 2001 rather than DA 90 days, they
22    wanted to change the term to DA at site or DA TT.
23    And we were getting a lot of pressure for these
24    payment terms.  We were paying DA 90 regularly, but
25    we were getting pressure that there were too much of
```

Page 105

```
 1    accounts receivable amount.
 2        Q    So whatever the terminology, whatever the
 3    payment protocol, it wasn't until March, 2012 that
 4    it switched to an LC at site, right?
 5        A    Correct.
```

```
 6        Q    Do you know if it's common in the industry
 7    for ramen manufacturers -- strike that.
 8             Do you know if it's common in the industry
 9    for ramen importers to operate on an LC basis?
10             MR. MCDONOUGH:  Vague.  Ambiguous.  Lacks
11    foundation.
12             You may answer.
13             THE WITNESS:  In general, if one has credit,
14    it's usually pay in DA terms.  However, we were told
15    by Sam Yang headquarters that they're doing everyone
16    with LC at site.  So we were being pressured to go
17    with that.
18    BY MR. RHOW:
19        Q    When you say "everyone," are you talking
20    about other distributors in the Sam Yang
21    distribution network?
22        A    That's what they say.  But when I was located
23    in Korea and worked at the company, the term was
24    mostly DA.
25        Q    You mean back in 1985?
```

Page 106

```
 1        Q    And did you believe advertising was important

 2   to increase sales of Sam Yang products in the United

 3   States?

 4        A    Yes, it is important.

 5        Q    Why?

 6        A    That is to inform the consumer of the

 7   product.  That is why advertising is important.

 8        Q    Did you believe that, based on the

 9   advertising you saw, that Sam Yang was not doing

10   sufficient advertising in the United States?

11        A    Correct.

12        Q    How much did S.C. Continent or Sam Yang

13   (U.S.A.) invest in advertising in the United States?

14             MR. MCDONOUGH:  Vague and ambiguous.

15   Overbroad, particularly as to time.

16             You may answer.

17             THE WITNESS:  I concur with my attorney.

18             MR. MCDONOUGH:  Unfortunately, you and I are

19   not making rulings right now.  You may answer to the

20   extent you can.

21   BY MR. RHOW:

22        Q    Let me clarify.  At any time, really from --

23   I'll just say from 2000 to the present, do you know

24   if Sam Yang (U.S.A.) or S.C. Continent have invested

25   any monies into advertising in the United States?
```

                                          Page 112

1     A    We did a little bit in the newspapers as well

2    as magazines.  However, we did not have a budget to

3    advertise via television or radio.

4     Q    If you can give me an average per year, how

5    much magazine and newspaper advertising did Sam Yang

6    and S.C. Continent spend on?

7     A    I don't really recall.  Since we didn't

8    really have the budget, it wasn't a big amount.

9     Q    Less than $1,000 a year?

10    A    Well, sometimes it could be more than 1,000.

11    So I'm not sure about that.

12        MR. MCDONOUGH:  He is just looking for

13    averages over time to the extent you can do that.

14        THE WITNESS:  I don't really recall.

15    BY MR. RHOW:

16    Q    Do you recall if in any year it was more than

17    2000?

18    A    A particular year?  I don't really recall.

19    Q    Do you recall that in some years since 2000,

20    Sam Yang and S.C. Continent have spent zero monies

21    on advertising?

22    A    I think we spent a small amount every year.

23    Q    And I'm trying to get a range on "small."  Is

24    small less than $2,500?  Is it less than $5,000?  Is

25    it less than $1,000?  What does "small" mean?

Page 113

```
 1          I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby

 3    certify:

 4              That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that any witnesses in the foregoing proceedings,

 7    prior to testifying, were placed under oath; that a

 8    record of the proceedings was made by me using

 9    machine shorthand which was thereafter transcribed

10    under my direction; further, that the foregoing is

11    an accurate transcription thereof.

12              I further certify that I am neither

13    financially interested in the action nor a relative

14    or employee of any attorney of any of the parties.

15              IN WITNESS WHEREOF, I have this date

16    subscribed my name.

17              Dated: 1/10/2017

18

19

20    _____

21         KATHLEEN E. BARNEY

22         CSR No. 5698

23

24

25
```

Page 127

Veritext Legal Solutions
866 299-5127

# EXHIBIT 13

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                         WEST DIVISION
       _____
 4     SAM YANG (USA), Inc.,       )
 5     ROYPAC, INC., dba SC        )
 6     CONTINENT CORPORATION,      )
 7                Plaintiff,       )
          vs.                      ) Case No.
 8     SAMYANG FOODS CO., LTD,     ) 2:15-cv-07697 AB
 9     and Does 1 through 20,      ) (KSx)
10     inclusive,                  )
11                Defendants.      )
       _____    )
12     SAMYANG FOODS CO., LTD      )
13        Counter-Claimant        )
                Vs.               )
14     SAM YANG (USA), Inc.,       )
15     ROYPAC, INC., dba SC        )
       CONTINENT CORPORATION,      )
16     MUN-K YUNG CHEN and Does   )
17     1 through 20, inclusive,    )
18        Counter-Defendants.     )
       _____   )
19          Continued Videotaped Deposition of SEE-YOUNG
20     LEE, Volume II, taken on behalf of Defendants, at
       1875 Century Park East, Suite 2300, Los Angeles,
21     California, beginning at 9:39 a.m., and ending at
22     4:20 p.m., on Monday, June 12, 2017, before Lori M.
       Barkley, CSR No. 6426.
23
24     Job No. 2621945
25     PAGES 128 - 232

                                            Page 128
```

| | | |
|---|---|---|
| 1 | don't know if we received objections to this | 09:47:58 |
| 2 | particular notice, so I'll confirm that, but if not I | 09:48:01 |
| 3 | hope that we can confer about these additional | 09:48:11 |
| 4 | document requests off the record. | 09:48:13 |
| 5 | Q.   Okay, Mr. Lee, I believe you previously | 09:48:31 |
| 6 | testified that you began working for Sam Yang USA in | 09:48:33 |
| 7 | 1985; is that correct? | 09:48:37 |
| 8 | THE INTERPRETER:  Excuse me, was there a | 09:48:54 |
| 9 | month there? | 09:48:56 |
| 10 | MS. BOWMAN:  No. | 09:48:56 |
| 11 | THE WITNESS:  Correct. | 09:48:59 |
| 12 | BY MS. BOWMAN: | 09:49:00 |
| 13 | Q.   And it was a subsidiary of Sam Yang Korea at | 09:49:00 |
| 14 | that time? | 09:49:12 |
| 15 | A.   Yes. | 09:49:12 |
| 16 | Q.   And you left Sam Yang USA for a period in | 09:49:13 |
| 17 | the 1990s, correct? | 09:49:16 |
| 18 | A.   Correct. | 09:49:24 |
| 19 | Q.   So you don't have personal knowledge of what | 09:49:24 |
| 20 | was -- what was happening at Sam Yang USA during that | 09:49:26 |
| 21 | period that you weren't there, but as the person most | 09:49:31 |
| 22 | knowledgeable, you do have information on behalf of | 09:49:33 |
| 23 | the company about that period, correct? | 09:49:35 |
| 24 | A.   Correct. | 09:49:59 |
| 25 | Q.   Can you tell me your title in the company | 09:49:59 |

Page 139

```
 1    that you work for?                               09:50:01

 2        A.   As a director.                          09:50:02

 3             THE INTERPRETER:  Excuse me, strike that.  09:50:16

 4    I'm not sure whether the witness' answer is a board  09:50:27

 5    of director or some other title.  So may I inquire?  09:50:30

 6             Okay, answer stands.                    09:50:42

 7    BY MS. BOWMAN:                                    09:50:43

 8        Q.   And for what company do you work, Mr. Lee?  09:50:43

 9        A.   Are you asking me when I had discontinued  09:50:51

10    working for Sam Yang USA?                         09:50:55

11        Q.   I'm asking right now, as we sit here.    09:51:00

12             THE INTERPRETER:  Excuse me.             09:51:11

13             THE WITNESS:  Managing director.         09:51:19

14    BY MS. BOWMAN:                                    09:51:20

15        Q.   Of which company?                        09:51:20

16        A.   SC Continent Corporation.                09:51:27

17        Q.   And that's the dba for Roypac?           09:51:28

18        A.   Correct.                                 09:51:35

19        Q.   And what are your primary job            09:51:35

20    responsibilities in your role as managing director  09:51:40

21    for SCC or Roypac?                                09:51:44

22        A.   Well, that would entail overall control of  09:52:06

23    the company, but with main focus in sales.        09:52:08

24        Q.   And so do you oversee other sales employees,  09:52:13

25    other Roypac sales employees?                     09:52:16
```

                                                    Page 140

| | | |
|---|---|---|
| 1 | A.   Yes. | 09:52:27 |
| 2 | Q.   And those are Michael Gin and -- or is there | 09:52:28 |
| 3 | anyone else? | 09:52:31 |
| 4 | A.   There's Mr. Yeo. | 09:52:40 |
| 5 | THE INTERPRETER:  Interpreter spelling: | 09:52:44 |
| 6 | Y-E-O, confirmed by the witness. | 09:52:47 |
| 7 | MS. BOWMAN:  Thank you.  I'm going to | 09:52:53 |
| 8 | introduce Exhibit 1009. | 09:52:59 |
| 9 | Q.   And, Mr. Lee, do you recognize the document | 09:53:01 |
| 10 | that's in front of you right now? | 09:53:35 |
| 11 | (Exhibit 1009 was marked for identification | |
| 12 | by the court reporter and is attached hereto.) | |
| 13 | THE WITNESS:  Yes. | 09:53:43 |
| 14 | BY MS. BOWMAN: | 09:53:43 |
| 15 | Q.   And I believe you testified previously that | 09:53:43 |
| 16 | you'd seen the Korean version of this document some | 09:53:45 |
| 17 | years ago; is that correct? | 09:53:47 |
| 18 | A.   Yes. | 09:53:58 |
| 19 | Q.   Okay, and what is this document? | 09:53:58 |
| 20 | MR. MCDONOUGH:  Document speaks for itself. | 09:54:02 |
| 21 | You may answer. | 09:54:09 |
| 22 | THE WITNESS:  My understanding is that this | 09:54:15 |
| 23 | is an exclusive contract. | 09:54:17 |
| 24 | BY MS. BOWMAN: | 09:54:21 |
| 25 | Q.   And is it also your understanding that | 09:54:21 |

Page 141

```
1            THE WITNESS:  Can you repeat that once more?    10:05:27

2    BY MS. BOWMAN:                                          10:05:30

3        Q.   Sure.  Would you agree that this              10:05:30

4    communication does not say that any rights are being   10:05:31

5    transferred from Sam Yang USA to SCC?                  10:05:33

6            MR. MCDONOUGH:  Same objections.                10:05:36

7            THE WITNESS:   My understanding is that the    10:06:34

8    separation between Sam Yang USA and SC Continent took  10:06:35

9    place in order for SC Continent to handle all the      10:06:42

10   products that were being imported from Korea and Sam   10:06:46

11   Yang USA handle all the products that was being        10:06:52

12   manufactured in USA for Sam Yang USA, so I believe     10:06:57

13   that is the reason why Sam Yang USA established SC      10:07:03

14   Continent.                                             10:07:09

15   BY MS. BOWMAN:                                          10:07:10

16       Q.   And that's what Mr. Chun is informing Sam     10:07:10

17   Yang Korea of in this document?                        10:07:14

18           MR. MCDONOUGH:  Argumentative --                10:07:25

19   argumentative, misstates testimony.  Document speaks   10:07:30

20   for itself.  Also legal conclusion.                    10:07:33

21           You may answer.                                 10:07:42

22           THE WITNESS:  It looks like, in order to        10:07:56

23   notify, this itself was being faxed.                   10:08:01

24           MS. BOWMAN:  Move to strike as                  10:08:08

25   nonresponsive.                                          10:08:09
```

Page 146

| | | |
|---|---|---|
| 1 | is Sam Yang USA. | 11:04:51 |
| 2 | Q.   Okay, and those two places of business for | 11:04:53 |
| 3 | Sam Yang USA and Roypac are the same property? | 11:04:55 |
| 4 | A.   Yes. | 11:05:05 |
| 5 | Q.   Okay.  Mr. Lee, do you know what Sam Yang | 11:05:05 |
| 6 | USA's profits were for the year 2016, if there were | 11:05:15 |
| 7 | profits? | 11:05:31 |
| 8 | A.   I don't remember. | 11:05:36 |
| 9 | Q.   What about 2015? | 11:05:38 |
| 10 | A.   I don't really recall, because I did not pay | 11:05:50 |
| 11 | particular attention to profits. | 11:05:53 |
| 12 | Q.   Do you know how much Sam Yang USA's profits | 11:05:57 |
| 13 | were for any year from 1997 until 2016? | 11:06:03 |
| 14 | A.   No, I don't really know about that. | 11:06:28 |
| 15 | Q.   Because you didn't pay attention to profits? | 11:06:29 |
| 16 | A.   Correct. | 11:06:36 |
| 17 | Q.   And you were the managing director focused | 11:06:36 |
| 18 | on sales during that entire period from 1997 to 2016; | 11:06:40 |
| 19 | is that correct? | 11:06:56 |
| 20 | MR. MCDONOUGH:  Misstates testimony | 11:06:56 |
| 21 | slightly. | 11:06:57 |
| 22 | You may answer. | 11:06:57 |
| 23 | THE WITNESS:  Since I returned to the | 11:07:15 |
| 24 | company in -- on April 1st, 2000, I was not in charge | 11:07:16 |
| 25 | of sales from 1997 to March year 2000. | 11:07:23 |

Page 163

```
 1     BY MS. BOWMAN:
 2         Q.   I'm sorry, just to clarify, are you saying    11:07:32
 3     that you were not in charge of sales from 1997 to      11:07:35
 4     2000 or -- is that correct?                            11:07:40
 5         A.   Yes.                                           11:07:53
 6         Q.   Okay, and during the time that you were in    11:07:54
 7     charge of sales from, I believe it was 2000 until      11:07:56
 8     present, or for the purposes of this question, 2000    11:08:01
 9     to 2016, you were not concerned with profits?          11:08:08
10            MR. MCDONOUGH:  Misstates testimony.            11:08:33
11            You may answer.                                 11:08:34
12            THE WITNESS:  Correct.                          11:08:38
13     BY MS. BOWMAN:
14         Q.   Okay.  As the person most knowledgeable       11:08:40
15     about Sam Yang testifying today, did you review any    11:08:43
16     documents regarding Sam Yang USA's profits during the 11:08:48
17     period from 1997 to 2016?                              11:08:51
18         A.   What documents are you referring to?          11:09:22
19         Q.   Well --                                       11:09:23
20            MR. MCDONOUGH:  She asked -- Mr. Lee, she       11:09:24
21     asked if you reviewed any documents.                   11:09:26
22            THE WITNESS:  What type of documents are you    11:09:35
23     talking about?                                         11:09:36
24     BY MS. BOWMAN:                                         11:09:37
25         Q.   Any documents that you reviewed in            11:09:37
```

Page 164

| | | |
|---|---|---|
| 1 | preparation for your testimony today regarding Sam | 11:09:39 |
| 2 | Yang USA's profits, specifically regarding or | 11:09:42 |
| 3 | reflecting Sam Yang USA's profits from 1997 to 2016. | 11:09:45 |
| 4 |     A.   No, I did not review. | 11:10:15 |
| 5 |     Q.   Are you aware of any documents that Sam Yang | 11:10:16 |
| 6 | USA keeps in its records that reflect its profits, | 11:10:19 |
| 7 | its annual profits from 1997 to 2016? | 11:10:24 |
| 8 |     A.   I know about it; however, I have not seen | 11:10:49 |
| 9 | it. | 11:10:51 |
| 10 |     Q.   What are the documents that you know about | 11:10:52 |
| 11 | but have not seen? | 11:10:53 |
| 12 |     A.   Well, what type of document?  Well, as to | 11:11:26 |
| 13 | that, I did not pay much attention, so I cannot say | 11:11:28 |
| 14 | one way or the other. | 11:11:32 |
| 15 |     Q.   Okay, so as the person most knowledgeable | 11:11:34 |
| 16 | appearing here on behalf of Sam Yang USA, are you | 11:11:36 |
| 17 | aware of whether Sam Yang USA creates profit and loss | 11:11:39 |
| 18 | statements? | 11:11:42 |
| 19 |     A.   I believe the company creates them. | 11:12:11 |
| 20 |     Q.   And is it your -- rather, are you aware if | 11:12:13 |
| 21 | Sam Yang USA created these documents from 1997 to | 11:12:19 |
| 22 | 2016? | 11:12:22 |
| 23 |     A.   I believe those were prepared in order to do | 11:12:46 |
| 24 | tax returns. | 11:12:48 |
| 25 |     Q.   But you've never seen them personally? | 11:12:49 |

Page 165

```
 1    USA's president?                                  11:23:25

 2         A.   I think, first of all, you have to ask for   11:23:34

 3    them.                                             11:23:41

 4         Q.   My understanding is that we have asked for   11:23:41

 5    them.  So I'm trying to understand if there's a   11:23:46

 6    particular person who would have access to them, to  11:23:50

 7    your knowledge.                                   11:23:54

 8         A.   I think most ideal thing is, first of all,   11:24:27

 9    you have to ask the President.                    11:24:30

10         Q.   Okay.  But you haven't seen these documents,  11:24:33

11    so you're not aware of what Sam Yang USA's profits  11:24:40

12    were for any year from 1997 to 2016, correct?     11:24:42

13         A.   Correct.                                11:25:03

14         Q.   So if you're not aware of what the profits   11:25:03

15    are from year to year, from 1997 to 2016, how do you  11:25:12

16    determine whether or not the company is doing well in  11:25:17

17    terms of its sales and distribution?              11:25:20

18         A.   Well, I have heard about it.  I don't know   11:25:53

19    in depth, but I heard about it somewhat.          11:26:02

20         Q.   From whom did you hear about it?        11:26:08

21         A.   I heard it from the president.          11:26:18

22         Q.   Anyone else?                            11:26:19

23         A.   No.                                     11:26:22

24         Q.   And what did you hear from the president   11:26:24

25    regarding profits during this period from 1997 to  11:26:26
```

Page 170

| | | |
|---|---|---|
| 1 | You may answer. | 11:44:17 |
| 2 | THE WITNESS:  Can you repeat your question, | 11:44:50 |
| 3 | please? | 11:44:51 |
| 4 | MS. BOWMAN:  Yes. | 11:44:52 |
| 5 | MR. MCDONOUGH:  I want to just -- I'll have | 11:44:54 |
| 6 | the same objections.  I won't say it after a question | 11:44:55 |
| 7 | so. | 11:44:58 |
| 8 | MS. BOWMAN:  I understand. | 11:44:58 |
| 9 | MR. MCDONOUGH:  All right. | 11:44:59 |
| 10 | MS. BOWMAN:  Okay. | 11:44:59 |
| 11 | Q.   So my question, Mr. Lee, was about the DA 90 | 11:45:00 |
| 12 | term, and what I'm asking you is, you understood in | 11:45:05 |
| 13 | November 1997 that the payment term was DA 90 because | 11:45:08 |
| 14 | it was your understanding that the parties had agreed | 11:45:12 |
| 15 | to conduct business that way, correct? | 11:45:14 |
| 16 | MR. MCDONOUGH:  Same objections. | 11:45:16 |
| 17 | THE WITNESS:  I believe that to be correct. | 11:45:45 |
| 18 | BY MS. BOWMAN: | |
| 19 | Q.   Okay. | 11:45:48 |
| 20 | Can I please have exhibit 1034(e).  Thank | 11:45:55 |
| 21 | you.  This is 1034(e). | 11:45:58 |
| 22 | (Exhibit 1034(e) was marked for | 11:46:14 |
| 23 | identification by the court reporter and is | |
| 24 | attached hereto.) | 11:46:33 |
| 25 | BY MS. BOWMAN: | |

Page 178

| | | |
|---|---|---|
| 1 | Q.   And you can take a moment to look at that | 11:46:33 |
| 2 | document.  And just let me know when you've had a | 11:46:35 |
| 3 | chance to review it. | 11:48:45 |
| 4 | MR. MCDONOUGH:  Take as much time as you | 11:48:50 |
| 5 | need. | 11:48:51 |
| 6 | THE WITNESS:  Yes. | 11:48:56 |
| 7 | BY MS. BOWMAN: | |
| 8 | Q.   Okay, and this document dated June 10th, | 11:48:57 |
| 9 | 2001, do you understand this document to show that -- | 11:49:00 |
| 10 | that in exchange for allowing Sam Yang Korea to ship | 11:49:08 |
| 11 | to Canada, in return for that, Sam Yang Korea is | 11:49:13 |
| 12 | permitting a payment term of 90 days post shipment? | 11:49:17 |
| 13 | MR. MCDONOUGH:  Lacks foundation.  Document | 11:49:53 |
| 14 | speaks for itself. | 11:49:55 |
| 15 | You may answer. | 11:49:59 |
| 16 | THE WITNESS:  Are you asking me about Canada | 11:50:09 |
| 17 | or the payment term of 90 days? | 11:50:12 |
| 18 | By MS. BOWMAN: | 11:50:17 |
| 19 | Q.   I'm asking you about both, actually, so if | 11:50:17 |
| 20 | you look near the bottom of the document, number 2 | 11:50:20 |
| 21 | appears to say that, for this shipment, Sam Yang | 11:50:24 |
| 22 | Korea is allowing a payment, a 90 day payment term? | 11:50:28 |
| 23 | A.   Yes. | 11:50:54 |
| 24 | Q.   And you see here that M.K. Chun says in June | 11:50:55 |
| 25 | 2001 or after, the term shall be 90 days from the | 11:51:00 |

Page 179

```
 1    shipping date, correct?                          11:51:03

 2            THE INTERPRETER:  I'm sorry, I didn't catch   11:51:09

 3    the name.  Interpreter speaking.  Who's that name?   11:51:11

 4            MS. BOWMAN:  I referred to M.K. Chun, Moon   11:51:13

 5    Kyung Chun.                                       11:51:21

 6            THE INTERPRETER:  Oh, M.K. Chun, thank you.   11:51:21

 7            THE WITNESS:  Well, in regards to this, in   11:52:18

 8    1998, Samyang Foods actually defaulted as a company   11:52:20

 9    and they lacked operating funds, so we temporarily   11:52:27

10    enter into agreement to provide payment terms in CAD,   11:52:36

11    so we were making payments in the term of CAD.   11:52:44

12    BY MS. BOWMAN:

13        Q.   Okay, and so from 1998, you were making   11:52:53

14    payments in CAD, and that lasted until 2001 when this   11:52:56

15    document was written by Moon Kyung Chun; is that   11:53:03

16    correct?                                          11:53:27

17            MR. MCDONOUGH:  I think it misstates   11:53:27

18    testimony and evidence.  I could be wrong.   11:53:29

19            You may answer.                           11:53:31

20            THE WITNESS:  Well, as to the CAD payment   11:53:54

21    terms is concerned, we accommodated them because they   11:53:56

22    pleaded with us, "them" meaning Samyang Foods, since   11:54:01

23    they lacked operating funds.                      11:54:09

24    BY MS. BOWMAN:

25        Q.   I understand that.  I'm just trying to   11:54:11

                                                    Page 180
```

| | | |
|---|---|---|
| 1 | confirm when that happened.  So when was -- when was | 11:54:13 |
| 2 | the date that Sam Yang USA agreed that it would pay | 11:54:15 |
| 3 | on a CAD term based on Sam Yang Korea's issue with | 11:54:21 |
| 4 | operating funds?  So in other words, when did the CAD | 11:54:25 |
| 5 | term start? | 11:54:50 |
| 6 | A.   I think it was after the company had | 11:54:50 |
| 7 | defaulted, and I think the default date was January | 11:55:13 |
| 8 | 26, 1998, and it was after that. | 11:55:17 |
| 9 | Q.   That's a very precise memory of the date. | 11:55:22 |
| 10 | MR. MCDONOUGH:  There's no question -- | 11:55:28 |
| 11 | there's no question pending. | 11:55:29 |
| 12 | BY MS. BOWMAN: | 11:55:34 |
| 13 | Q.   Okay, and so is it your understanding that | 11:55:34 |
| 14 | in this document when Moon Kyung Chun says that | 11:55:36 |
| 15 | payment term for the shipping in June 2001 or after | 11:55:41 |
| 16 | shall be 90 days, she means that it's changing from | 11:55:46 |
| 17 | CAD to DA 90 days? | 11:55:51 |
| 18 | A.   Correct. | 11:56:27 |
| 19 | Q.   Okay.  And is it your understanding that the | 11:56:28 |
| 20 | payment term remained at DA 90 days until | 11:56:33 |
| 21 | approximately 2012? | 11:56:37 |
| 22 | A.   Correct. | 11:56:52 |
| 23 | Q.   Okay, and just to confirm the terms, CAD is | 11:56:53 |
| 24 | cash on delivery? | 11:56:55 |
| 25 | A.   Cash against delivery. | 11:57:17 |

Page 181

```
 1        Q.    Okay, so does that mean that when an item is    11:57:18

 2   delivered, the cash has to be paid for it at that          11:57:21

 3   time?                                                      11:57:34

 4        A.    Correct.                                        11:57:34

 5        Q.    Okay.  And also while we're going through       11:57:35

 6   terms, DA 90 days, does that mean that payment is due      11:57:40

 7   after -- 90 days after the delivery, within 90 days        11:57:43

 8   after?                                                     11:57:47

 9        A.    Actually, it's the 90 days from shipment        11:58:09

10   date in Korea.                                             11:58:16

11        Q.    I understand, thank you.                        11:58:19

12             So Sam Yang Korea gets paid faster with CAD      11:58:28

13   than with -- than with DA 90 days, correct?                11:58:31

14        A.    We had financial issues as well, so we could    11:58:54

15   not continue on those terms.                               11:58:56

16        Q.    My question was a little different; I'm just    11:58:58

17   asking about how the terms would generally work.  So       11:59:03

18   generally speaking, under a CAD payment term, Sam          11:59:14

19   Yang Korea would receive payment faster than it would      11:59:19

20   under DA 90 days, correct?                                 11:59:22

21        A.    Yes.                                            11:59:35

22        Q.    Okay.  And I believe you previously stated      11:59:35

23   that until November 1997, the payment term was DA 120      11:59:39

24   days.  So why did Sam Yang USA agree to compromise         11:59:45

25   and change to DA 90 days in November 1997?                 11:59:50
```

                                                    Page 182

| | | |
|---|---|---|
| 1 | payment term was DA 120 days, correct? | 12:02:44 |
| 2 | A.   Correct. | 12:02:57 |
| 3 | Q.   And then from November 1997 until about | 12:02:58 |
| 4 | January 1998, the payment term was DA 90 days, | 12:03:03 |
| 5 | correct? | 12:03:08 |
| 6 | MR. MCDONOUGH:  Lacks foundation, calls for | 12:03:21 |
| 7 | speculation. | 12:03:29 |
| 8 | I'm sorry, you may answer. | 12:03:30 |
| 9 | THE WITNESS:  I don't know for certain.  The | 12:03:48 |
| 10 | financial situation still was difficult, so I'm not | 12:03:53 |
| 11 | sure if CAD started as of November '97. | 12:03:58 |
| 12 | BY MS. BOWMAN: | |
| 13 | Q.   Okay, fair enough.  So from either 1997 or | 12:04:02 |
| 14 | early 1998 until 2001, the payment term was CAD, | 12:04:09 |
| 15 | correct? | 12:04:14 |
| 16 | A.   Correct. | 12:04:29 |
| 17 | Q.   And then from 2001 until 2012, the payment | 12:04:30 |
| 18 | term was DA 90 days? | 12:04:33 |
| 19 | A.   Correct.  I think maybe from July 2001. | 12:04:50 |
| 20 | Q.   Okay. | 12:04:53 |
| 21 | A.   Anyway, it's correct. | 12:04:55 |
| 22 | Q.   And then starting in 2012, the payment term | 12:04:56 |
| 23 | was LC, correct? | 12:04:59 |
| 24 | A.   Correct. | 12:05:10 |
| 25 | Q.   Okay. | 12:05:10 |

Page 184

| | | |
|---|---|---|
| 1 | Korea wasn't allowed to sort of arbitrarily or for no | 12:25:30 |
| 2 | reason decide to increase prices for the products it | 12:25:34 |
| 3 | sold to Sam Yang USA, correct? | 12:25:37 |
| 4 | A.   They would arbitrarily increase the price | 12:26:26 |
| 5 | and will present it to us.  Then after our company | 12:26:30 |
| 6 | reviewing such prices, we raised objections and we | 12:26:36 |
| 7 | were able to adjust those prices somewhat. | 12:26:44 |
| 8 | Q.   Okay, and then is it your contention that, | 12:26:55 |
| 9 | by raising those prices arbitrarily, Sam Yang Korea | 12:26:59 |
| 10 | was violating the distribution agreement? | 12:27:02 |
| 11 | MR. MCDONOUGH:  Objection, calls for a legal | 12:27:27 |
| 12 | conclusion. | 12:27:28 |
| 13 | You may answer. | 12:27:29 |
| 14 | THE WITNESS:  As far as price increases are | 12:27:33 |
| 15 | concerned, those prices were somewhat negotiated. | 12:28:05 |
| 16 | Even though agreement is done that way there were | 12:28:12 |
| 17 | some increases as to raw materials, so taking those | 12:28:19 |
| 18 | into consideration, price increase happened. | 12:28:24 |
| 19 | BY MS. BOWMAN: | |
| 20 | Q.   Okay, so if I'm understanding you, you're | 12:28:29 |
| 21 | saying that the price increases that happened over | 12:28:32 |
| 22 | the years under the distribution agreement were the | 12:28:34 |
| 23 | result of negotiations between Sam Yang Korea and Sam | 12:28:36 |
| 24 | Yang USA; is that correct? | 12:28:40 |
| 25 | A.   Correct. | 12:29:03 |

Page 186

| | | |
|---|---|---|
| 1 | Q.    Okay, and so you agreed to these increases | 12:29:04 |
| 2 | as a result of those negotiations with Sam Yang | 12:29:09 |
| 3 | Korea, correct? | 12:29:12 |
| 4 | A.    Correct. | 12:29:26 |
| 5 | Q.    Do you recall when the first price increases | 12:29:26 |
| 6 | occurred, roughly? | 12:29:31 |
| 7 | MR. MCDONOUGH:   Subsequent to the execution | 12:29:41 |
| 8 | of the distribution agreement? | 12:29:43 |
| 9 | MS. BOWMAN:   Correct. | 12:29:44 |
| 10 | THE WITNESS:   I don't remember. | 12:30:00 |
| 11 | BY MS. BOWMAN: | |
| 12 | Q.    Okay.  Can I have exhibit 1036, please. | 12:30:01 |
| 13 | (Exhibit 1036 was marked for identification | 12:30:05 |
| 14 | by the court reporter and is attached hereto.) | 12:30:33 |
| 15 | BY MS. BOWMAN: | |
| 16 | Q.    Mr. Lee, could you just review this document | 12:30:34 |
| 17 | and let me know when you've had a chance to review | 12:30:36 |
| 18 | it.  Okay, have you had a chance to review? | 12:30:39 |
| 19 | A.    Yes. | 12:31:42 |
| 20 | Q.    Okay, and this is a document from Samyang | 12:31:43 |
| 21 | Foods Co., to SC Continent Corporation, dated July | 12:31:49 |
| 22 | 16th, 2003, and based on this document, do you | 12:31:50 |
| 23 | recollect that Sam Yang Korea informed Sam Yang USA | 12:32:05 |
| 24 | that it would be increasing prices starting September | 12:32:08 |
| 25 | 1st, 2003? | 12:32:12 |

Page 187

| | | |
|---|---|---|
| 1 | A.   Yes. | 12:32:32 |
| 2 | Q.   And do you recall any other occasions before | 12:32:34 |
| 3 | this communication on July 16th, 2003, at which Sam | 12:32:37 |
| 4 | Yang Korea increased the prices? | 12:32:45 |
| 5 | A.   I don't recall. | 12:33:11 |
| 6 | MS. BOWMAN:   Okay, I'm going to introduce | 12:33:17 |
| 7 | Exhibit 1156. | 12:33:19 |
| 8 | (Exhibit 1156 was marked for identification | 12:33:20 |
| 9 | by the court reporter and is attached hereto.) | 12:33:39 |
| 10 | MS. BOWMAN:   And I'm looking at page 14 of | 12:33:39 |
| 11 | this exhibit. | 12:33:41 |
| 12 | Q.   And this document -- this document is the | 12:33:46 |
| 13 | First Amended Complaint for Damages and Injunctive | 12:33:51 |
| 14 | Relief in this matter, and paragraph 64 on this page | 12:33:54 |
| 15 | at the top lists seven different dates on which Sam | 12:34:16 |
| 16 | Yang Korea raised the prices.   Those are:   September | 12:34:21 |
| 17 | 1st, 2003, February 1st, 2005, July 1st, 2006, | 12:34:24 |
| 18 | November 1st, 2006, July 1st, 2008, April 1st, 2001, | 12:34:33 |
| 19 | and October 1st, 2012. | 12:34:39 |
| 20 | Now, did those accurately reflect the dates | 12:34:42 |
| 21 | that you recall Sam Yang Korea raising prices of | 12:34:45 |
| 22 | its -- of its products pursuant to negotiations with | 12:34:50 |
| 23 | Sam Yang USA? | 12:34:54 |
| 24 | A.   Correct. | 12:35:43 |
| 25 | MR. MCDONOUGH:   And, Counsel, just for the | 12:35:44 |

Veritext Legal Solutions
866 299-5127

```
 1    BY MS. BOWMAN:

 2        Q.   Mr. Lee, you stated a moment ago that the      12:37:36

 3    price increases were the result of negotiations         12:37:38

 4    between Sam Yang Korea and Sam Yang USA about those      12:37:41

 5    increases, correct?                                     12:37:43

 6        A.   Yes.

 7        Q.   So they weren't arbitrary, because there       12:38:05

 8    were all those negotiations about the prices between    12:38:10

 9    those parties, correct?                                 12:38:12

10        MR. MCDONOUGH:   Argumentative, misstates           12:38:22

11    testimony, harassing.                                   12:38:25

12        You may answer.                                     12:38:27

13        THE WITNESS:   Correct.                             12:38:35

14    BY MS. BOWMAN:

15        Q.   Okay, and so the statement in paragraph 66,    12:38:36

16    which I'm going to read into the record so it can be    12:38:40

17    translated if there's no objection from counsel.        12:38:43

18        MR. MCDONOUGH:   There isn't.                       12:38:46

19        MS. BOWMAN:   Okay.   So the statement that         12:38:47

20    (as read):                                              

21        Upon information and belief, Sam Yang Korea         12:38:49

22    arbitrarily increased the prices of its products it     12:38:51

23    charged the plaintiffs in direct breach of the          12:38:55

24    distribution agreement.                                 12:38:57

25        Q.   That paragraph is incorrect in light of the    12:39:00
```

Page 190

| | | |
|---|---|---|
| 1 | some instances through the negotiations, you were | 12:51:05 |
| 2 | able to obtain a lower price, and in those instances | 12:51:08 |
| 3 | you agreed to the pricing, correct? | 12:51:12 |
| 4 | MR. MCDONOUGH:  And this -- I'd object to | 12:51:35 |
| 5 | "negotiations" and "negotiate," etc., in this context | 12:51:36 |
| 6 | as vague and ambiguous. | 12:51:38 |
| 7 | THE WITNESS:  Well, even though the | 12:52:08 |
| 8 | discussions were held, since we are the weaker party, | 12:52:09 |
| 9 | at the end, we must abide by Sam Yang Korea's | 12:52:13 |
| 10 | requests. | 12:52:18 |
| 11 | BY MS. BOWMAN: | |
| 12 | Q.   Okay, I understand that, but I was trying to | 12:52:23 |
| 13 | ask about the two different situations that you | 12:52:29 |
| 14 | mentioned a moment ago in your previous answer, and | 12:52:32 |
| 15 | if I understand correctly, you testified that there | 12:52:34 |
| 16 | were some times when you would suggest a different | 12:52:38 |
| 17 | price and Sam Yang Korea who lower the price, and you | 12:52:42 |
| 18 | would come to an agreement about what that price | 12:52:46 |
| 19 | should be; is that correct? | 12:52:49 |
| 20 | A.   Yeah. | 12:53:24 |
| 21 | MR. MCDONOUGH:  Now, hold on, I would object | 12:53:25 |
| 22 | to "suggest" and "agree" in this particular context | 12:53:27 |
| 23 | as vague and ambiguous. | 12:53:29 |
| 24 | MS. BOWMAN:  And I'm just using the terms | 12:53:30 |
| 25 | that were just used. | 12:53:31 |

Page 195

```
 1              You may answer.                      12:53:43

 2              MS. SHIN:  He may answer.            12:53:45

 3              THE INTERPRETER:  I'm getting there. 12:53:45

 4              THE WITNESS:  Yes.                   12:53:46

 5    BY MS. BOWMAN:

 6        Q.   Okay, and there were other situations where  12:53:47

 7    you proposed a lower price and Sam Yang Korea refused  12:53:49

 8    the lower price but in those instances you ultimately  12:53:52

 9    accepted the price they proposed because you felt  12:53:57

10    like you didn't have a choice, correct?        12:54:00

11        A.   Correct.                              12:54:27

12        Q.   Even though you felt it was unfair because  12:54:28

13    you were the weaker party?                     12:54:30

14        A.   Correct.                              12:54:40

15        Q.   And even though you thought that it breached  12:54:40

16    the terms of the distribution agreement, correct?  12:54:43

17              MR. MCDONOUGH:  Misstates testimony.  12:54:54

18    Evidence, the amended complaint and theories there  12:54:55

19    in.                                            12:54:59

20              You may answer.  Are.                12:54:59

21              THE WITNESS:  Well, what should I answer?  12:55:12

22              MR. MCDONOUGH:  Good question.       12:55:14

23    BY MS. BOWMAN:                                 12:55:15

24        Q.   Well, the question I asked was, just to read  12:55:15

25    back:  So there were other situations where you  12:55:22
```

| | | |
|---|---|---|
| 1 | can get it over with. | 13:00:59 |
| 2 | MR. MCDONOUGH:  Okay. | 13:00:59 |
| 3 | BY MS. BOWMAN: | 13:01:00 |
| 4 | Q.   So, Mr. Lee, you just testified that there | 13:01:01 |
| 5 | were other situations where you proposed a lower | 13:01:04 |
| 6 | price to Sam Yang Korea but they refused it, and | 13:01:06 |
| 7 | you -- you accepted their price proposal anyway, even | 13:01:11 |
| 8 | though you thought it was unfair because they were | 13:01:14 |
| 9 | the weaker party, and my question is, you accepted it | 13:01:18 |
| 10 | even though you thought it breached the terms of the | 13:01:22 |
| 11 | distribution agreement, correct? | 13:01:26 |
| 12 | MR. MCDONOUGH:  It's asked and answered, | 13:02:02 |
| 13 | it's overbroad, vague and ambiguous, and the | 13:02:03 |
| 14 | incorporation of the term "breached" misstates prior | 13:02:05 |
| 15 | testimony, evidence, and facts and theories and | 13:02:09 |
| 16 | allegations in the Complaint. | 13:02:10 |
| 17 | You may answer. | 13:02:11 |
| 18 | THE WITNESS:  Yes. | 13:02:37 |
| 19 | MS. BOWMAN:  Okay, and Counsel, for the | 13:02:39 |
| 20 | record, I'm not referring to your theories of the | 13:02:41 |
| 21 | case, and it's not my job to present them, so to the | 13:02:43 |
| 22 | extent you think they're misrepresented, that's not a | 13:02:47 |
| 23 | relevant objection. | 13:02:50 |
| 24 | MR. MCDONOUGH:  May the record reflect that | 13:03:06 |
| 25 | I disagree. | 13:03:07 |

Page 200

| | | |
|---|---|---|
| 1 | MS. BOWMAN:  Okay, just a couple more | 13:03:11 |
| 2 | questions.  Or do you want to take a break?  Okay, | 13:03:12 |
| 3 | you know what, let's break for lunch. | 13:03:15 |
| 4 | VIDEO OPERATOR:  We're now going off camera, | 13:03:19 |
| 5 | the time is 1:03 p.m. | 13:03:21 |
| 6 | | |
| 7 | (Whereupon at the hour of 1:03, | |
| 8 | P.M., a luncheon recess was taken. | |
| 9 | The deposition was resumed at 2:15 | |
| 10 | P.M., the same persons being | |
| 11 | present.) | 14:15:24 |
| 12 | | 14:15:24 |
| 13 | VIDEO OPERATOR:  We are now back on camera. | 14:15:40 |
| 14 | The time is 2:15 p.m. | 14:15:42 |
| 15 | BY MS. BOWMAN: | |
| 16 | Q.   Mr. Lee, are you ready to proceed? | 14:15:47 |
| 17 | A.   Yes, I am. | 14:15:48 |
| 18 | Q.   Okay, so I'm going to switch topics a little | 14:15:49 |
| 19 | from where we left off before lunch. | 14:15:52 |
| 20 | A.   Okay. | 14:15:59 |
| 21 | Q.   Okay, and it is your understanding that Sam | 14:16:00 |
| 22 | Yang USA had exclusive rights to distribute in Mexico | 14:16:03 |
| 23 | under the distribution agreement, correct? | 14:16:06 |
| 24 | A.   Correct. | 14:16:27 |
| 25 | Q.   But the last time that Sam Yang USA actually | 14:16:27 |

Page 201

| | | |
|---|---|---|
| 1 | shipped to Mexico was, I believe you said | 14:16:31 |
| 2 | approximately ten years ago; is that correct? | 14:16:32 |
| 3 | A.    Correct. | 14:16:49 |
| 4 | Q.    Okay, and since that time, you haven't | 14:16:51 |
| 5 | actively sought to develop any new accounts in | 14:16:53 |
| 6 | Mexico, correct? | 14:16:56 |
| 7 | MR. MCDONOUGH:  Vague, ambiguous, overbroad. | 14:17:06 |
| 8 | You may answer. | 14:17:12 |
| 9 | THE WITNESS:  We made efforts, and we have | 14:17:16 |
| 10 | continued to made efforts. | 14:17:18 |
| 11 | BY MS. BOWMAN: | |
| 12 | Q.    What kind of efforts did you make? | 14:17:21 |
| 13 | A.    Well, in order to assess the situation, we | 14:17:40 |
| 14 | continue to send samples to those who we were doing | 14:17:45 |
| 15 | business and with those who we weren't doing business | 14:17:51 |
| 16 | with. | 14:17:55 |
| 17 | Q.    And when you say those you were doing | 14:17:56 |
| 18 | business with or those you weren't, are you referring | 14:18:00 |
| 19 | to wholesalers or other distributors or some other | 14:18:02 |
| 20 | kind of entity? | 14:18:07 |
| 21 | THE INTERPRETER:  Okay, I'd like to clarify | 14:18:47 |
| 22 | one thing. | 14:18:49 |
| 23 | THE WITNESS:  I've sent samples through | 14:19:03 |
| 24 | wholesalers located in Mexico, as well as sent small | 14:19:05 |
| 25 | amounts of shipments to those small businesses that | 14:19:12 |

Page 202

| | | |
|---|---|---|
| 1 | MR. MCDONOUGH:  Vague, ambiguous as to | 14:29:59 |
| 2 | "permitted." | 14:30:01 |
| 3 | You may answer. | 14:30:02 |
| 4 | THE WITNESS:  Are you referring to the | 14:30:15 |
| 5 | matter that we exported goods to Guatemala? | 14:30:17 |
| 6 | BY MS. BOWMAN: | 14:30:21 |
| 7 | Q.   Yes. | 14:30:21 |
| 8 | A.   My understanding of that, as to that is | 14:30:28 |
| 9 | there had been discussions with Sam Yang in regards | 14:30:31 |
| 10 | to that. | 14:30:35 |
| 11 | Q.   But it's not written into the distribution | 14:30:35 |
| 12 | agreement, correct? | 14:30:37 |
| 13 | A.   My understanding is that, in order to cover | 14:31:05 |
| 14 | North America and all the way to Guatemala, I believe | 14:31:10 |
| 15 | that discussion had been held with Sam Yang in | 14:31:18 |
| 16 | regards to Guatemala regarding, for now, starting | 14:31:25 |
| 17 | from there. | 14:31:36 |
| 18 | Q.   Okay, I'm -- I'm not quite sure I understood | 14:31:38 |
| 19 | your response, so I'm going to try to confirm.  You | 14:31:43 |
| 20 | agree that the distribution and sales agreement does | 14:31:51 |
| 21 | not say that Sam Yang USA is authorized to sell in | 14:31:53 |
| 22 | Guatemala, correct? | 14:32:00 |
| 23 | MR. MCDONOUGH:  Document speaks for itself, | 14:32:27 |
| 24 | calls for a legal conclusion. | 14:32:31 |
| 25 | You may answer. | 14:32:32 |

Page 207

| | | |
|---|---|---|
| 1 | THE WITNESS:  As to the legal aspects I do | 14:32:58 |
| 2 | not know, but apart from the agreement, it is true | 14:33:01 |
| 3 | that discussion was held in regards to that with Sam | 14:33:09 |
| 4 | Yang before it was exported. | 14:33:14 |
| 5 | BY MS. BOWMAN: | |
| 6 | Q.   Okay, so you believe that you had a right to | 14:33:18 |
| 7 | export to Panama based on discussions that you had | 14:33:20 |
| 8 | with Sam Yang Korea outside of the written | 14:33:24 |
| 9 | distribution agreement, correct? | 14:33:27 |
| 10 | MS. BOWMAN:  Did I say Panama?  I'm sorry, I | 14:33:35 |
| 11 | meant Guatemala. | 14:33:38 |
| 12 | THE INTERPRETER:  Should I replace that and | 14:33:41 |
| 13 | re-ask or -- | 14:33:44 |
| 14 | MS. BOWMAN:  Yes, please, if there's no | 14:33:45 |
| 15 | objection from counsel. | 14:33:46 |
| 16 | MR. MCDONOUGH:  No, no objection. | 14:33:47 |
| 17 | THE WITNESS:  That is my -- that is my | 14:34:21 |
| 18 | understanding.  However, I was not in charge at the | 14:34:24 |
| 19 | time.  It was another department who took care of | 14:34:32 |
| 20 | that. | 14:34:36 |
| 21 | BY MS. BOWMAN: | |
| 22 | Q.   Okay. | 14:34:38 |
| 23 | MR. MCDONOUGH:  Were you finished? | 14:34:39 |
| 24 | THE WITNESS:  Well, thereafter year 2003, | 14:35:29 |
| 25 | our manufacturing plant closed down, so we tried to | 14:35:33 |

Page 208

| | | |
|---|---|---|
| 1 | get products from Sam Yang to export to Guatemala, so | 14:35:40 |
| 2 | we got pricing from them.  However, the price did not | 14:35:45 |
| 3 | meet our requirement; therefore, we got the product | 14:36:19 |
| 4 | from union as an OEM product, and we exported those | 14:36:24 |
| 5 | product to Guatemala until 2008. | 14:36:32 |
| 6 | BY MS. BOWMAN: | |
| 7 | Q.   Okay, and when did you first begin exporting | 14:36:37 |
| 8 | products to Guatemala? | 14:36:39 |
| 9 | A.   I believe that was in 19194. | 14:36:51 |
| 10 | Q.   So from 1994 to 2008, Sam Yang USA was | 14:37:00 |
| 11 | exporting products to Guatemala; is that correct? | 14:37:05 |
| 12 | A.   Correct. | 14:37:21 |
| 13 | Q.   Okay, so other than Guatemala, United | 14:37:22 |
| 14 | States, Mexico, and Canada, from 1997 to 2016, were | 14:37:27 |
| 15 | there any other countries to which Sam Yang USA | 14:37:34 |
| 16 | exported Sam Yang products? | 14:37:39 |
| 17 | A.   Three countries:  Mexico, Canada, and | 14:37:48 |
| 18 | Guatemala. | 14:38:10 |
| 19 | Q.   And the United States? | 14:38:11 |
| 20 | A.   Well, here we have -- we -- manufacturing | 14:38:19 |
| 21 | plant. | 14:38:25 |
| 22 | Q.   Until 2003, correct? | 14:38:25 |
| 23 | A.   Correct. | 14:38:30 |
| 24 | Q.   Okay.  And regarding the samples that you | 14:38:31 |
| 25 | sent to Mexico do you have any documents or | 14:39:04 |

Page 209

| 1 | correspondence reflecting those samples that you sent | 14:39:08 |
| 2 | to wholesalers in Mexico? | 14:39:11 |
| 3 |     A.   I don't have anything like that.  It was | 14:39:28 |
| 4 | sent through a small company -- sent to a small | 14:39:57 |
| 5 | company through a wholesaler located in L.A. | 14:40:02 |
| 6 | However, we were told that the taste was not | 14:40:07 |
| 7 | appropriate, and therefore, they did not show much | 14:40:15 |
| 8 | interest in products from Korea. | 14:40:21 |
| 9 |     Q.   Okay, so other than the one shipment of | 14:40:24 |
| 10 | approximately ten years ago, Sam Yang USA or Roypac | 14:40:27 |
| 11 | didn't directly have any contact with any wholesalers | 14:40:32 |
| 12 | or distributors in Mexico, correct? | 14:40:35 |
| 13 |     A.   Correct, not directly. | 14:40:54 |
| 14 |     Q.   Okay, and you stated that you didn't visit | 14:41:04 |
| 15 | Mexico between 1997 and 2016, but did anyone else at | 14:41:07 |
| 16 | Roypac or Sam Yang USA go to Mexico on behalf of Sam | 14:41:14 |
| 17 | Yang USA or Roypac during that period? | 14:41:18 |
| 18 |     A.   I'm not sure whether anyone from Sam Yang | 14:42:05 |
| 19 | USA's production part had visited, but as to SC | 14:42:10 |
| 20 | Continent, we did not visit. | 14:42:18 |
| 21 |     Q.   SC Continent was only responsible for the | 14:42:28 |
| 22 | import business, correct, and Sam Yang USA for the -- | 14:42:31 |
| 23 | for the domestic business? | 14:42:35 |
| 24 |     A.   Correct. | 14:42:58 |
| 25 |     Q.   So Sam Yang USA didn't have say reason to go | 14:42:59 |

Page 210

| | | |
|---|---|---|
| 1 | from the prior one, which was not limited in time. | 14:48:39 |
| 2 | THE INTERPRETER:  I'd like to clarify one | 14:49:31 |
| 3 | thing. | 14:49:33 |
| 4 | THE WITNESS:  My understanding -- my | 14:49:36 |
| 5 | understanding is that we did business with a company | 14:49:49 |
| 6 | called Averaterra, located in Mexico from, '94 to | 14:49:54 |
| 7 | 2006, and that business had been done continuously in | 14:50:03 |
| 8 | that period, and then I believe there would have been | 14:50:12 |
| 9 | business plan as well as someone had visited. | 14:50:15 |
| 10 | However, it was -- that was taken care of by another | 14:50:18 |
| 11 | party so I don't know for sure. | 14:50:27 |
| 12 | BY MS. BOWMAN: | |
| 13 | Q.   Okay, is it fair to say that you've never | 14:50:29 |
| 14 | seen a written business plan for sales and | 14:50:32 |
| 15 | distribution in Mexico from Roypac or Sam Yang USA? | 14:50:34 |
| 16 | A.   Correct. | 14:51:02 |
| 17 | | 14:51:10 |
| 18 | (Whereupon a discussion was held off | |
| 19 | the record.) | |
| 20 | BY MS. BOWMAN: | 14:51:25 |
| 21 | Q.   Mr. Lee, is it also fair to say that you've | 14:51:25 |
| 22 | never written or seen a written business plan for | 14:51:27 |
| 23 | Canada from Roypac or Sam Yang USA? | 14:51:30 |
| 24 | A.   Correct. | 14:51:59 |
| 25 | Q.   Okay.  And is it also the case that Sam Yang | 14:52:00 |

Page 213

| | | |
|---|---|---|
| 1 | USA did not ship to Mexico after 2001 -- I'm sorry, | 14:52:05 |
| 2 | strike that. | 14:52:16 |
| 3 | Is it also true that Sam Yang USA did not | 14:52:17 |
| 4 | ship to Canada after 2001? | 14:52:21 |
| 5 | A.   We had been continuing to export our | 14:53:28 |
| 6 | products to Toronto from mid 1980s.  Products came -- | 14:53:30 |
| 7 | that came from Korea went to Torrance and products | 14:53:38 |
| 8 | that were manufactured by Sam Yang USA factory were | 14:53:42 |
| 9 | exported through safe way to Canada from 1996 to | 14:53:51 |
| 10 | 2002. | 14:53:57 |
| 11 | Q.   Okay, so is it correct that after 2002, Sam | 14:54:01 |
| 12 | Yang USA did not ship any products to Canada? | 14:54:04 |
| 13 | A.   Well, until 2001, through Roypac of Sam | 14:54:55 |
| 14 | Yang, we exported, and then from 1995 through a | 14:55:03 |
| 15 | company named BY, located in Vancouver, we were | 14:55:11 |
| 16 | exporting.  However, we didn't have enough product to | 14:55:16 |
| 17 | fill the container; nor new products came, and also, | 14:55:21 |
| 18 | the products did not taste good, so we discontinued. | 14:55:27 |
| 19 | And after 2001, I think midst of that year, | 14:55:43 |
| 20 | maybe from July, Sam Yang Korea started to export | 14:55:51 |
| 21 | directly, so we took our hands off of it. | 14:55:56 |
| 22 | Q.   Okay, so you stopped exporting in 2001, | 14:56:01 |
| 23 | correct, to Canada? | 14:56:04 |
| 24 | A.   Correct. | 14:56:09 |
| 25 | Q.   Okay.  And that was because you found out in | 14:56:09 |

Page 214

| | | |
|---|---|---|
| 1 | 2001 that Sam Yang Korea was exporting to Canada? | 14:56:14 |
| 2 | MR. MCDONOUGH:  Misstates testimony.  It's | 14:56:29 |
| 3 | also argumentative as phrased, insofar as the witness | 14:56:30 |
| 4 | identified other factors. | 14:56:33 |
| 5 | You may answer. | 14:56:34 |
| 6 | MS. BOWMAN:  That is not an appropriate | 14:56:35 |
| 7 | objection. | 14:56:36 |
| 8 | You may answer. | 14:56:54 |
| 9 | THE WITNESS:  Well, in year 2001, we got | 14:57:09 |
| 10 | pressured from Korea about Canada, so we had no | 14:57:13 |
| 11 | choice but permitted exporting to Canada. | 14:57:22 |
| 12 | BY MS. BOWMAN: | |
| 13 | Q.   Okay.  So in 2001, when you found out that | 14:57:32 |
| 14 | Sam Yang Korea was exporting Canada, did you believe | 14:57:47 |
| 15 | that that was a violation of Sam Yang USA's rights | 14:57:49 |
| 16 | under the distribution agreement? | 14:57:53 |
| 17 | MR. MCDONOUGH:  Vague, ambiguous, overbroad, | 14:58:18 |
| 18 | particularly as to time.  Also calls for a legal | 14:58:21 |
| 19 | conclusion. | 14:58:24 |
| 20 | You may answer. | 14:58:24 |
| 21 | THE WITNESS:  We were pressured from Korea | 14:59:09 |
| 22 | in year 2001, so we had permitted Korea to export to | 14:59:10 |
| 23 | Canada for one year, and had thought that that supply | 14:59:18 |
| 24 | will come back to us after one year.  However, we | 14:59:24 |
| 25 | continued to be pressured, so we really did not know | 14:59:29 |

Page 215

```
 1    what to do after that.                          14:59:36

 2    BY MS. BOWMAN:

 3        Q.    So Sam Yang Korea continued to export to   14:59:40

 4    Canada after the one year that you permitted?   14:59:43

 5            MR. MCDONOUGH:  Misstates testimony.    14:59:56

 6            You may answer.                          14:59:57

 7            THE WITNESS:  Sam Yang Korea continued to  15:00:31

 8    pressure ignoring the agreement, and they continued  15:00:33

 9    to export the product and they pressured us, so.  15:00:46

10            THE INTERPRETER:  Let me clarify.       15:00:53

11            THE WITNESS:  So the situation was that we  15:00:59

12    could not get into it again.                    15:01:02

13    BY MS. BOWMAN:

14        Q.    So -- okay, so Sam Yang Korea continued   15:01:11

15    exporting after 2002, and you were -- I'm sorry,  15:01:14

16    strike that.                                     15:01:23

17            So you were aware that Sam Yang Korea was  15:01:24

18    continuing to export after 2002, but you felt   15:01:26

19    pressure not to do anything about it; is that   15:01:30

20    correct?                                         15:01:59

21            MR. MCDONOUGH:  Misstates and            15:01:59

22    mischaracterizes testimony.                     15:02:00

23            You may answer.                          15:02:01

24            THE WITNESS:  The person who applied the  15:02:31

25    pressure was the chairman who was the father of the  15:02:34
```

Page 216

| | | |
|---|---|---|
| 1 | president, so due to the personal relationship, | 15:02:40 |
| 2 | although I just said we should sue, since she was the | 15:02:48 |
| 3 | daughter, she did not lodge -- lodge a lawsuit. | 15:02:54 |
| 4 | BY MS. BOWMAN: | |
| 5 | Q.   And when was that? | 15:03:04 |
| 6 | A.   That continued from 2001 on wards. | 15:03:06 |
| 7 | Q.   But you didn't sue until 2015, correct? | 15:03:13 |
| 8 | A.   Correct. | 15:03:23 |
| 9 | MS. BOWMAN:  Sorry, can we go off the record | 15:03:59 |
| 10 | for one minute. | 15:04:01 |
| 11 | VIDEO OPERATOR:  We're now going off camera. | 15:04:02 |
| 12 | The time is 3:04 p.m. | 15:04:05 |
| 13 | | 15:06:06 |
| 14 | (Recess taken.) | |
| 15 | | 15:25:40 |
| 16 | VIDEO OPERATOR:  We're now back on camera. | 15:25:50 |
| 17 | The time is 3:26 p.m. | 15:25:51 |
| 18 | BY MS. BOWMAN: | 15:25:57 |
| 19 | Q.   Mr. Lee, do you contend that Sam Yang Korea | 15:26:02 |
| 20 | engaged in parallel exporting of Sam Yang products to | 15:26:06 |
| 21 | the east coast in violation of distribution and sales | 15:26:10 |
| 22 | agreement? | 15:26:27 |
| 23 | MR. MCDONOUGH:  Vague, ambiguous, overbroad, | 15:26:35 |
| 24 | potentially beyond the scope of the PMK designation | 15:26:38 |
| 25 | of this witness. | 15:26:44 |

Page 217

| | | |
|---|---|---|
| 1 | MR. MCDONOUGH:  Just so the witness | 15:35:17 |
| 2 | understands, I recognize that "a second" is a figure | 15:35:18 |
| 3 | of speech. | 15:35:21 |
| 4 | But please don't feel rushed in reviewing | 15:35:22 |
| 5 | this document.  There is no question pending, sir. | 15:35:24 |
| 6 | There's no question pending. | 15:35:41 |
| 7 | THE WITNESS:  As to this it's not regarding | 15:35:44 |
| 8 | Nagasaki Champong but some other hot -- | 15:35:46 |
| 9 | BY MS. BOWMAN: | 15:35:49 |
| 10 | Q.   Okay, well, so this item does mention | 15:35:49 |
| 11 | Nagasaki Champong in number 3 but that -- my question | 15:35:53 |
| 12 | was a little bit different. | 15:35:55 |
| 13 | Under number 3, which says (as read): | 15:35:57 |
| 14 | Matters related to import of products for | 15:35:59 |
| 15 | domestic use into the US. | 15:36:01 |
| 16 | The first sentence says (as read): | 15:36:03 |
| 17 | Products for Korean consumption have been | 15:36:06 |
| 18 | imported and sold in a large volume in the middle and | 15:36:10 |
| 19 | eastern regions of the US since about ten years ago. | 15:36:13 |
| 20 | We have asked your company to stop your import tens | 15:36:16 |
| 21 | of times but it hasn't been corrected up to now. | 15:36:19 |
| 22 | So this letter would suggest that since at | 15:36:23 |
| 23 | least the mid 2000s, SC Continent Corp., or Sam Yang | 15:36:27 |
| 24 | USA was aware of products of Sam Yang being sold on | 15:36:35 |
| 25 | the east coast, correct? | 15:36:38 |

Page 221

```
 1              MR. MCDONOUGH:  Lacks foundation so far as    15:37:32
 2      the witness did not author the document.  Calls for   15:37:33
 3      speculation.  Misstates the document.                 15:37:35
 4              You may answer if you're able to.             15:37:39
 5              THE INTERPRETER:  I will complete my          15:37:42
 6      questioning 'cause I wasn't done yet, so.             15:37:44
 7              THE WITNESS:  No one knew where the products  15:38:37
 8      were being imported from, because Korea repeatedly    15:38:39
 9      told us that they did not know who the source were.   15:38:44
10      BY MS. BOWMAN:
11          Q.   Okay, but you did know that products were    15:38:50
12      coming in and being sold on the east coast of the     15:38:52
13      United States that you did not export, correct?       15:38:57
14              MR. MCDONOUGH:  Vague as to "export," the     15:39:13
15      context here.                                         15:39:16
16              THE WITNESS:  Correct.                        15:39:22
17      BY MS. BOWMAN:
18          Q.   And as of 2014, you'd known about it for     15:39:23
19      approximately ten years, if Mr. Woon-bae Yeo's letter 15:39:25
20      is correct, right?                                    15:39:30
21              MR. MCDONOUGH:  Vague and ambiguous as to     15:39:51
22      "it."                                                 15:39:52
23              THE WITNESS:  We knew about it, but it had a  15:40:22
24      sticker on the domestic consumption products, so no   15:40:25
25      one knew who was bringing these in.                   15:40:32
```

Page 222

| | | |
|---|---|---|
| 1 | to him, "That wasn't my question," I believe it | 15:52:58 |
| 2 | confuses the witness. | 15:52:59 |
| 3 | MS. BOWMAN:  So I actually wasn't finished | 15:53:37 |
| 4 | before Counsel's objection. | 15:53:39 |
| 5 | Q.   And just to simplify this, is it correct | 15:53:41 |
| 6 | that it was around 2003 or 2004 when you first | 15:53:44 |
| 7 | learned from wholesalers on the east coast that there | 15:53:47 |
| 8 | were products appearing with the domestic consumption | 15:53:50 |
| 9 | sticker? | 15:53:53 |
| 10 | A.   Correct. | 15:54:12 |
| 11 | Q.   Okay.  And you mentioned that there were two | 15:54:13 |
| 12 | companies, two companies I believe that were selling | 15:54:22 |
| 13 | products with these domestic consumption stickers; | 15:54:25 |
| 14 | what were those two companies, if you recall? | 15:54:30 |
| 15 | A.   At the time Lee Brothers and Wang Global New | 15:55:01 |
| 16 | York, and salespeople from that company called us. | 15:55:07 |
| 17 | MS. BOWMAN:  Okay, can we take a short | 15:55:32 |
| 18 | break? | 15:55:34 |
| 19 | VIDEO OPERATOR:  We're now going off camera. | 15:55:38 |
| 20 | The time is 3:55 p.m. | 15:55:39 |
| 21 | | |
| 22 | (Recess taken.) | |
| 23 | | 16:19:08 |
| 24 | VIDEO OPERATOR:  We're now back on camera. | 16:19:16 |
| 25 | The time is 4:19 p.m. | 16:19:17 |

Page 229

1    STATE OF CALIFORNIA       ) ss.

2    COUNTY OF LOS ANGELES     )

3

4            I, Lori M. Barkley, CSR No. 6426, do hereby

5    certify:

6            That the foregoing deposition testimony

7    taken before me at the time and place therein set

8    forth and at which time the witness was administered

9    the oath;

10           That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17           I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21           IN WITNESS WHEREOF, I have subscribed my

22   name this June day of 28th, 2017.

23

24

25           LORI M. BARKLEY, CSR No. 6426

                                        Page 232

# EXHIBIT 14

1  SUH LAW GROUP, APC
2  MICHAEL K. SUH (CA Bar No. 213855)
   EDWARD W. SUH (CA Bar No. 265356)
3  3810 WILSHIRE BLVD., SUITE 1212
4  LOS ANGELES, CA 90010
   Telephone:  (213)385-7347
5  Facsimile:  (213)383-3323
6  Michael@suhnassoclaw.com
   Edward@suhnassoclaw.com
7

8  Attorneys for Plaintiffs,
   SAM YANG (U.S.A.), INC.,
9  ROYPAC, INC. dba S.C. CONTINENT
10 CORPORATION

EXHIBIT
1156

11           **UNITED STATES DISTRICT COURT**

12          **CENTRAL DISTRICT OF CALIFORNIA**

13               **WESTERN DIVISION**

14
   SAM YANG (U.S.A.), INC.; ROYPAC,        Case No.  2:15-cv-07697
15 INC. dba S.C. CONTINENT
   CORPORATION;                            FIRST AMENDED COMPLAINT
16                                         FOR DAMAGES AND
              Plaintiffs,                  INJUNCTIVE RELIEF FOR:
17
                                           1) BREACH OF WRITTEN
18      vs.                                   ~ CONTRACT;
19 SAMYANG FOODS CO., LTD.; and            2) BREACH OF COVENANT OF
20 Does 1 through 20, inclusive               GOOD FAITH AND FAIR
                                              DEALING;
21            Defendants.
                                           3) ANTICIPATORY BREACH
22                                            OF WRITTEN CONTRACT;
23                                         4) PRELIMINARY
                                              INJUNCTION;
24
                                           5) TRADEMARK
25                                            INFRINGEMENT;
26                                         6) VIOLATION OF LANHAM
                                              ACT §1114, 15 U.S.C. §1114
27
                                           7) VIOLATION OF LANHAM
28                                            ACT §43(a), 15 U.S.C. §1125(a)

## I.   INTRODUCTION

1.   Plaintiffs SAM YANG (U.S.A.), INC. ("SYUSA") and ROYPAC, INC. dba S.C. CONTINENT CORPORATION ("Roypac") (collectively, "Plaintiffs") bring this action against Defendant SAMYANG FOODS CO., LTD. ("Defendant" or "Samyang Korea") for damages and injunctive relief arising out of Defendant's continued breach of a distribution and sales agreement between Plaintiffs and Defendant.

2.   The distribution and sales agreement was entered into as of November 29, 1997 between SYUSA and Samyang Korea, and granted, among other rights, SYUSA an exclusive distributorship to sell all of Samyang Korea's products within North America, including the United States, Canada, and Mexico (the "Distribution Agreement"). Samyang Korea was specifically prohibited from manufacturing or selling any of Samyang Korea's products directly or indirectly into North America, but Samyang Korea has breached the Distribution Agreement. Samyang Korea's breach has caused significant damage to Plaintiffs. A true and correct copy of the Distribution Agreement is attached hereto as Exhibit A.

3.   The Distribution Agreement does not have a termination clause and does not allow the parties to unilaterally terminate the agreement for any reason. However, on April 21, 2016, Samyang Korea sent to SYUSA a termination notice by e-mail stating that Samyang Korea would be terminating the Distribution Agreement effective August 1, 2016. Such actions would irreparably injure Plaintiffs since it would permanently damage or destroy the distribution channels established by Plaintiffs and would cost numerous employees their jobs and paychecks.

4.   SYUSA is the sole and rightful owner of all "Samyang" trademarks and related intellectual property in the United States. SYUSA has been using these trademarks continuously during its regular course of business. However, Samyang Korea has illegally registered a "Samyang Foods" trademark without SYUSA's

- 1 -

1    authorization or consent, and has used such trademarks to conduct business in the
2    United States also without the consent of SYUSA, which owns the exclusive
3    distribution rights to all of Samyang Korea's products in the United States.  An
4    immediate preliminary and permanent injunction is needed to prevent the
5    continuing infringement of SYUSA's trademarks by Samyang Korea, and SYUSA
6    also seeks monetary relief including attorneys' fees.
7         5.    Plaintiffs seek the recovery of damages and injunctive relief to
8    prevent Samyang Korea from continued breach of the Distribution Agreement, and
9    an immediate injunctive relief preventing Samyang Korea from unilaterally
10   terminating the Distribution Agreement and causing irreparable injury to Plaintiffs.
11                    II.    **JURISDICTION AND VENUE**
12        6.    Venue is proper in this Court because Defendant is an alien
13   corporation and thus may be sued in any judicial district as provided in 28 U.S.C. §
14   1391(c)(3); *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.* (1972) 406
15   US 706, 714, 92 S.Ct. 1936, 1940.
16        7.    Venue is also proper in this Court as a substantial part of the events or
17   omissions that directly give rise to the claims contained herein occurred in this
18   District. 28 U.S.C. §1391(b)(2); *Jenkins Brick Co. v. Bremer* (11th Cir. 2003) 321
19   F3d 1366, 1372; *Bates v. C&S Adjusters, Inc.* (2nd Cir. 1992) 980 F2d 865, 867;
20   *Myers v. Bennett Law Offices* (9th Cir. 2001) 238 F3d 1068, 1076.  The
21   Distribution Agreement was signed by SYUSA in California, SYUSA was located
22   in California during negotiations of the terms of the Distribution Agreement, and
23   performance of the terms of the Distribution Agreement was to be completed in
24   California.  Each and every breach of the Distribution Agreement affected
25   commerce in California because the goods were to be shipped to SYUSA, located
26   in Los Angeles county in the State of California.
27        8.    Venue is also proper in this Court because the Distribution Agreement
28   contains a choice of law provision that sets the governing law to the laws of the

1   State of California. *Jackson v. Payday Fin'l, LLC* (7th Cir. 2014) 764 F3d 765, 775.

2   ### III.   PARTIES

3       9.   Plaintiff SYUSA is a corporation organized, existing, and doing

4   business under the laws of California with its principal place of business located in

5   Santa Fe Springs, California.  SYUSA holds the rights to an exclusive

6   distributorship rights agreement to distribute Samyang Korea's products in North

7   America, has not assigned the distribution rights, and continues to hold such rights

8   to this day.

9       10.   Plaintiff Roypac is a corporation organized, existing, and doing

10   business under the laws of California with its principal place of business located in

11   Santa Fe Springs, California.  Roypac is a wholly-owned subsidiary of SYUSA

12   which exercises the exclusive distributions rights on behalf of SYUSA as

13   SYUSA's agent and which purchased and imported Defendant's products to North

14   America.  Roypac operates under a DBA registered as S.C. Continent Corporation.

15       11.   Defendant Samyang Korea is a company headquartered in Seongbuk-

16   Gu, Seoul, Korea, and is a manufacturer of a variety of food products, with a

17   significant portion of the product being instant noodles, also known as ramen.

18   Samyang Korea manufactured and sold its products to Plaintiffs for distribution

19   within North America, including the United States.

20   ### IV.   GENERAL FACTS

21       12.   Samyang Korea manufactures a large variety of food products

22   including numerous variations of instant ramen for sale in Korea and overseas.

23   Pursuant to the terms of the Distribution Agreement, SYUSA holds the rights to be

24   the sole and exclusive distributor of all of Samyang Korea's products in North

25   America, including the United States, Canada, and Mexico.  SYUSA, through its

26   agent Roypac, imports Samyang Korea's products for sale in North America

27   pursuant to a price sheet that is provided for Samyang Korea's products.  When

28   SYUSA places an order for goods, Samyang Korea must use best efforts to fulfill

1  the orders for import and distribution by SYUSA in its North America district.
2  Furthermore, any goods that Samyang Korea develops in Korea must be
3  conformed to meet the strict health standards established by the United States Food
4  and Drug Administration ("FDA") so that SYUSA may import and sell those
5  products within the United States.
6      13.    Samyang Korea is contractually prohibited from selling its product
7  into the North American market, either directly or indirectly, other than through
8  SYUSA.  SYUSA has never waived this right.
9      A. Sales of Products to Third Parties
10     14.    Starting in or around July 2014, SYUSA became aware of Samyang
11  Korea's breach of the Distribution Agreement over a series of transactions
12  whereby Samyang Korea had exported Samyang Korea's products to a third party
13  company named ENI DIST, Inc. in Baltimore, Maryland without SYUSA's
14  knowledge or approval.  SYUSA thereafter discovered that Samyang Korea had
15  started exporting goods to ENI DIST, Inc., previously known as Seohae Fishery
16  USA, Inc., beginning as early as November 10, 2007, and possibly even earlier.
17  ENI DIST, Inc. and Seohae Fishery USA, Inc. are collectively referred to as ENI
18  herein.
19     15.    SYUSA never waived any rights held by SYUSA under the
20  Distribution Agreement.  In particular, SYUSA has never waived its rights to be
21  the exclusive distributor of Samyang Korea's products in all of North America.
22     16.    The Distribution Agreement specifically states that "Samyang Korea
23  shall not directly or indirectly manufacture or sell any of the Products into the
24  Territories except through [SYUSA]" with the Territories being defined as United
25  States, Canada, and Mexico.
26     17.    On November 10, 2007, a shipment of Samyang Korea's products
27  arrived in Baltimore, specifically containing 2,560 cartons of instant ramen.
28  SYUSA did not authorize this import and distribution.

1       18.    Starting from November 10, 2007 through at least July 12, 2015,
2  Samyang Korea exported goods to ENI for sale and distribution in the United
3  States without SYUSA's knowledge or authorization.  ENI received at least 72
4  individual and unique shipments/orders for sale within the United States in direct
5  breach of the Distribution Agreement.

6       19.    On or about June 2012 SYUSA discovered that Samyang Korea had
7  breached the Distribution Agreement over a series of transactions by exporting
8  products into the United States by way of another company based in the New
9  York/New Jersey area.  T.Up Trading, Inc. (and possibly a related company
10  Express21, Inc.) started importing Samyang Korea's products into the New
11  York/New Jersey area starting in November 2009 and continued through at least
12  January 3, 2015.  These two companies received approximately 28 separate
13  shipments starting from November 2009 through January 2015.

14       20.    SYUSA has also discovered recently that Samyang Korea sold its
15  products in the United States through two other companies.  Starting on January
16  24, 2012, and possibly earlier, A2M U.S.A., Inc. and Pioneer Logistics, Inc.
17  imported Samyang Korea's products into the New York/NewJersey area.  It is
18  believed that these two companies received at least 21 separate shipments starting
19  from January 2012 through February 2013.

20       21.    On information and belief, Samyang Korea has distributed for sale its
21  products to other companies through other ports in the United States, including
22  Washington.

23       22.    None of the sale of product directly and/or indirectly by Samyang
24  Korea into the United States was authorized or consented to by SYUSA.

25       23.    SYUSA has also just discovered that Samyang Korea has distributed
26  product to Mexico in 2008, in direct breach of the Distribution Agreement and
27  which SYUSA never authorized or consented to.  SYUSA is the sole and exclusive
28  distributor of all products in North America, including Mexico.

-5-

24.     Samyang Korea has also distributed product for sale in Canada through various other companies, all without SYUSA's authorization or consent. The Distribution Agreement grants SYUSA sole and exclusive distribution privileges through all of North America, including Canada.

25.     SYUSA recently discovered that Samyang Korea also distributed significant amounts of its product to Canada through various companies, including as an example only and with no limitations Ho-Won Trading Canada, Pan Asia Food Co., Ltd., Total Express HQ, and Suhkyong Canada Ltd.

26.     Samyang Korea began shipping its products into Canada starting on December 26, 2006 to Suhkyong Canada Ltd., and possibly even earlier. SYUSA did not have know or authorize any of Samyang Korea's shipments of products into Canada for the companies listed above.

    B. <u>FDA Regulations</u>

27.     When Samyang Korea releases a new product in Korea, the news of the new product travels very fast to North America, whether by word of mouth, social media, or the viewing of advertisements in TV spots by the Korean population residing in North America who subscribe to cable channels with Korean tv broadcasts.  As such, there is a short period of time when SYUSA would be able to capitalize on the excitement surrounding a new product.  However, Samyang Korea has made it extremely difficult for SYUSA to profit from new products.

28.     Due to strict food regulations in the United States, SYUSA has always requested and required that any products imported into the United States meet all FDA regulations and requirements.  To that end, whenever Samyang Korea releases a new product, particularly instant ramen, in Korea, SYUSA has always had to request that the ingredients meet the FDA regulations prior to the importing of such products to the United States.

29.     Samyang Korea is obligated to ensure that its products are timely conformed to FDA requirements so that SYUSA may import and sell products in

the North America market.  SYUSA is aware that Samyang Korea makes modifications necessary on a timely basis to expedite the import of its products to its distributors in other areas of the world.

30.    Despite Samyang Korea's obligations to manufacture FDA compliant products for import by SYUSA into North America, Samyang Korea continues to frustrate SYUSA by either falsely claiming that modifications cannot be made, or making modifications many years after a new product has been released and well after any hype and excitement surrounding a new product has vanished.

31.    Some of the products that Samyang Korea has either refused or significantly delayed in meeting FDA regulations are: 1) Nagasaki Champong, which was released in July 2011; 2) Nagasaki Champong Big Cup, released in September 2011; 3) Nagasaki Champong Cup, released in November 2011; Nagasaki Hong Champong, released in June 2013; 4) Fire Chicken Stir Fried Noodles, released in April 2012; 5) Fire Chicken Stir Fried Noodles Big Cup, released in June 2012; 6) Fire Chicken Stir Fried Noodles Cup, released in November 2013; 7) Gan Champong, released in July 2007; 8) Gan Champong Big Cup, released in September 2008; 9) Hanoo Teuk Pool Myun, released December 2013; and 10) Youboo Udon, released November 2013.

32.    On information and belief, Samyang Korea, despite refusing SYUSA's requests for changes to the ingredients in products to meet FDA regulations and thus deliberately blocking SYUSA's attempts to import certain product to the United States, has distributed many of these products in the United States through other companies that may or may not meet FDA regulations.  If the products do meet FDA regulations, Samyang Korea has deliberately misled and lied to SYUSA about the availability of such products and has wrongly refused to allow SYUSA to import such products for sale in North America.

33.    Samyang Korea's refusal to use its best efforts to timely provide SYUSA with new and popular products for sale has hindered SYUSA's business

1  and prevented SYUSA from growing its business and gaining market share in
2  North America.

3      C. Changing of Payment Terms

4      34.   At the time of execution of the Distribution Agreement, SYUSA was
5  able to purchase Samyang Korea's products pursuant to a credit arrangement.
6  SYUSA would generally incur a charge for accounts payable upon ordering
7  product from Samyang Korea, which would then be paid in accordance with
8  standard payment terms, usually in 90 days.

9      35.   Pursuant to the Distribution Agreement, Samyang Korea was not
10 permitted to change the payment terms, but on August 30, 2007 Samyang Korea
11 informed SYUSA that Samyang Korea would no longer sell product to SYUSA on
12 a credit basis. Instead, Samyang Korea would only sell product to SYUSA on a
13 line of credit basis that would have to be paid by SYUSA prior to the shipment of
14 products from Samyang Korea to SYUSA. Samyang Korea then further made
15 changes to payment terms in December 2011 without SYUSA's approval or
16 consent. These unilateral changes in payment terms is also a direct breach of the
17 Distribution Agreement which states that Samyang Korea "shall not... change the
18 payment terms."

19     36.   Furthermore, SYUSA alleges on information and belief that Samyang
20 Korea does not require immediate payment from its other distributors in other
21 areas of the world, but instead has placed such onerous restrictions only on
22 SYUSA. Such actions are designed to place a heavy burden on SYUSA in bad
23 faith.

24     37.   Pursuant to the Distribution Agreement Samyang Korea is required to
25 sell its products to SYUSA at the price and on terms and conditions most favorable
26 to the largest distributor. Furthermore, price adjustments are only allowed to
27 reflect the fluctuations of the costs of manufacturing or purchasing by Samyang
28 Korea.

1    38.    Samyang Korea's bad faith actions have hindered SYUSA's business

2  and prevented SYUSA from growing its business and gaining market share in

3  North America.

4    D. Intellectual Property

5    39.    SYUSA is the sole and rightful owner of all of the "Samyang"

6  trademarks in the United States, including the "Samyang Foods" trademark that

7  had been registered by Samyang Korea without SYUSA's authorization or consent.

8    40.    On or about January 26, 1998, Samyang Korea fully assigned all

9  rights and interest in all "Samyang" trademarks, including the goodwill of the

10  business in which the mark is used.

11    41.    Pursuant to the Distribution Agreement, Samyang Korea is required to

12  assign to SYUSA "any and all Intellectual Property Rights registered in the United

13  States or any states authorities in the U.S. including, but not limited to, trademark

14  registration for the name and logo of "Samyang."  Samyang Korea surreptitiously

15  registered a "Samyang Foods" trademark without SYUSA's authorization or

16  consent in 2005, and has failed to assign the rights to that trademark to SYUSA in

17  direct breach of the Distribution Agreement.

18    42.    Furthermore, the Distribution Agreement grants from Samyang Korea

19  to SYUSA "the rights to use all of Samyang Korea's trademarks, trade names,

20  brand names, trade dresses, logos, designs, packaging and copyrights."  This right

21  is irrevocable.

22    43.    In accordance with SYUSA's ownership rights to the "Samyang"

23  trademarks, SYUSA recently registered two trademarks, which Samyang Korea

24  intends to oppose.  SYUSA now seeks declaratory relief that SYUSA owns all

25  rights to the "Samyang" trademarks and an injunction preventing Samyang Korea

26  from inappropriately opposing the trademark registrations.

27    E. Artificial Inflation of Prices

28    44.    On or about August 2013, SYUSA discovered when served with a

-9-

1    summons and complaint alleging anti-trust violations against Samyang Korea and

2    SYUSA that Samyang Korea allegedly colluded with other manufacturers of

3    instant ramen in Korea and thus artificially raised the prices of instant ramen.

4    Since SYUSA is a direct purchaser of the instant ramen manufactured by Samyang

5    Korea, SYUSA was a direct victim of such price collusion engaged in by Samyang

6    Korea.  Such artificial inflation of prices is a direct breach of the Distribution

7    Agreement, which specifies that prices of products sold by Samyang Korea to

8    SYUSA can only be increased for an increase in the cost of manufacturing.

9        45.    The Korean Federal Trade Commission (the "KFTC") released a

10   report (the "KFTC Report") alleging that the four companies that manufacture

11   instant ramen in Korea colluded to artificially raise prices by communicating non-

12   public details of price increases to each other.  As alleged in a case filed by direct

13   and indirect purchasers of Defendant's product in the United States[1], this

14   conspiracy was confirmed by Defendant's President, OO Kim[2], who affirmed

15   details of the conspiracy to the KFTC, such as "[f]rom price increase in 2001,

16   when I [led] the price increase of [Samyang Korea] for the first time, to price

17   increase in 2008, [the] ramen market [] exercised price information exchange, real

18   price increase work, etc… systematically and repeatedly."

19       46.    OO Kim also stated that the process would work as follows: "[b]efore

20   the price increase, employees from each company in charge of market

21   research/external business exchanged information.  After the price increase, sales

22   team of each company checked on price situation at distribution channels including

23   chain stores.  In addition, for the great matters which might jeopardize price system

24   of the business, such as price dumping, the companies maneuvered through" the

---

25

26   [1] See *In Re Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115-WHO, N.D. Cal. The
     court ruled in response to Motions to Dismiss filed by defendants in that case that a conspiracy to
27   raise prices in Korea which raised the prices of imported noodles was plausibly pled (Dkt. No.
     115).
28   [2] The KFTC Order identified witnesses by their last name only, and included the designation of
     "OO" presumably to mask the identity of certain of the individual participants in the conspiracy.

1    Ramen Conference, discussed below.

2        47.    OO Choi, the Chairman of Samyang Korea's Office of Business,

3    reported to OO Chon, Samyang Korea's CEO, about the discussions at this

4    meeting. OO Choi told OO Chon that "[w]e talked this and that . . . then someone

5    brought up the topic, 'shouldn't we increase ramen price.'  And it seemed that

6    everyone agreed that once Nongshim increased the price, everyone would increase

7    this price as well."

8        48.    OO Choi also discussed the meeting with OO Kim, a consultant at

9    Samyang Korea's head business office. OO Choi told OO Kim that "we talked that

10   it had been 2-3 years since ramen price was increased. If Nongshim increase[d]

11   first, others will follow and raise it."

12       49.    On March 28, 2001, representatives from the Korean Noodles

13   manufacturers attended the Regular General Assembly of Ramen Conference, held

14   at the Capital Hotel in Seoul. At this conference, the manufacturers, including

15   Defendant, met and confirmed their agreement to cooperate concerning price

16   increases.  According to OO Ahn, Vice Chair of Samyang Korea's head business

17   office, "[o]ne of the board members of either Ottogi or Paldo asked director []

18   Yoon of Nong Shim, [if they could] 'increase the price in consecutive order after

19   Nong Shim increase[s] it.  How has the price increase project of your company []

20   proceeded so far?'" Ottogi Co., Ltd. and Korea Yakult representatives responded:

21   "Yes.  We wouldn't be released from the pressure of production cost, unless there

22   is a two-digit increase." OO Yoon replied: "[w]ouldn't it be difficult to have a two

23   digit increase?  I remember that there had not been any two-digit increase in the

24   past . . ., anyway, the price increase will be implemented soon."

25       50.    Thus, at the March 28, 2001 Ramen Conference meeting, Defendant

26   colluded on the subsequent collective price increase.

27       51.    On or about May 17, 2001, a few days after the other manufacturers

28   raised prices of their products, Defendant decided to raise factory prices by June 1,

-11-

1    2001 by an average of 12% for 17 products, which included raising prices of its
2    Korean Noodles by the same amount as Nongshim.

3         52.    Subsequently, on or about October 21, 2002, Nongshim decided to
4    raise factory prices, and provided details and dates concerning these prices to
5    Samyang Korea. On or about October 25, 2002, Samyang Korea decided to
6    increase factory prices effective November 1, 2002.  The factory price increase
7    averages 9.5% for 28 products, which included raising the price of its Korean
8    Noodles by the same amount as Nongshim.  Such increases were then
9    communicated by Samyang Korea to other manufacturers, who followed suit.

10         53.    On or about December 22, 2004, Samyang Korea was informed about
11    Nongshim's price increases prior to the effective date of those increases.  On or
12    about February 24, 2005, Samyang Korea decided to follow suit and raised prices
13    for 32 items by an average of 7.2%, which included raising the price of its Korean
14    Noodles by the same amount as Nongshim.  These increases were then
15    communicated to other manufacturers.

16         54.    On or about March 22, 2007, and again on February 18, 2008
17    Samyang Korea again decided to increase factory prices based on information
18    received as a participant in the conspiracy, while also furthering the conspiracy by
19    sending non-public information to other manufacturers.

20         55.    Each price increase made by Defendant was then reflected in the
21    prices at which Defendant sold its Korean Noodles to Plaintiffs for export to the
22    United States.

23         56.    On March 26, 2008, the General Assembly of Ramen Conference was
24    held at Capital Hotel in Seoul.  At this conference, the Korean Defendants agreed
25    that they would postpone price increases or lower prices after an increase.

26         57.    OO Lee, Board Director of Samyang Korea's Head Business Office,
27    stated to the KFTC that: "Since the new administration [of the South Korean
28    government], inaugurated on February 25, 2008, played an emphasis of price

-12-

1  stabilization, it was difficult decision to make a price increase, and because
2  customers' response was also negative about the increase, ramen manufacturing
3  companies worried much about the increase.  Nevertheless, because the price
4  decision had already made based on the exchange of information and date about
5  price increase, each company emphasized (agreed) that any company could not
6  postpone the price increase or that increased price could not be lowered again."

7      58.    Similarly, OO Kim, Chair of Samyang Korea's Business Management
8  Team, noted to the KFTC that due to the change in South Korean government,
9  South Korea "was experiencing the feeling of renewal.  As the new administration
10 suggested price stabilization as a major policy as soon as the president's
11 inauguration, companies including Nongshim discussed about ramen price which
12 would be increased.  While worrying about criticism or implications that would
13 cause by price increase, we discussed the prospect of the process and strategic
14 responses about the criticism."

15     59.    Accordingly, the March 2008 Ramen Conference ensured that the
16 collusively-raised prices for Korean Noodles remained inflated.

17     60.    On July 12, 2012, the KFTC issued the KFTC Order, concluding that
18 Samyang Korea conspired with the other main Korean Noodles manufacturers to
19 fix prices of Korean Noodles.

20     61.    The KFTC imposed monetary and injunctive relief, including 136
21 billion won (approximately $120 million) in fines.  It also ordered the
22 manufacturers to stop sharing pricing information.

23     62.    Samyang Korea was excused by the KFTC from paying its fine and
24 received leniency from the KFTC because it provided information about the
25 conspiracy to the KFTC.

26     63.    As a result of Samyang Korea's participation in the price conspiracy
27 to fix Korean Noodles prices, Plaintiffs were forced to purchase Korean Noodles
28 from Defendant at artificially inflated prices.

-13-

64.     Samyang Korea raised the prices of products sold to Plaintiffs on seven different occasions: 1) September 1, 2003; 2) February 1, 2005; 3) July 1, 2006; 4) November 1, 2006; 5) July 1, 2008; 6) April 1, 2001; and 7) October 1, 2012.

65.     Plaintiffs did not have actual or constructive knowledge that the price increases from 2003 to 2012 were a result of a secret conspiracy to artificially raise prices until on or about August 2013.

66.     Upon information and belief, Samyang Korea arbitrarily increased the prices of the products it charged to Plaintiffs in direct breach of the Distribution Agreement.

67.     Prior to this time, Defendant engaged in a secret conspiracy to collusively raise the prices of the Korean Noodles it was selling to Plaintiffs for export to the United States.  Plaintiffs were unaware of Defendant's treacherous acts during the entire time that the conspiracy was continuing.

68.     Defendant never represented to Plaintiffs the true reason, namely the conspiracy to fix prices, as the reason that prices for Korean Noodles increased. Instead, Defendant always represented that any price increases were due to the increase in cost of raw materials.

69.     The KFTC determined, however, that the Korean Noodles price increases had little correlation with input costs, and often substantially exceeded increased input costs.

70.     The affirmative acts of Defendant alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.  By its very nature, Defendant's price-fixing conspiracy was inherently self-concealing.

71.     The combination and conspiracy alleged herein was concealed by Defendant by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendant and its co-conspirators

-14-

1   by the use of the telephone or in-person meetings, the use of non-public emails,

2   and concealing the existence and nature of their competitor pricing discussions

3   from non-conspirators (including Plaintiffs).

4        72.   The conspiracy among the ramen manufacturers in Korea to raise

5   prices of goods for arbitrary reasons directly led to Samyang Korea arbitrarily

6   increasing the prices of the products it charged to Plaintiffs.

7        73.   The artificial raising of prices of the products purchased by Plaintiffs

8   is in direct breach of the Distribution Agreement, which provides that Samyang

9   Korea may only "adjust the price to reflect the fluctuations of the costs of

10  manufacturing or purchasing" and that Samyang Korea "shall not arbitrarily

11  increase the prices of the Products it charges to" Plaintiffs.

12  F.   Intentional Obstruction of Business

13       74.   SYUSA is the sole and exclusive distributor of all of Samyang

14  Korea's products in North America, including United States, Canada, and Mexico.

15       75.   Samyang Korea is required to act in good faith and help promote

16  SYUSA's business, including providing all resources available to SYUSA, helping

17  SYUSA with marketing, helping SYUSA establish distribution channels as needed,

18  and providing for terms and conditions favorable for SYUSA's business.

19       76.   Samyang Korea deliberately acted in bad faith to intentionally disrupt

20  SYUSA's business.  Samyang Korea blocked the growth of SYUSA's business by

21  selling, directly and/or indirectly, products into North America outside of SYUSA.

22  Samyang Korea also changed payment terms to SYUSA, making it very difficult

23  for SYUSA to order sufficient product to increase distribution in North America.

24  Samyang Korea also artificially raised prices so as to cut into SYUSA's profit

25  margins and further hinder SYUSA's business growth.

26  G.   Termination Notice

27       77.   On April 21, 2016, Samyang Korea sent a letter by email to SYUSA

28  stating its intention to terminate the Distribution Agreement effective August 1,

-15-

1    2016.

2        78.    The Distribution Agreement does not provide for its termination other

3    than the eventual expiration of the agreement term.

4        79.    The Distribution Agreement was entered into on November 29, 1997.

5    The initial term of the Distribution Agreement is for fifty (50) years, and the term

6    was to automatically renew for another fifty (50) years thereafter.

7        80.    The Distribution Agreement thus has approximately another eighty-

8    one (81) years remaining on its term.

9        81.    On April 27, 2016, counsel for SYUSA sent a letter to counsel for

10   Samyang Korea demanding that the termination notice be retracted.  On April 29,

11   2016, counsel for Samyang Korea informed counsel for SYUSA that Samyang

12   Korea refused to retract the termination notice.

13       82.    Samyang Korea by way of its termination notice has expressly stated

14   that it will not perform the terms of the Distribution Agreement as required

15   effective August 1, 2016.

16       83.    Plaintiffs are still willing and have the ability to perform all of its

17   obligations pursuant to the Distribution Agreement.

18       84.    The value of the Distribution Agreement for the remaining eighty-one

19   (81) years of its term is believed to be in excess of one billion dollars

20   ($1,000,000,000).  The exact amount of damages will be proven at trial.

21

22                    V.    **CLAIMS FOR RELIEF**

23                    **BREACH OF CONTRACT**

24       85.    Plaintiffs refer to, reallege, and incorporate by reference every

25   allegation from each and every paragraph before and after this paragraph, as

26   though said paragraphs were set forth in full herein.

27       86.    The Distribution Agreement grants to Plaintiffs exclusive

28   distributorship rights to any and all of Samyang Korea's products to be sold in

-16-

FIRST AMENDED COMPLAINT. CASE NO. 2:15-CV-07697

1   North America, including the United States, Canada, and Mexico.  Samyang Korea

2   was expressly disallowed from directly or indirectly manufacturing or selling any

3   of Samyang Korea's products into North America.

4      87.    Samyang Korea failed to abide by the terms of the Distribution

5   Agreement as discovered by Plaintiffs recently.

6      88.    Samyang Korea instead sold, directly or indirectly, its products into

7   North America.  These actions were done without Plaintiffs' knowledge or

8   approval.

9      89.    Each individual sale or other action by Samyang Korea to import its

10   products into North America is a breach of the Distribution Agreement.

11      90.    As a direct and proximate result of Samyang Korea's breach of the

12   Distribution Agreement by selling, directly or indirectly, its products to other

13   companies for distribution in North America, Plaintiffs have lost significant profits

14   it would have otherwise gained from the sale of such products in North America.

15   Plaintiffs profit on each sale of products to a market or other retailer after import.

16   Samyang Korea's act of selling independently of Plaintiffs has deprived Plaintiffs

17   of potential profit, and Samyang Korea should reimburse Plaintiffs for such lost

18   profit, in an amount to be proven at trial.

19      91.    Samyang Korea was expressly disallowed from changing the credit

20   terms upon which Samyang Korea's products were sold to Plaintiffs.  Samyang

21   Korea still changed the terms of the agreement and threatened to not sell Plaintiffs

22   any product if Plaintiffs did not comply.  Since Plaintiffs need to be able to import

23   Samyang Korea's products for sale in North America as its business, Plaintiffs

24   were forced to comply under duress.

25      92.    The Distribution Agreement specifically prohibits the changing of

26   payment terms.  Each of Samyang Korea's unilateral changes of the payment terms

27   constitutes a breach of the Distribution Agreement.

28      93.    By changing payment terms, Samyang Korea limited the amount of

-17-

1    products that Plaintiffs could import for distribution into North America, since

2    Plaintiffs were limited by the line of credit it could obtain from a separate bank.

3         94.    As a direct and proximate result of Samyang Korea's breach of the

4    Distribution Agreement by unilaterally changing the credit terms, Plaintiffs lost

5    significant potential profit it could have made from the increased sale of products

6    in North America, in an amount to be proven at trial.

7         95.    Samyang Korea must make its products compliant with all food

8    regulations for sale in North America prior to the sale and shipment of those

9    products to SYUSA for import and distribution.  However, Samyang Korea's

10   repeated failures or untimely delays in making its product compliant constitute

11   breaches of the Distribution Agreement.

12        96.    As a direct and proximate result of Samyang Korea's breach of the

13   Distribution Agreement by failing to make products compliant for import and sale

14   in North America, Plaintiffs lost significant profits by being unable to sell such

15   products in North America, in an amount to be proven at trial.

16        97.    Samyang Korea was required to assign all intellectual property and

17   trademark rights to SYUSA, but failed to do so.  In fact, Samyang Korea even

18   failed to properly register several trademarks, which forced SYUSA to file

19   trademark applications in an attempt to protect SYUSA's valuable intellectual

20   property rights.

21        98.    As a result of Samyang Korea's failures, SYUSA still has not been

22   assigned the valuable intellectual property rights as required under the Distribution

23   Agreement, and Plaintiffs have had to take steps in filing for trademark

24   applications in an effort to protect its legal rights.

25        99.    As a direct and proximate result of Defendant's unlawful conduct,

26   Plaintiffs have been injured in that they currently still have not been assigned and

27   do not hold the valuable intellectual property rights to be used in operating its

28   business.  Furthermore, Plaintiffs have had to spend attorneys' fees and costs in

1   filing for several trademarks in an attempt to protect its rights.

2       100.   Samyang Korea was also expressly disallowed from changing the

3   pricing of its products for any reason other than the increase in cost of

4   manufacturing.  However, Samyang Korea engaged in a conspiracy to artificially

5   raise prices.

6       101.   As a result of Samyang Korea's actions, Plaintiffs have suffered

7   significant damages due to lost revenue and market share in the areas and cities

8   that Samyang Korea improperly sold its products for distribution.

9       102.   As a direct and proximate result of Defendant's unlawful conduct,

10  Plaintiffs have been injured in their business and property in that they paid more

11  for Samyang Korea's products than they otherwise would have paid in the absence

12  of Defendant's unlawful conduct.

13      103.   The Distribution Agreement provides for the awarding of costs and

14  expenses, including reasonable attorneys' fees, incurred by the prevailing party in

15  the event of any controversy, claim, or dispute between the parties related to the

16  Distribution Agreement.  Plaintiffs seek an award of such costs and attorneys' fees

17  incurred to enforce the rights of Plaintiffs.

18  **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

19      104.   Plaintiffs refer to, reallege, and incorporate by reference every

20  allegation from each and every paragraph before and after this paragraph, as

21  though said paragraphs were set forth in full herein.

22      105.   In every agreement there is an implied promise of good faith and fair

23  dealing that requires a party to not do anything to unfairly interfere with the rights

24  of the other party to receive the benefits of the agreement.

25      106.   Pursuant to the Distribution Agreement, Defendant owed Plaintiffs a

26  duty to act in good faith in executing the terms of the Distribution Agreement.

27      107.   Specifically, Defendant was not allowed to act in ways that would

28  deprive Plaintiffs of the rights bargained for in entering into the Distribution

1    Agreement.

2         108.   Plaintiffs complied with every term in the Distribution Agreement or

3    was excused from having to perform.

4         109.   Accordingly, Defendant was required to perform according to the

5    terms of the Distribution Agreement.

6         110.   Defendant's actions of deliberately selling its products to third parties

7    unassociated with Plaintiffs caused Plaintiffs significant harm and directly and

8    unfairly interfered with the rights of Plaintiffs to receive the benefits of the

9    Distribution Agreement.

10        111.   Defendant's actions of unilaterally changing the payment terms

11   unfairly interfered with Plaintiffs' right to receive the benefits of the Distribution

12   Agreement.

13        112.   Defendant's actions of refusing or significantly delaying any

14   modifications to the ingredients list of many products in compliance with FDA

15   regulations caused Plaintiffs significant harm since Plaintiffs were unable to import

16   and sell those goods, and thus Defendant's actions directly and unfairly interfered

17   with Plaintiffs' rights to receive the benefits of the Distribution Agreement.

18        113.   Defendant's actions of colluding with other manufacturers in order to

19   artificially raise the prices of products it sold to SYUSA caused Plaintiffs

20   significant harm since Plaintiffs were forced to pay artificially inflated prices that

21   had no correlation to any increases in manufacturing costs, and thus Defendant's

22   actions directly and unfairly interfered with Plaintiffs' rights to receive the benefits

23   of the Distribution Agreement.

24        114.   The Distribution Agreement provides for the awarding of costs and

25   expenses, including reasonable attorneys' fees, incurred by the prevailing party in

26   the event of any controversy, claim, or dispute between the parties related to the

27   Distribution Agreement.  Plaintiffs seek an award of such costs and attorneys' fees

28   incurred to enforce the rights of Plaintiffs.

## ANTICIPATORY BREACH OF WRITTEN CONTRACT

115.   Plaintiffs refer to, reallege, and incorporate by reference every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

116.   On April 21, 2016, Samyang Korea expressly stated its intention to breach the Distribution Agreement effective August 1, 2016.  Despite SYUSA's demands, Samyang Korea on April 29, 2016 expressly refused to retract the notice.

117.   The Distribution Agreement will have in excess of eight-one (81) years left on its term as of August 1, 2016.  The anticipatory breach will cause Plaintiffs to suffer damages estimated to be in excess of one billion dollars ($1,000,000,000), to be proven at trial.

118.   Plaintiffs are willing and able to comply with all of its obligations pursuant to the Distribution Agreement for its remaining term.

119.   As a direct and proximate result of Samyang Korea's actions, Plaintiffs will have suffered damages in losing the valuable rights and business granted to it by the Distribution Agreement.

## TEMPORARY INJUNCTIVE RELIEF

120.   Plaintiffs refer to, reallege, and incorporate by reference every allegation from each and every paragraph before and after this paragraph, as though said paragraphs were set forth in full herein.

121.   Plaintiffs are entitled to receive the benefit of the Distribution Agreement as detailed herein.

122.   In reliance of the Distribution Agreement, Plaintiffs have established a business, hired numerous employees, and created and maintain numerous distribution channels for the distribution of product received from Samyang Korea.

123.   Plaintiffs by this action seek permanent injunctive relief prohibiting Samyang Korea from continued breach of the Distribution Agreement, the merits of which clearly favor Plaintiffs.  However, a more immediate concern is that

-21-

1  Samyang Korea has sent a notice establishing Samyang Korea's intent to

2  wrongfully terminate the Distribution Agreement effective August 1, 2016.

3      124.  A preliminary injunction is needed to prevent Samyang Korea from

4  wrongfully terminating the Distribution Agreement effective August 1, 2016 as it

5  would cause great and irreparable injury to Plaintiffs.  Plaintiffs would be forced to

6  lose all of its employees and lose all of the distribution channels that have been

7  established, the effects of which Plaintiffs would be unable to recover from.

8  **TRADEMARK INFRINGEMENT**

9      125.  Plaintiffs refer to, reallege, and incorporate by reference every

10  allegation from each and every paragraph before and after this paragraph, as

11  though said paragraphs were set forth in full herein.

12      126.  The Distribution Agreement requires that Samyang Korea assign any

13  and all intellectual property rights registered in the U.S. to SYUSA.  By agreement,

14  SYUSA rightfully owns all trademarks related to "Samyang" including "Samyang

15  Foods."  Indeed, on or about January 26, 1998, the "Samyang Foods" mark that

16  had been previously registered was fully assigned to SYUSA, including the

17  goodwill of the business in which the mark is used.

18      127.  SYUSA did not request or authorize Samyang Korea to register with

19  the USPTO any trademarks related to the "Samyang" name, including "Samyang

20  Foods."  However, Samyang Korea registered the "Samyang Foods" trademark in

21  the U.S. on or around August 9, 2005.

22      128.  Samyang Korea's registration and use of the "Samyang Foods" mark

23  is directly infringing on SYUSA's valuable right.  Samyang Korea's use of the

24  "Samyang Foods" mark for the sale of goods in the U.S. through other distribution

25  channels was unauthorized by SYUSA and is directly infringing on SYUSA's

26  business.

27      129.  Samyang Korea's continued use of the trademarks owned by SYUSA

28  will cause confusion among consumers as to the source of the goods.  SYUSA

1   owns the trademarks and holds the exclusive distribution rights to product in North

2   America.  Samyang Korea's sale of goods in similar markets to SYUSA will likely

3   confuse both consumers and retailers as to the source of the goods.

4        130.  As a direct and proximate result of Samyang Korea's infringement of

5   SYUSA's rights to the "Samyang" trademark, SYUSA has suffered and will

6   continue to suffer substantial damages in an amount to be proven at trial.

7        131.  Samyang Korea knew that SYUSA was the right owner of the

8   "Samyang" trademarks because Samyang Korea fully assigned all such ownership

9   rights to the "Samyang" trademarks to SYUSA.  However, Samyang Korea

10  surreptitiously registered another "Samyang" trademark and has been selling

11  products using the "Samyang" trademark in the U.S. in direct breach of the

12  Distribution Agreement and infringing on SYUSA's trademarks.  These actions

13  were willful, oppressive, malicious, and in wanton and conscious disregard of

14  SYUSA's rights.  Therefore, punitive damages should be assessed against

15  Samyang Korea in an amount that will be sufficient to discourage it and others

16  from such conduct in the future.

17  **VIOLATION OF LANHAM ACT §1114, 15 U.S.C. §1114 – TRADEMARK**

18                          **INFRINGEMENT**

19       132.  Plaintiffs refer to, reallege, and incorporate by reference every

20  allegation from each and every paragraph before and after this paragraph, as

21  though said paragraphs were set forth in full herein.

22       133.  SYUSA is the rightful owner of the "Samyang" and "Samyang

23  Foods" trademarks in the U.S.

24       134.  Samyang Korea has surreptitiously registered the "Samyang Foods"

25  trademark in direct violation of SYUSA's ownership rights, and has used these

26  marks in commerce and/or in connection with the sale, distribution, or advertising

27  of goods.  Such use is likely to cause confusion, mistake, and/or deception.

28       135.  SYUSA did not request or authorize Samyang Korea to register the

1    "Samyang Foods" trademark, nor has SYUSA authorized Samyang Korea to sell

2    goods in the U.S. using the trademarks owned by SYUSA.

3         136.   Samyang Korea's continued use of the "Samyang" trademarks will

4    cause confusion among consumers as to the source of the goods, as SYUSA is the

5    owner of the trademarks and the sole and exclusive distributor of goods in the U.S.

6         137.   Unless restrained, the foregoing wrongful acts of Samyang Korea will

7    continue to cause irreparable injury to Plaintiffs, both during the pendency of this

8    proceeding and thereafter.  SYUSA is therefore entitled to an order preliminarily

9    and permanently enjoining Samyang Korea and its agents, employees, and others

10   acting in concert with it, from directly or indirectly: (i) registering or applying to

11   register any trademark that is confusingly similar to the "Samyang" or "Samyang

12   Foods" name or mark; (ii) manufacturing, producing, distributing, selling, offering

13   for sale, advertising, or displaying any "Samyang" product in the U.S. that tends to

14   relate or connect to such product in any way to SYUSA or to any goods or services

15   offered, provided, sold, manufactured, sponsored or approved by, or otherwise

16   connected with SYUSA; (iii) using any mark that is confusingly similar to the

17   "Samyang" or "Samyang Foods" name or mark; and/or (iv) making any false

18   description or representation of origin concerning any goods offered for sale by

19   Samyang Korea.

20        138.   SYUSA is further entitled to recover its ascertainable damages

21   sustained in consequence of Samyang Korea's wrongful conduct, in an amount to

22   be determined at trial, along with attorneys' fees and costs incurred.

23   **VIOLATION OF LANHAM ACT §43(a); 15 U.S.C. §1125 (a) – FEDERAL**

24   **UNFAIR COMPETITION AND FALSE DESIGNATION OF ORIGIN**

25        139.   Plaintiffs refer to, reallege, and incorporate by reference every

26   allegation from each and every paragraph before and after this paragraph, as

27   though said paragraphs were set forth in full herein.

28        140.   SYUSA is the rightful owner of all "Samyang" trademarks in the

-24-

1    United States. Any prior rights that were owned by Samyang Korea were fully

2    assigned and transferred to SYUSA as of 1998.

3        141.   Samyang Korea has registered trademarks not owned by them in

4    direct violation and infringement on SYUSA's rights, and have sold product in the

5    U.S. using these false trademarks, which constitute false designation of origin,

6    false or misleading description, and/or false or misleading representation and

7    Unfair Competition under 15 U.S.C. §1125. Such conduct causes and is likely to

8    cause confusion, mistake, and/or deception as to the affiliation, connection, or

9    association of Samyang Korea and any product that Samyang Korea produces,

10   promotes, sells, or distributes with SYUSA and any and all of its products, or as to

11   the origin, sponsorship, or approval of Samyang Korea's goods, services or

12   commercial activities by SYUSA.

13       142.   Such infringement of SYUSA's trademark rights constitute unfair

14   competition and is an infringement of SYUSA's rights in the "Samyang Foods"

15   mark in violation of the Lanham Act §43(a), 15 U.S.C. §1125(a).

16       143.   SYUSA lacks an adequate remedy at law for the foregoing wrongful

17   conduct of Samyang Korea, in that: (i) Samyang Korea's actions damage and

18   threaten to continue to damage SYUSA's unique and valuable property injury

19   which cannot be adequately compensated by monetary damages; (ii) the damages

20   to SYUSA from Samyang Korea's wrongful actions are not precisely and fully

21   ascertainable; (iii) the wrongful acts of Samyang Korea injure and threaten to

22   continue to injure SYUSA's reputation and goodwill; and (iv) the damages

23   resulting to SYUSA from Samyang Korea's conduct, and the conduct itself, are

24   continuing, and SYUSA would be required to bring a multiplicity of suits to

25   achieve full compensation for the injuries caused thereby.

26       144.   Unless restrained, the foregoing wrongful acts of Samyang Korea will

27   continue to cause irreparable injury to SYUSA, both during the pendency of this

28   proceeding and thereafter. SYUSA is therefore entitled to an order preliminarily

1   and permanently enjoining Samyang Korea and its agents, employees, and others

2   acting in concert with them, from directly or indirectly: (i) (i) registering or

3   applying to register any trademark that is confusingly similar to the "Samyang" or

4   "Samyang Foods" name or mark; (ii) manufacturing, producing, distributing,

5   selling, offering for sale, advertising, or displaying any "Samyang" product in the

6   U.S. that tends to relate or connect to such product in any way to SYUSA or to any

7   goods or services offered, provided, sold, manufactured, sponsored or approved by,

8   or otherwise connected with SYUSA; (iii) using any mark that is confusingly

9   similar to the "Samyang" or "Samyang Foods" name or mark; and/or (iv) making

10  any false description or representation of origin concerning any goods offered for

11  sale by Samyang Korea.

12      145.   SYUSA is further entitled to recover its ascertainable damages

13  sustained in consequence of Samyang Korea's wrongful conduct, in an amount to

14  be determined at trial, and for attorneys' fees and costs incurred.

15                    **PERMANENT INJUNCTIVE RELIEF**

16      146.   Plaintiffs refer to, reallege, and incorporate by reference every

17  allegation from each and every paragraph before and after this paragraph, as

18  though said paragraphs were set forth in full herein.

19      147.   There currently exists an immediate and ongoing harm caused by

20  Samyang Korea's continued breach of the Distribution Agreement.

21      148.   The failure to immediately stop Samyang Korea's actions of

22  continuing to sell, directly or indirectly, its products into North America other than

23  through Plaintiffs will cause a great and irreparable harm to Plaintiffs since

24  Plaintiffs will be deprived of its valuable right to exclusive distribution of all of

25  Samyang Korea's product in the United States and North America.  Samyang

26  Korea should be stopped from selling, directly or indirectly, any of its products

27  into North America unless such distribution occurs through Plaintiffs.

28      149.   Samyang Korea's repeated failures and delays in modifying its

1  products so as to make them compliant with food regulations in North America

2  have made it impossible for Plaintiffs to import and distribute those products for

3  consumption, thereby causing it great and irreparable harm. Samyang Korea

4  should be required to make such changes to its products as needed immediately for

5  the import and distribution of all of its products in North America.

6      150. The changed payment terms have made it more onerous on Plaintiffs

7  to import and distribute products in North America. The payment terms should be

8  reverted to the original payment terms, as the changed terms has caused Plaintiffs

9  great and immediate harm in that Plaintiffs are unable to place orders past a certain

10  bank imposed limit due to limited funds.

11      151. Furthermore, the failure to immediately stop Samyang Korea's

12  artificial inflation of prices will continue to have a negative effect on Plaintiffs'

13  business finances and the conspiracy must be enjoined immediately. The artificial

14  inflation of prices must also be immediately reversed, and Samyang Korea must

15  show justification for each increase in pricing that is claimed to be due to an

16  increase in manufacturing costs.

17      **VI.   PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiffs request that the Court enter judgment on their

19  behalf, adjudging and decreeing that:

20      A. A temporary restraining order preventing Defendant from unilaterally

21  terminating the Distribution Agreement until full resolution of this case;

22      B. A preliminary and permanent injunction preventing Defendant from

23  continuing to infringe on Plaintiffs' trademark rights;

24      C. Declaratory relief stating that SYUSA is the rightful owner of all

25  "Samyang" trademarks in the United States, and an injunction preventing Samyang

26  Korea from opposing any related trademark registrations filed by SYUSA;

27      D. Defendant has breached the Distribution Agreement and that Plaintiffs

28  have been injured in their business and property as a result of Defendant's

1  violations;

2    E.    Plaintiffs recover damages sustained by them, as proven in trial, and

3  that judgment in favor of Plaintiffs be entered against Defendant;

4    F.    Plaintiffs recover all lost profits that would have been realized by

5  them, as proven in trial;

6    G.    Plaintiffs recover the full value of the Distribution Agreement for the

7  remaining term based on Defendant's anticipatory breach of the contract;

8    H.    Defendant, its subsidiaries, affiliates, successors, transferees,

9  assignees, and its respective officers, directors, partners, agents, and employees

10  thereof and all other persons acting or claiming to act on its behalf be permanently

11  enjoined and restrained from continuing the actions alleged herein, including:

12        a. Continuing to sell and import its product into North America

13           outside of the exclusive distribution arrangement between

14           Samyang Korea and Plaintiffs;

15        b. Continuing to make unilateral changes to the payment terms

16           originally agreed upon by the parties;

17        c. Continuing to fail to change or delay in making changes to the

18           products so as to make them compliant with all applicable food

19           regulations in North America; and

20        d. Artificially raising prices of products sold to Plaintiffs other than

21           for reasons of an increase in the cost of manufacturing.

22    I.    Plaintiffs be awarded pre-judgment and post-judgment interest, and

23  that such interest be awarded at the highest legal rate from and after the date of

24  service of the initial complaint in this action;

25    J.    Plaintiffs be awarded exemplary and/or punitive damages against

26  Defendant;

27    K.    Plaintiffs recover their costs of this suit, including reasonable

28  attorneys' fees, as provided by the Distribution Agreement and by law; and

1      L.    Plaintiffs receive such other or further relief as may be just and

2  proper.

3              **VII.  DEMAND FOR JURY TRIAL**

4     Plaintiffs demand a trial by jury as to all issues so triable.

5  Dated:      May 12, 2016        SUH LAW GROUP, APC

6

7                       By: /s/ Edward Suh

8                        Edward Suh
                          Attorneys for Plaintiffs

9                       SAM YANG (U.S.A.), INC., ROYPAC,
                       INC. dba S.C. CONTINENT

10                    CORPORATION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 15

```
 1                UNITED STATES DISTRICT COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                      WEST DIVISION
     _____
 4   SAM YANG (USA), Inc.,      )
     ROYPAC, INC., dba SC        )
 5   CONTINENT CORPORATION,      )
                                 )
 6              Plaintiff,       )
                                 )
 7       vs.                     )
                                 ) Case No.
 8   SAMYANG FOODS CO., LTD,     ) 2:15-cv-07697 AB
     and DOES 1 through 20,      ) (KSx)
 9   inclusive,                  )
                                 )
10              Defendants.      )
     _____ )
11                               )
     SAMYANG FOODS CO., LTD      )
12                               )
         Counter-Claimant,       )
13                               )
            Vs.                  )
14                               )
     SAM YANG (USA), Inc.,       )
15   ROYPAC, INC., dba SC        )
     CONTINENT CORPORATION,      )
16   MUN-K YUNG CHEN, and        )
     DOES 1 through 20,          )
17   inclusive,                  )
                                 )
18       Counter-Defendants.     )
     _____ )
19
20       VIDEOTAPED DEPOSITION OF SEE-YOUNG LEE
                Los Angeles, California
21          Wednesday, September 13, 2017
                     Volume III
22
     Reported by:
23   Lori M. Barkley
     CSR No. 6426
24   Job No. 2704164
25   PAGES 233 - 344
```

Page 233

| | | |
|---|---|---|
| 1 | aware that Sam Yang Foods products were being sold on | 10:13:18 |
| 2 | the East Coast that had not been imported by Sam Yang | 10:13:22 |
| 3 | USA, correct? | 10:13:25 |
| 4 | A.   Yes. | 10:13:39 |
| 5 | Q.   And some of these products were being sold | 10:13:39 |
| 6 | at stores that were not Sam Yang USA's customers, | 10:13:41 |
| 7 | correct? | 10:13:52 |
| 8 | MR. MCDONOUGH:  Wait, no, no, no.  As | 10:13:52 |
| 9 | phrased that question is vague and ambiguous.  Also | 10:13:54 |
| 10 | misstates prior testimony. | 10:13:57 |
| 11 | You may answer. | 10:13:59 |
| 12 | THE WITNESS:  Yes. | 10:14:06 |
| 13 | BY MS. BOWMAN: | 10:14:07 |
| 14 | Q.   When did you first become aware that Sam | 10:14:12 |
| 15 | Yang products not imported by Sam Yang USA were being | 10:14:14 |
| 16 | sold on the East Coast? | 10:14:17 |
| 17 | MR. MCDONOUGH:  Just to be -- I understand | 10:14:30 |
| 18 | that you're laying a foundation, but so the record's | 10:14:31 |
| 19 | clear, it's asked and answered from the Volume II of | 10:14:33 |
| 20 | his deposition. | 10:14:36 |
| 21 | You may answer again. | 10:14:37 |
| 22 | THE WITNESS:  I returned to the company in | 10:15:08 |
| 23 | year 2000, and maybe three to four years after my | 10:15:10 |
| 24 | return to the company, I became aware. | 10:15:17 |
| 25 | | |

Page 242

```
 1    BY MS. BOWMAN:                                    10:15:21

 2         Q.   How did you become aware?              10:15:21

 3         A.   I was contacted by a business partner. 10:15:34

 4         Q.   Which business partner?                10:15:36

 5         A.   Those would be wholesalers to whom we  10:15:45

 6    provided products.                               10:15:50

 7         Q.   Did these wholesalers tell you how they 10:15:52

 8    learned that Sam Yang products not imported by Sam 10:15:56

 9    Yang USA were being sold on the East Coast?       10:16:01

10         A.   Well, they saw products that were not  10:16:37

11    imported by us in the markets, that is why they  10:16:46

12    contacted us.                                     10:16:50

13         Q.   Did they tell you which markets they saw the 10:16:51

14    products in?                                      10:16:53

15         A.   At the time, I probably knew, but it's been 10:17:36

16    a long time, so I don't recall, and furthermore, I 10:17:39

17    really did not pay too much attention to those,   10:17:43

18    because those were in small quantities.  And from 10:17:46

19    time to time, small quantity of products that were 10:17:51

20    manufactured for domestic use in Korea would be   10:17:56

21    coming in with stickers on them from time to time in 10:18:01

22    small quantities, and those wholesalers who told us 10:18:06

23    about that did not know who brought those products 10:18:12

24    in.                                               10:18:16

25         Q.   So at that time, around 2003 or 2004, you 10:18:17
```

Page 243

```
 1    stores where they saw those Sam Yang products?        10:20:04
 2        A.   I don't recall.                              10:20:13
 3        Q.   Did you ever contact any of the stores that  10:20:13
 4    you believed were selling Sam Yang products not       10:20:22
 5    imported by Sam Yang USA?                             10:20:24
 6        A.   At a later date, store such as H Mart        10:20:51
 7    contacted me as well.                                 10:20:56
 8        Q.   So in 2003 -- I'm sorry.                     10:21:21
 9        A.   However, the quantity was so small that I    10:21:24
10    really did not pay that much attention, and I did     10:21:29
11    contact Sam Yang Korea as to let me know which        10:21:34
12    company did packaging for that.                       10:21:43
13        Q.   So in 2003, other than contacting Sam Yang   10:21:46
14    Korea, you did not contact any of the stores who you  10:21:49
15    believe were selling Sam Yang products, correct?      10:21:54
16        A.   We tried to find out around 2007 and 2008    10:22:32
17    timeframe, but we could not find out, because -- we   10:22:38
18    could not find out, and also, Sam Yang Korea could    10:23:03
19    not find out who it was, because the quantity of the  10:23:06
20    product was so small and some small amount will come  10:23:11
21    out -- come in, and then another small quantity will  10:23:17
22    come in, shipped along with other products.           10:23:24
23        Q.   Mr. Lee, you're still telling me about later 10:23:27
24    dates, 2007 and 2008, and I'm still trying to get an  10:23:30
25    answer to whether in 2003 you ever contacted any      10:23:34
```

Page 245

| | | |
|---|---|---|
| 1 | stores regarding the products on the East Coast. | 10:23:38 |
| 2 | A.    2003, 2004, at that time, we did not have a | 10:24:30 |
| 3 | direct business with stores.  Therefore, we could | 10:24:38 |
| 4 | only find out through wholesalers, and at the time, | 10:24:39 |
| 5 | we asked those wholesaler, but we were notified by | 10:24:44 |
| 6 | the wholesalers that they, themselves, did not know. | 10:24:48 |
| 7 | Q.    If -- so are you telling me that the | 10:24:56 |
| 8 | wholesalers did not know where they saw the Sam Yang | 10:25:00 |
| 9 | products on the East Coast that they told you were | 10:25:02 |
| 10 | being sold in 2003? | 10:25:05 |
| 11 | A.    No, that's not what I mean.  I am saying | 10:25:39 |
| 12 | that the wholesalers told me that they did not know | 10:25:42 |
| 13 | who brought in the product to the stores, and I'm | 10:25:46 |
| 14 | talking about those products that were bought in | 10:25:54 |
| 15 | other than my company, with stickers on them, and | 10:25:55 |
| 16 | these are products that were brought in by small | 10:26:01 |
| 17 | businesses. | 10:26:04 |
| 18 | Q.    Okay.  I'm asking you a different question. | 10:26:05 |
| 19 | I'm talking about the stores who were actually | 10:26:07 |
| 20 | selling the products. | 10:26:09 |
| 21 | And my question is:  When you found out who | 10:26:10 |
| 22 | the stores were who were selling Sam Yang products | 10:26:13 |
| 23 | did you ever contact any of those stores in 2003? | 10:26:16 |
| 24 | A.    No, I did not. | 10:26:51 |
| 25 | Q.    Okay. | 10:26:52 |

Page 246

| | | |
|---|---|---|
| 1 | A.   And the reason for that is that the quantity | 10:27:03 |
| 2 | of the product was very, very small, so I did not pay | 10:27:08 |
| 3 | that much attention to it. | 10:27:14 |
| 4 | Q.   Okay.  I'd like to look at Exhibit 1051C, | 10:27:15 |
| 5 | please. | 10:27:40 |
| 6 | (Exhibit 1051C was marked for identification | |
| 7 | by the court reporter and is attached hereto.) | 10:28:12 |
| 8 | BY MS. BOWMAN: | 10:28:12 |
| 9 | Q.   And please take a look and let me know when | 10:28:12 |
| 10 | you've had a chance to review the document. | 10:28:15 |
| 11 | A.   Okay. | 10:29:33 |
| 12 | Q.   Okay.  And this is a document, it appears to | 10:29:33 |
| 13 | be a fax dated June 12, 2008, and it is from Senior | 10:29:40 |
| 14 | Manager Woon-bae Yeo.  Now, in number 2 on this | 10:29:45 |
| 15 | document, it refers to large volumes of products for | 10:29:53 |
| 16 | domestic consumption being imported into the eastern | 10:29:58 |
| 17 | region of the U.S. | 10:30:01 |
| 18 | Do you recall what the volume of products | 10:30:03 |
| 19 | was? | 10:30:06 |
| 20 | A.   What do you mean by volume? | 10:30:43 |
| 21 | Q.   The quantity, where it says that a large | 10:30:46 |
| 22 | quantity of products. | 10:30:49 |
| 23 | MR. MCDONOUGH:  And to be clear, she's | 10:30:58 |
| 24 | referring to this time period as referenced in this | 10:30:59 |
| 25 | document. | 10:31:02 |

Page 247

```
 1      Q.   Did you ask for the names of those stores?      10:43:26

 2      A.   I think I asked but I don't recall what the     10:43:55

 3   circumstances was exactly and at the time we did not    10:43:58

 4   do business directly with those stores and it was       10:44:03

 5   them who had the relationship with those markets.       10:44:07

 6      Q.   When you say "them," do you mean the            10:44:11

 7   wholesale customers of Sam Yang USA and Roypac?         10:44:14

 8      A.   Yes.   I'm referring to these three companies   10:44:28

 9   that's listed here.                                     10:44:32

10      Q.   Okay.  So you did not contact any of the        10:44:33

11   stores that you believed were selling Sam Yang          10:44:36

12   products not imported by Sam Yang USA at that time,     10:44:39

13   correct?                                                10:44:42

14      A.   Correct.                                        10:44:57

15      Q.   And in 2008 you did not sue any of the          10:44:58

16   stores that you believed were selling Sam Yang          10:45:01

17   products not imported by Sam Yang USA, correct?         10:45:05

18      A.   Correct.                                        10:45:21

19      Q.   And when I say "you" neither Roypac nor Sam     10:45:30

20   Yang USA sold -- I'm sorry, sued any of those stores,   10:45:37

21   correct?                                                10:45:40

22      A.   Correct.                                        10:45:51

23      Q.   Okay.  Did you speak with Sam Yang Korea        10:45:51

24   about the complaints that you received from the three   10:46:02

25   wholesale customers listed on this document 1051C in    10:46:08
```

Page 252

| | | |
|---|---|---|
| 1 | 2008? | 10:46:12 |
| 2 | A.   Yes. | 10:46:32 |
| 3 | Q.   And did you ask Sam Yang Korea to take any | 10:46:32 |
| 4 | action when you informed them of those complaints? | 10:46:38 |
| 5 | A.   As to action, not really, because of the | 10:47:13 |
| 6 | quantity was too -- kind of small, but I did ask them | 10:47:19 |
| 7 | to prevent those product from being shipped into the | 10:47:24 |
| 8 | U.S. if -- if they could find out who it was. | 10:47:31 |
| 9 | Q.   Did you think that Sam Yang Korea had the | 10:47:39 |
| 10 | ability to stop the products from being imported into | 10:47:42 |
| 11 | the U.S. in 2008? | 10:47:45 |
| 12 | A.   We couldn't do it and I felt that Sam Yang | 10:48:10 |
| 13 | Korea probably could do it.  That is why I asked | 10:48:16 |
| 14 | them. | 10:48:19 |
| 15 | Q.   Okay.  Other than Sam Yang Korea, did you | 10:48:20 |
| 16 | ask any other stores, entities, or wholesalers to | 10:48:30 |
| 17 | take steps to stop the import of products by entities | 10:48:34 |
| 18 | other than Sam Yang USA in 2008? | 10:48:40 |
| 19 | A.   Whom are you referring to?  Whom or what | 10:49:16 |
| 20 | entity are you referring to? | 10:49:19 |
| 21 | Q.   Well, that's what I'm asking you, but I | 10:49:21 |
| 22 | suppose, did you contact any other stores who were | 10:49:24 |
| 23 | selling Sam Yang products not imported by Sam Yang | 10:49:28 |
| 24 | USA in 2008? | 10:49:31 |
| 25 | MR. MC DONOUGH:  Asked and answered. | 10:49:45 |

Page 253

```
 1    BY MS. BOWMAN:                                   10:49:46
 2       Q.   To ask them to stop importing Sam Yang -- or  10:49:47
 3    I'm sorry, strike that.                          10:49:50
 4              To ask them to stop selling Sam Yang   10:49:51
 5    products not imported by Sam Yang USA?           10:49:53
 6              MR. MC DONOUGH:  Asked and answered.  It's  10:50:16
 7    also vague and ambiguous now, the way it's phrased.  10:50:17
 8              You may try.                           10:50:20
 9              THE WITNESS:  That question is kind of  10:50:30
10    strange and ambiguous.                           10:50:31
11    BY MS. BOWMAN:                                   10:50:34
12       Q.   Well, it came in a couple of parts, so I'll  10:50:35
13    try to ask a better question.                    10:50:38
14              In 2008, did you contact any stores that  10:50:39
15    were selling Sam Yang products that weren't imported  10:50:44
16    by Sam Yang USA or Roypac in order to ask those  10:50:47
17    stores to stop selling Sam Yang products that weren't  10:50:53
18    imported by Sam Yang USA or Roypac?              10:50:56
19       A.   No, I did not.                           10:50:58
20              MS. BOWMAN:  Okay.  Can we please look at  10:51:28
21    Exhibit 1051D.                                   10:51:29
22              (Exhibit 1051D was marked for identification  10:51:53
23         by the court reporter and is attached hereto.)  10:51:53
24    BY MS. BOWMAN:                                   10:51:54
25       Q.   Mr. Lee, please let me know when you've had  10:51:54
```

Page 254

```
 1          Q.   So where did you get these two names from:     11:02:36

 2   DY Import and Seohae Fishery?  And by "you," I mean        11:02:38

 3   Roypac or Sam Yang USA?                                    11:02:45

 4          MR. MC DONOUGH:  Lacks foundation, calls for        11:03:02

 5   speculation.  He's not the author of the document.         11:03:04

 6          You may answer.                                     11:03:06

 7          THE WITNESS:  As I told you before, I heard         11:03:22

 8   it from our business partners.                             11:03:23

 9   BY MS. BOWMAN:                                             11:03:28

10          Q.   Okay.  So I believe what you told me before    11:03:28

11   was that you heard that the products were being sold       11:03:30

12   by your business partners.  So just to confirm, did        11:03:33

13   your business partners tell you that DY Import and         11:03:36

14   Seohae Fishery were importing Sam Yang products into       11:03:40

15   the United States at this time, 2008?                      11:03:43

16          A.   I don't know about the quantity.  I know the   11:04:32

17   products were brought in and those products were for       11:04:35

18   domestic use, so I didn't think that large of a            11:04:42

19   quantity were -- were brought in.                          11:04:46

20          Q.   Mr. Lee, you're not answering my question at   11:04:48

21   all.  What I'm specifically asking you is and --           11:04:52

22          MR. MC DONOUGH:  She's going to try to              11:04:58

23   ask -- she's going to ask a question.                      11:05:00

24   BY MS. BOWMAN:                                             11:05:03

25          Q.   What I'm asking you is number 8 of this        11:05:03
```

Page 258

| | | |
|---|---|---|
| 1 | document says that there are domestic use products | 11:05:05 |
| 2 | for Korea that have been imported by DY Imports and | 11:05:07 |
| 3 | by Seohae Fishery, and that's in this document that | 11:05:12 |
| 4 | we're look at, 1051 D. | 11:05:16 |
| 5 | I'm asking you what the basis was for Roypac | 11:05:18 |
| 6 | or Sam Yang USA's assertion here that the products | 11:05:22 |
| 7 | are being imported by DY Import and Seohae Fishery. | 11:05:25 |
| 8 | MR. MC DONOUGH:  And just I'm reasserting | 11:05:33 |
| 9 | the objection lacks foundation, calls for | 11:05:35 |
| 10 | speculation, insofar as Mr. Lee did not author this | 11:05:36 |
| 11 | particular document. | 11:05:39 |
| 12 | You may answer. | 11:05:40 |
| 13 | THE WITNESS:  We were contacted by our | 11:06:44 |
| 14 | business partners in that region such as Rhee | 11:06:46 |
| 15 | Brothers or Hanmi? | 11:06:54 |
| 16 | BY MS. BOWMAN: | |
| 17 | Q.   Did you -- in 2008, did anyone at Roypac or | 11:07:03 |
| 18 | Sam Yang USA ever contact DY Import to ask if they | 11:07:07 |
| 19 | were importing Sam Yang products into the United | 11:07:09 |
| 20 | States? | 11:07:26 |
| 21 | THE INTERPRETER:  Was the contact | 11:07:26 |
| 22 | "DY Import" there in that question? | 11:07:28 |
| 23 | MS. BOWMAN:  "DY Import." | 11:07:31 |
| 24 | THE WITNESS:  I don't remember. | 11:07:47 |
| 25 | | |

Page 259

| | | |
|---|---|---|
| 1 | BY MS. BOWMAN: | 11:07:48 |
| 2 | Q.   But you never sued DY Import for importing | 11:07:51 |
| 3 | Sam Yang products into the United States in 2008, | 11:07:55 |
| 4 | correct? | 11:07:58 |
| 5 | A.   Correct. | 11:08:11 |
| 6 | Q.   And you never contacted Seohae Fishery to | 11:08:12 |
| 7 | ask if they were importing Sam Yang products into the | 11:08:14 |
| 8 | United States in 2008, correct? | 11:08:18 |
| 9 | MR. MC DONOUGH:  Argumentative.  Misstates | 11:08:19 |
| 10 | testimony. | 11:08:21 |
| 11 | You may answer. | 11:08:21 |
| 12 | It's also asked and answered. | 11:08:33 |
| 13 | THE WITNESS:  Correct. | 11:08:38 |
| 14 | BY MS. BOWMAN: | 11:08:38 |
| 15 | Q.   And you never sued Seohae Fishery in 2008 | 11:08:40 |
| 16 | for importing Sam Yang products into the United | 11:08:42 |
| 17 | States, correct? | 11:08:45 |
| 18 | A.   Correct. | 11:08:58 |
| 19 | Q.   You only contacted Sam Yang Korea to ask | 11:08:58 |
| 20 | them to stop products from being imported in 2008, | 11:09:00 |
| 21 | correct? | 11:09:03 |
| 22 | MR. MC DONOUGH:  That question totally | 11:09:17 |
| 23 | misstates his testimony as to what he contacted Sam | 11:09:18 |
| 24 | Yang Korea about and asked them to do. | 11:09:23 |
| 25 | You may answer. | 11:09:24 |

Page 260

| | | |
|---|---|---|
| 1 | THE WITNESS:  That's correct. | 11:09:33 |
| 2 | MS. BOWMAN:  Okay.  And for the record, I'm | 11:09:34 |
| 3 | not attempting to restate the witness's testimony. | 11:09:36 |
| 4 | I'm merely asking questions that are trying to | 11:09:39 |
| 5 | advance the information we're getting. | 11:09:41 |
| 6 | MR. MC DONOUGH:  Been an hour if -- looks | 11:09:50 |
| 7 | like you're transitioning. | 11:09:52 |
| 8 | MS. BOWMAN:  I'm not actually.  I have a | 11:09:54 |
| 9 | couple more things on -- | 11:09:56 |
| 10 | MR. MC DONOUGH:  Why don't we take a break | 11:09:56 |
| 11 | anyway, it's been an hour.  All right.  Thanks. | 11:09:58 |
| 12 | MS. BOWMAN:  Sure. | 11:10:00 |
| 13 | VIDEO OPERATOR:  Off the record, 11:09. | 11:10:03 |
| 14 | | |
| 15 | (Recess taken.) | |
| 16 | | 11:28:38 |
| 17 | VIDEO OPERATOR:  Time is 11:30.  We are back | 11:30:52 |
| 18 | on the record. | 11:30:55 |
| 19 | BY MS. BOWMAN: | 11:30:56 |
| 20 | Q.   Okay.  And before we start with questions, I | 11:30:56 |
| 21 | just want to make clear for the record, which counsel | 11:30:59 |
| 22 | mentioned a couple of times, that when I say "you," | 11:31:02 |
| 23 | I'm referring to Roypac or Sam Yang USA. | 11:31:07 |
| 24 | And if I am referring to you personally, | 11:31:10 |
| 25 | Mr. Lee, I will make that clear in the question so | 11:31:12 |

Page 261

| | | |
|---|---|---|
| 1 | that there's no confusion. | 11:31:14 |
| 2 | A.   Understood. | 11:31:47 |
| 3 | MR. MC DONOUGH:   That is understood. | 11:31:47 |
| 4 | And if you're ever confused, just ask her, | 11:31:48 |
| 5 | okay? | 11:31:52 |
| 6 | THE WITNESS:   Understood. | 11:31:59 |
| 7 | BY MS. BOWMAN: | 11:32:00 |
| 8 | Q.   Thank you. | 11:32:02 |
| 9 | Okay.  Mr. Lee, I believe you testified that | 11:32:02 |
| 10 | you were aware of Sam Yang products not imported by | 11:32:07 |
| 11 | Sam Yang USA being sold on the East Coast around 2003 | 11:32:10 |
| 12 | and 2004, and that you also received complaints from | 11:32:14 |
| 13 | customers in 2008, but did you receive any complaints | 11:32:18 |
| 14 | from your customers about imports of Sam Yang | 11:32:22 |
| 15 | products between 2004 and 2008? | 11:32:27 |
| 16 | A.   I had been contacted in regards to small | 11:33:26 |
| 17 | quantity of products that were brought in.  However, | 11:33:30 |
| 18 | since the quantity was so small, that I did not make | 11:33:36 |
| 19 | that into a big issue. | 11:33:42 |
| 20 | Q.   How many times were you contacted by | 11:33:44 |
| 21 | customers about imports of Sam Yang products between | 11:33:48 |
| 22 | 2004 and 2008? | 11:33:52 |
| 23 | A.   I don't remember. | 11:34:10 |
| 24 | Q.   Do you know if it was more than ten times? | 11:34:10 |
| 25 | A.   I would not be -- I would not know that, | 11:34:26 |

Page 262

| | | |
|---|---|---|
| 1 | A.   No, that's not what I'm saying.  The | 12:26:39 |
| 2 | products came into the U.S., so I inquired about that | 12:26:48 |
| 3 | to Sam Yang Korea, but Sam Yang Korea told me they | 12:26:54 |
| 4 | did not know about that. | 12:26:58 |
| 5 | Q.   My question is what you were referring to | 12:26:59 |
| 6 | when you said "after June 2012" in the prior answer. | 12:27:03 |
| 7 | A.   Well, that's when I became aware of T-Up and | 12:27:41 |
| 8 | then the products were being brought in in the units | 12:27:46 |
| 9 | of containers.  So I inquired to Korea as to whether | 12:27:51 |
| 10 | or not they're shipping goods through T-Up because I | 12:28:00 |
| 11 | was suspicious of the Sam Yang Korea.  But Sam Yang | 12:28:02 |
| 12 | Korea denied it and told me that they did not know. | 12:28:08 |
| 13 | Q.   Why were you suspicious of Sam Yang Korea? | 12:28:12 |
| 14 | A.   I was suspicious because of the products | 12:28:40 |
| 15 | were coming in in the unit of container.  So if they | 12:28:42 |
| 16 | were to ship something full of a container, that it | 12:28:46 |
| 17 | may have been Sam Yang Korea.  That is why I asked | 12:28:52 |
| 18 | Sam Yang Korea directly:  Are you shipping these | 12:28:58 |
| 19 | goods.  And I was told that Sam Yang Korea was not. | 12:29:02 |
| 20 | Q.   Okay.  So you believe shipping in a | 12:29:09 |
| 21 | container was more likely to be a product -- a | 12:29:12 |
| 22 | product shipped by Sam Yang Korea versus small | 12:29:21 |
| 23 | quantities were less likely to be shipped by Sam Yang | 12:29:24 |
| 24 | Korea? | 12:29:39 |
| 25 | A.   I was suspicious. | 12:29:39 |

Page 281

```
 1              (Whereupon at the hour of

 2              12:35 p.m., a luncheon recess was

 3              taken.  The deposition was resumed

 4              at 1:49 p.m., the same persons being

 5              present.)

 6                                                    13:51:43

 7              VIDEO OPERATOR:  The time is 1:51.  We are   13:51:56

 8      back on the record.                           13:52:00

 9              MS. BOWMAN:  And just a correction:  The   13:52:14

10      document that I circulated is Exhibit 1136.   13:52:16

11              (Exhibit 1136 was marked for identification   13:52:54

12          by the court reporter and is attached hereto.)   13:52:54

13      BY MS. BOWMAN:                                13:52:54

14          Q.   And please just let me know once you've had   13:52:55

15      a chance to look at the document, Mr. Lee?    13:52:58

16          A.   Okay.                                13:53:23

17          Q.   Mr. Lee, have you seen this kind of document   13:53:23

18      before?                                       13:53:30

19          A.   Yes.                                 13:53:31

20          Q.   Okay.  And what kind of document is this?   13:53:33

21          A.   In relating to BL, B/L.              13:53:44

22          Q.   What is B/L?                         13:53:50

23          A.   It stands for bill of lading.        13:53:56

24          Q.   Okay.  And is this a type of shipment   13:53:58

25      document?                                     13:54:01
```

                                                      Page 284

| | | |
|---|---|---|
| 1 | A.    Yes. | 13:54:02 |
| 2 | Q.    Is this type of document publicly available? | 13:54:05 |
| 3 | MR. MC DONOUGH:  Vague, ambiguous, | 13:54:16 |
| 4 | overbroad, particularly as to time. | 13:54:19 |
| 5 | You may answer. | 13:54:20 |
| 6 | THE WITNESS:  Yes. | 13:54:27 |
| 7 | BY MS. BOWMAN: | 13:54:28 |
| 8 | Q.    Okay.  Is there any way, looking at this | 13:54:29 |
| 9 | document, that you would be able to tell whether -- | 13:54:35 |
| 10 | whether it was in any way related to Sam Yang Korea? | 13:54:40 |
| 11 | A.    Just by looking at the document, no, but I | 13:55:02 |
| 12 | have a lot of suspicion about this. | 13:55:07 |
| 13 | Q.    Okay. | 13:55:11 |
| 14 | THE INTERPRETER:  Interpreter correction: | 13:55:19 |
| 15 | Just by looking at the document, no, but we had a lot | 13:55:21 |
| 16 | of suspicion about this. | 13:55:24 |
| 17 | BY MS. BOWMAN: | 13:55:30 |
| 18 | Q.    What was the basis for your suspicion? | 13:55:31 |
| 19 | A.    Well, where it says instant noodles with | 13:55:58 |
| 20 | soup base, that means it's in regards to Ramen, so if | 13:56:04 |
| 21 | this is about shipping Ramen, that's where our | 13:56:10 |
| 22 | suspicion was. | 13:56:15 |
| 23 | Q.    This could be any company shipping Ramen, | 13:56:17 |
| 24 | correct; not necessarily Sam Yang Korea? | 13:56:19 |
| 25 | A.    We asked Sam Yang Korea whether or not they | 13:56:49 |

Page 285

| | | |
|---|---|---|
| 1 | shipped the product, many times, but they denied it. | 13:56:54 |
| 2 | Q.   My question is, that these products could | 13:57:07 |
| 3 | have been shipped by any Ramen manufacturer, correct, | 13:57:16 |
| 4 | not necessarily Sam Yang Korea? | 13:57:19 |
| 5 | MR. MC DONOUGH:  Speculation, lacks | 13:57:21 |
| 6 | foundation. | 13:57:22 |
| 7 | You may answer. | 13:57:22 |
| 8 | THE WITNESS:  We suspected it was Sam Yang | 13:57:55 |
| 9 | Korea that shipped Sam Yang Ramen products, because | 13:58:00 |
| 10 | ENI handles Sam Yang Ramen. | 13:58:07 |
| 11 | BY MS. BOWMAN: | 13:58:13 |
| 12 | Q.   When did you first become aware that ENI was | 13:58:13 |
| 13 | handling Sam Yang Ramen? | 13:58:17 |
| 14 | A.   Can you repeat that question once more? | 13:58:32 |
| 15 | Q.   Sure. | 13:58:34 |
| 16 | When did you first become aware that ENI was | 13:58:35 |
| 17 | handling Sam Yang Ramen? | 13:58:38 |
| 18 | A.   That was January 2017. | 13:58:53 |
| 19 | MR. MC DONOUGH:  I'd say, retroactively, | 13:58:55 |
| 20 | vague and ambiguous as to handling. | 13:58:59 |
| 21 | You may answer, you already have. | 13:59:01 |
| 22 | BY MS. BOWMAN: | 13:59:07 |
| 23 | Q.   Okay.  But this document is dated 2015, | 13:59:10 |
| 24 | correct?  And specifically I'm referring to the | 13:59:12 |
| 25 | arrival dates on the first page of the document Bates | 13:59:21 |

Page 286

| | | |
|---|---|---|
| 1 | those small bundle merchants, those small quantities | 14:02:54 |
| 2 | could be bought from Cheongnyangni and Yeongdeungpo | 14:02:59 |
| 3 | and those products would have stickers on them and | 14:03:03 |
| 4 | then brought into the U.S. | 14:03:09 |
| 5 | But if we look this document it lists | 14:03:10 |
| 6 | different containers like this.  So for shipments | 14:03:16 |
| 7 | that is shipped in container full, as described here, | 14:03:21 |
| 8 | could only be from Sam Yang Korea.  That is why I | 14:03:26 |
| 9 | thought that. | 14:03:30 |
| 10 | BY MS. BOWMAN: | 14:03:31 |
| 11 | Q.   I see. | 14:03:31 |
| 12 | Mr. Lee, if you wanted to search for a | 14:03:38 |
| 13 | document like this from Sam Yang Korea, would you | 14:03:40 |
| 14 | know how to search specifically for shipments that | 14:03:43 |
| 15 | were brought in by Sam Yang Korea? | 14:03:47 |
| 16 | MR. MC DONOUGH:  Vague and ambiguous. | 14:04:11 |
| 17 | You may answer. | 14:04:12 |
| 18 | THE WITNESS:  Can you repeat that once more? | 14:04:16 |
| 19 | BY MS. BOWMAN: | 14:04:18 |
| 20 | Q.   Sure. | 14:04:18 |
| 21 | So if you wanted to identify a document like | 14:04:19 |
| 22 | this that contains shipments that were provided by | 14:04:22 |
| 23 | Sam Yang Korea, would you know how to search for a | 14:04:27 |
| 24 | document like this? | 14:04:29 |
| 25 | MR. MC DONOUGH:  Same objections.  Vague and | 14:04:48 |

Page 288

| | | |
|---|---|---|
| 1 | A.   I don't recall. | 14:18:25 |
| 2 | Q.   Prior to 2013, did you ever attempt to look | 14:18:25 |
| 3 | for documents showing a relationship between Sam Yang | 14:18:30 |
| 4 | Korea and T-Up? | 14:18:33 |
| 5 | A.   The products started to come in randomly | 14:19:06 |
| 6 | from year 2012.  So from that point on, we started to | 14:19:13 |
| 7 | search as to where these products were coming from. | 14:19:21 |
| 8 | Q.   Okay.  Prior to 2012, did you search for | 14:19:26 |
| 9 | documents showing a relationship between Sam Yang | 14:19:36 |
| 10 | Korea and any other distributor or importer? | 14:19:40 |
| 11 | A.   Prior to that, although I don't recall, I | 14:20:17 |
| 12 | don't think we did, because we started to become | 14:20:21 |
| 13 | suspicious when the products started to come in in | 14:20:26 |
| 14 | the unit of containers. | 14:20:31 |
| 15 | Q.   So you never searched for any documents in | 14:20:35 |
| 16 | 2008 showing relationship between Sam Yang Korea and | 14:20:38 |
| 17 | Seohae Fishery? | 14:20:43 |
| 18 | A.   Correct. | 14:20:57 |
| 19 | Q.   Okay.  Mr. Lee, I believe you said earlier | 14:20:58 |
| 20 | that at least prior to Michael Gin working for | 14:21:14 |
| 21 | Roypac, you were the primary person at Roypac who was | 14:21:17 |
| 22 | responsible for handling FDA compliance issues, | 14:21:19 |
| 23 | correct? | 14:21:26 |
| 24 | MR. MC DONOUGH:  Slightly misstates | 14:21:42 |
| 25 | testimony. | 14:21:44 |

Page 294

| | | |
|---|---|---|
| 1 | to.  I have one more section left. | 16:28:58 |
| 2 | THE INTERPRETER:  The interpreter would like | 16:29:01 |
| 3 | a break. | 16:29:02 |
| 4 | MR. MC DONOUGH:  Let's take a break. | 16:29:03 |
| 5 | THE INTERPRETER:  Thank you. | 16:29:04 |
| 6 | MS. BOWMAN:  Okay. | 16:29:04 |
| 7 | VIDEO OPERATOR:  Off the record, 4:28. | 16:29:05 |
| 8 | | |
| 9 | (Recess taken.) | |
| 10 | | 16:48:46 |
| 11 | VIDEO OPERATOR:  Okay.  The time is 4:49. | 16:49:55 |
| 12 | We are back on the record. | 16:49:57 |
| 13 | BY MS. BOWMAN: | 16:49:59 |
| 14 | Q.  Mr. Lee, prior to 2015, did Sam Yang USA | 16:50:00 |
| 15 | ever apply to register any Sam Yang trademarks? | 16:50:05 |
| 16 | A.  I don't remember. | 16:50:28 |
| 17 | Q.  Was the first trademark application for Sam | 16:50:30 |
| 18 | Yang product that Sam Yang USA filed, the 2015 | 16:50:35 |
| 19 | application filed after this lawsuit was filed? | 16:50:39 |
| 20 | A.  I don't know the date exactly. | 16:51:04 |
| 21 | Q.  Is it your understanding that Sam Yang USA | 16:51:05 |
| 22 | applied to register a Sam Yang trademark in 2015? | 16:51:13 |
| 23 | A.  Can you repeat that, please. | 16:51:27 |
| 24 | MS. BOWMAN:  Can I have the question | 16:51:29 |
| 25 | translated back? | 16:51:30 |

Page 326

| | | |
|---|---|---|
| 1 | States but you're not sure why? | 17:25:30 |
| 2 | A.   I don't know if this is a correct example or | 17:26:43 |
| 3 | not, but I read it on the newspaper long time ago | 17:26:47 |
| 4 | that someone or some entity in the U.S. registered | 17:26:53 |
| 5 | the trademark of a big company in Korea and that | 17:26:59 |
| 6 | registration was canceled in the U.S., that's what I | 17:27:07 |
| 7 | read in the newspaper. | 17:27:15 |
| 8 | And it is my belief that trademark rights of | 17:27:16 |
| 9 | Sam Yang in North America lies with Sam Yang USA.  So | 17:27:21 |
| 10 | if some other person or entity had registered, maybe | 17:27:29 |
| 11 | that would become a legal fight. | 17:27:36 |
| 12 | Q.   But you didn't think it was necessary to | 17:27:39 |
| 13 | check whether any other entity had registered? | 17:27:43 |
| 14 | A.   Trademark is currently registered so I do | 17:28:08 |
| 15 | not believe checking is necessary now. | 17:28:10 |
| 16 | Q.   I'm not talking about now.  I'm talking | 17:28:18 |
| 17 | about in the past at any point between 1998 and 2015. | 17:28:20 |
| 18 | A.   Some other entity registering the trademark, | 17:29:40 |
| 19 | that's really not possible, and I believe we are | 17:29:43 |
| 20 | continuously checking.  I'm not saying that our | 17:29:46 |
| 21 | company's checking, but our team of attorneys are | 17:29:49 |
| 22 | doing so. | 17:29:54 |
| 23 | And as to Sam Yang's trademark being | 17:29:55 |
| 24 | registered, I don't think it is a problem, because | 17:30:03 |
| 25 | trademark rights lies with Sam Yang USA.  And since a | 17:30:08 |

Page 338

| | | |
|---|---|---|
| 1 | trademark is already registered, so I don't think | 17:30:15 |
| 2 | it's a -- I don't think it's worth talking about. | 17:30:18 |
| 3 | Q.   Okay.  So apparently your continuous | 17:30:24 |
| 4 | searches did not reveal that Sam Yang Korea had | 17:30:27 |
| 5 | registered the Sam Yang trademark in 2005, correct, | 17:30:31 |
| 6 | since you attempted to register the same trademark in | 17:30:35 |
| 7 | 2015? | 17:30:38 |
| 8 | A.   Sam Yang Korea was supposed to notify Sam | 17:31:27 |
| 9 | Yang USA if they were going to register the trademark | 17:31:31 |
| 10 | in the U.S.  Since they did not notify Sam Yang USA, | 17:31:35 |
| 11 | I believe that to be breach of agreement. | 17:31:41 |
| 12 | Q.   So the answer is:  No, your searches did not | 17:31:49 |
| 13 | reveal that Sam Yang had registered the Sam Yang | 17:31:56 |
| 14 | trademark in 2005? | 17:31:59 |
| 15 | THE INTERPRETER:  Excuse me, is it 2015 or | 17:32:17 |
| 16 | 2005? | 17:32:19 |
| 17 | MS. BOWMAN:  What I just said? | 17:32:20 |
| 18 | THE INTERPRETER:  Yeah. | 17:32:21 |
| 19 | MS. BOWMAN:  It's 2005. | 17:32:22 |
| 20 | THE INTERPRETER:  Okay. | 17:32:23 |
| 21 | MR. MC DONOUGH:  She said Sam Yang, but I | 17:32:23 |
| 22 | think she's intending to say Sam Yang Korea. | 17:32:25 |
| 23 | THE WITNESS:  I don't know about that. | 17:32:44 |
| 24 | BY MS. BOWMAN: | 17:32:47 |
| 25 | Q.   Okay.  Has Sam Yang USA ever licensed Sam | 17:32:47 |

Page 339

```
 1    STATE OF CALIFORNIA        ) ss.

      COUNTY OF LOS ANGELES      )

 2              I, Lori M. Barkley, CSR No. 6426, do hereby

 3    certify:

 4              That the foregoing deposition testimony

 5    taken before me at the time and place therein set

 6    forth and at which time the witness was administered

 7    the oath;

 8              That the testimony of the witness and all

 9    objections made by counsel at the time of the

10    examination were recorded stenographically by me, and

11    were thereafter transcribed under my direction and

12    supervision, and that the foregoing pages contain a

13    full, true and accurate record of all proceedings and

14    testimony to the best of my skill and ability.

15              I further certify that I am neither counsel

16    for any party to said action, nor am I related to any

17    party to said action, nor am I in any way interested

18    in the outcome thereof.

19              IN WITNESS WHEREOF, I have subscribed my

20    name this 2nd day of October, 2017.

21

22

23

24              _____

25              LORI M. BARKLEY, CSR No. 6426
```

Page 344